UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LANNY SMITH,<br><br>                    Petitioner,<br><br>        v.<br><br>LAWRENCE G. WASDEN, Idaho Attorney General, and BRENT REINKE, Director of the Idaho Department of Correction,<br><br>                    Respondents. | Case No. 4:08-cv-00227-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

Respondents have filed their Response to the non-dismissed claims in this habeas corpus matter, Petitioner has submitted a Reply, and those claims are now at issue. (Dkts. 94, 100.) Also pending are Petitioner's second and third motions for discovery. (Dkts. 92, 104.) The parties have adequately stated the facts and the law in their briefing, and the Court will resolve these matters on the record without oral argument. D. Idaho L. Civ. R. 7.1(d)(1).

For the reasons set forth more fully below, the Court will deny relief on the remaining claims in the Amended Petition. The Court also concludes that further evidentiary development through additional discovery or an evidentiary hearing is not warranted. Finally, the Court will issue a certificate of appealability over its resolution of

**MEMORANDUM DECISION AND ORDER - 1**

Claim C (ineffective assistance of counsel; limited to subpart 4) and its denial of discovery related to that claim.

## BACKGROUND

In March of 1992, Leo and Mary Yvonne Downard were shot to death in their home in Ammon, Idaho. The Downards were most likely killed late night on March 21 or early in the morning on March 22, but their bodies were not discovered for another three days. Jeff Smith was the last person to be seen at the Downard's home on March 21, and the State initially charged him with first-degree murder, but the case was dismissed after a preliminary hearing. The investigation then shifted to Jeff's brother, Lanny (the "Petitioner" herein). After the State developed new evidence, Petitioner was charged and convicted of murdering the Downards.

Petitioner is currently serving a controlling sentence of life in prison without the possibility of parole. Because he continues to claim that he is innocent of these crimes and that Jeff is the more likely perpetrator, the factual background will be recited in detail here.

**1.     Petitioner's Possession of the Murder Weapon, and Jeff Smith's Whereabouts, on March 20, 21, and 22, 1992**

In the 1980s, the Downwards lived with their children in a house on Sabin Drive in Ammon, which was one street over from Lynn and Julia Smith's home on Midway Drive. Lynn and Julia's sons – Petitioner and Jeff – knew the Downards and their children, and they visited the Downards' home often throughout their childhood years. (State's Lodging

**MEMORANDUM DECISION AND ORDER - 2**

A-12, pp. 2125-27.)

Lynn and Julia divorced in 1988, and Lynn moved to nearby Idaho Falls, eventually marrying Sondra Genzinger, while Julia remained in the family home on Midway. (State's Lodging A-9, pp. 1390-91, 1479.) By then, Jeff had also moved out, but Petitioner still lived with his mother on Midway until late 1991, when he moved into a basement room in his father and step-mother's home in Idaho Falls. (State's Lodgings A-9, p. 1391; A-12, p. 2133.)

Lynn Smith kept several guns locked in a gun cabinet to which only he had access, and one of those guns was Petitioner's .22 caliber, pump-action Remington Fieldmaster rifle. (State's Lodging A-9, pp. 1480-81.) On the evening of March 20, 1992, a Friday, Petitioner told his father that he intended to go target shooting the next day. (*Id*.) At Petitioner's request, Lynn unlocked the gun cabinet and gave him the Fieldmaster rifle, together with a box of .22 caliber ammunition. (*Id*. at 1481.)

Saturday morning, Lynn left town and would not return until late that night. (State's Lodging A-14, p. 1491.) Sondra Smith, Petitioner's stepmother, was doing her weekly chores when she saw Petitioner, carrying his rifle, leave the house around 11:00 a.m. (*Id*. at 1402.) That afternoon, he drove to the golf course where he worked and spoke briefly with a coworker. (State's Lodging A-11, p.1906.) The coworker noticed the rifle in the backseat of Petitioner's car, and Petitioner told him that he was going target shooting. (*Id*. at 1907.) He returned home in the middle of the afternoon, which drew Sondra's attention because he struggled to open the front door with the rifle in his hands.

**MEMORANDUM DECISION AND ORDER - 3**

(*Id.* at 1439.) When he left home for the second time around 5:30 p.m., Sondra saw that he was again carrying the rifle. (*Id.*)

Around noon on that Saturday, Jeff Smith arrived at his mother's home in Ammon to power rake her lawn. (State's Lodging A-12, pp. 2138-39.) He needed a truck to haul the heavy rental equipment, and Leo Downard gave him permission to borrow the Downards' pickup. (*Id.* at 2141.) Leo asked Jeff to rake his lawn after he had finished Julia's lawn. (*Id.*)

Altogether, Jeff completed three lawns that afternoon, and he was paid about $40. (State's Lodging A-12, pp. 2144-45.) Late in the afternoon, he returned the equipment to the rental store and drove to Lynn and Sondra's home in Idaho Falls to drop off some wooden planks. (*Id.*) Petitioner apparently helped Jeff unload the planks before Petitioner left with the rifle. (State's Lodging A-9, p.1407.) Sondra noticed that Jeff was dirty, and she kept a close eye on him because she had just finished cleaning the house. (State's Lodging A-9, p. 1407.) She watched him as he used the telephone briefly before leaving the residence, and she did not see him take anything with him as he left. (*Id.* at 1409-1416.)

Jeff returned the truck to the Downards and was seen departing their home at 6:30 p.m. (State's Lodging A-6, pp. 607, 628.) About thirty minutes later, neighbors saw Leo standing in his driveway, and he waved to them. (*Id.* at 553, 608.)

At about that same time, Petitioner arrived at a friend's house to watch NCAA basketball tournament games. (State's Lodging A-13, p. 2572.) Petitioner told his friend

**MEMORANDUM DECISION AND ORDER - 4**

that he had been target shooting shortly before he came over. (*Id*. at 2576.) He stayed at the friend's house for about three hours, until about 10:15 p.m. (*Id*. at 2574.) Another guest claimed that Petitioner lingered in the doorway for a few minutes before announcing that he was headed home and adding that he "was going to kill some rabbits." (State's Lodging A-11, p. 1914.)

Sondra Smith was preparing for bed when she heard the front door open and close between 10:30 and 11:00 p.m. Saturday night. (State's Lodging A-9, p. 1437.) She assumed that Petitioner had returned. (*Id*.) Lynn Smith returned from his day trip around midnight, and he saw that Petitioner's car was parked in front of the house. (*Id*. at 1494.) Lynn noticed that Petitioner was still awake because he could hear the shower running in the bathroom downstairs. (*Id*. at 1513-14.)

Earlier, around 9:00 p.m., Jeff arrived at a nightclub, where he stayed for about three hours before moving on to another club. (State's Lodging A-12, pp. 2151-53.) He was generally in a good mood, interacted with others, and even bought an acquaintance a drink. (*Id*. at 2332-33.) Jeff left the bar at 1:00 a.m. and, according to him, he then went to his apartment to go to sleep. (*Id*. at 2153.) His girlfriend arrived around 3:00 a.m. and stayed the rest of the night. (*Id*. at 2366.) Except for about 15 minutes the next morning when Jeff went out to buy some groceries, he and his girlfriend were together all day on March 22 until late that night. (*Id*. at 2367, 2375.) Jeff was happy to see his girlfriend and was relaxed during the time that they spent together. (*Id*. at 2380-81.)

At an unknown time in the overnight hours of March 21 and 22, 1992, Leo and

**MEMORANDUM DECISION AND ORDER - 5**

Mary Downard were shot to death in their home.

## 2.    The Days Following the Murders

On Sunday morning, Petitioner retrieved the rifle from his bedroom and gave it to Lynn, who put it away and locked the cabinet. (State's Lodging A-9, pp. 1515-17.)

That same morning, a member of the Downards' church became concerned when the normally dependable Mary failed to show up to teach a Sunday school class. (State's Lodging A-7, pp. 655-57.) She called the Downards' home, and then called again for the next several days, but received no answer. (*Id*.)

On separate occasions on Sunday afternoon, two witnesses in the Downards' neighborhood saw a person that they recognized as Petitioner drive slowly down Sabin Drive, once on a motorcycle and once in his compact car. (State's Lodging A-11, pp. 1979, 2006.) Others saw him driving in the area again two days later, looking in the direction of the Downards' home. (*Id*. at 2017-18, 2029-31.)

Jeff Smith also returned to the Downards' residence on Tuesday and Wednesday, ostensibly to ask Leo if he could borrow the truck again, and he went to the front door and knocked. (State's Lodging A-12, pp. 2155-60.) Jeff noticed that the front door was slightly ajar, but he did not go inside, and he left when there was no answer. (*Id*.)

The Downards' bodies were discovered on Wednesday, March 25. (State's Lodging A-6, p. 614.) Leo was found in the living room. (State's Lodging A-7, pp. 661.) He had been shot three times; once in the chest, another in his heart, and a third shot entered his head from extremely close range. (*Id*. at 773-74.) Mary's body was discovered

**MEMORANDUM DECISION AND ORDER - 6**

upstairs in the master bedroom. (*Id*. at 662.) She had been shot three times in the head, with one shot behind her ear. (*Id*. at 764.)

### 3.    The Investigation, Charges, and Trial

Investigators retrieved five .22 caliber shell casings from the crime scene. (State's Lodging A-8, pp. 1142-44.) They also discovered two partial shoe prints in the dust in the bedroom where Mary's body was found and additional partial prints in a field behind the house. (State's Lodging A-7, pp. 710-11.) Of these, a photograph was taken of one of the prints from the upstairs bedroom. (*Id*.)

Because Jeff was the last person known to have been with the Downards before they were killed, the investigation started with him. (State's Lodging A-7, p. 673.) The police contacted Lynn Smith, who notified Jeff that investigators wanted to speak with him about "something serious that had happened in Ammon." (State's Lodging A-8, p. 997.) Jeff quickly located a police officer who was engaged in a traffic stop near his apartment and said, without prompting, that he had not been to Ammon recently. (State's Lodging A-13, p. 2534.) When he was interviewed formally that night, however, he admitted that he had been to the Downards' home raking their lawn the previous Saturday and that he had been back to knock on their door. (State's Lodging A-7, pp. 678, 691.) When he was told that the Downards had been killed, he broke down and cried. (*Id*. at 678.)

Investigators searched Jeff's apartment and retrieved a pair of size 9 ½ Foot Joy tennis shoes with a tread that was similar to the prints that they had seen in the Downards'

MEMORANDUM DECISION AND ORDER - 7

home. (State's Lodging A-10, p. 1604.) These shoes were eventually deemed to be slightly too large to have made the print that had been photographed. (State's Lodging A-11, p. 1859.) They also collected a pair of jeans that had a small red spot on them, and a presumptive test for blood was positive, but a follow-up test by a lab apparently did not confirm the presence of blood. (State's Lodging A-11, pp. 1889-90.)

Investigators later seized guns from Lynn Smith's gun cabinet, including the .22 caliber Fieldmaster rifle, and though Petitioner had the rifle on March 21 and 22, he told officers that only his father had access to the locked cabinet and that no one used the Fieldmaster in "quite some time." (State's Lodging A-10, p. 1597.) Lynn Smith also claimed that the cabinet had been locked when he went out of town on March 21. (*Id.* 1601.) Despite these assurances, ballistics tests would later confirm that the spent shell casings found in the Downards' home had been fired and ejected from Petitioner's Fieldmaster rifle. (State's Lodging A-8, pp. 1142-47.) And while the bullets taken from the Downards' bodies were severely damaged, at least one was also linked to the same rifle. (*Id.* at 1150.)

Because investigators still did not know that Petitioner possessed the murder weapon on the weekend that the Downards were killed, the State went forward with charges against Jeff for murder and burglary. The case proceeded to a preliminary hearing, where Lynn admitted for the first time that Petitioner had the rifle from March 20 to 22. (State's Lodging A-10, p. 1609.) The charges against Jeff were dismissed, and the State's investigation then shifted to Petitioner.

**MEMORANDUM DECISION AND ORDER - 8**

Investigators had searched Petitioner's bedroom and seized a pair of size 8 ½ Foot Joy tennis shoes that, unlike Jeff's Foot Joys, were found to be of the same size as the print that had been photographed in Downards' bedroom. (State's Lodging A-8, pp. 971-72.) The case against Petitioner still did not move forward, however, until about a year and a half after the murders, when a witness named Beverly Huffaker began to take on a more prominent role. She told investigators that Petitioner was a frequent visitor to her home before, during, and for some time after the Downards were murdered. (State's Lodging A-9, pp. 1239-40.) She said that Petitioner was close friends with her son, Scott, and that Petitioner had expressed his interest in older, heavy-set women and, in particular, that he found Mary Downard to be attractive. (*Id*. at 1281-91.)

Most notably, Huffaker told the police about a meeting that she claimed happened with Petitioner very early in the morning on March 22, 1992, after she had returned from a trip to Nevada with her son. (State's Lodging A-9, pp. 1244-45.) According to her, Petitioner was waiting at her home when they arrived at 1:00 a.m., and he was teary and extremely upset, but he would only tell her that "something bad had happened." (*Id.* at 1249.) Scott Huffaker also recalled this incident and agreed that it happened on that date. (*Id*. at1370.) Although the Huffakers went to Nevada frequently to see shows and to gamble, they recalled this particular trip because Scott had won $400, which he allegedly used to buy a rifle the next day. (*Id*. at 1371.) [1]

---

[1] The Huffakers' claims that this strange late-night interaction with Petitioner occurred on the weekend of the Downards' murders, rather than on some other date, was strongly contested by the defense at trial. A receipt of Scott's purchase of a rifle in1992 was discovered during the trial, and it was

On December 14, 1994, a grand jury indicted Petitioner on two counts of first degree murder, one count of burglary, and a sentencing enhancement for the use of a deadly weapon. (State's Lodging A-1, pp. 1-3.)

The case did not proceed to a jury trial for another 15 months, beginning in late March of 1996 and ending approximately four weeks later. Jeff Smith, who up to that point had indicated that he would invoke his Fifth Amendment privilege against self-incrimination, agreed to testify for the State under a grant of immunity. (State's Lodging A-12, pp. 2112-2283.) He provided a timeline of his actions on the weekend that the Downards were killed, and he denied that he committed the crimes. (*Id*.)

In addition to the evidence recited above – including the forensic shoe print evidence matching Petitioner's shoes and the ballistics evidence tying the spent shell casings to Petitioner's Fieldmaster rifle – the State also presented the testimony of a jailhouse informant, James Swogger, Jr., who claimed that Petitioner had confessed to him that he had killed the Downards. (State's Lodging A-10, pp. 1558-59.)

The defense called nearly two dozen witnesses in its case-in-chief. (State's Lodgings A-12 - A-14.) Notable among the evidence was the testimony of Brian Ravenscroft, who claimed that Petitioner had admitted to him "that he was aware that it was his shoe print that was found at the Downards' home." (State's Lodging A-13, p. 2592.) Petitioner did not testify, and the jury returned guilty verdicts on all counts.

---

dated in February rather than in March. The receipt was introduced into evidence.

     This issue is the subject of one of Petitioner's current habeas claims, and it will be discussed in greater detail later in this Memorandum Decision.

**MEMORANDUM DECISION AND ORDER - 10**

(State's Lodging A-14, pp. 528-30.)

The State originally sought the death penalty, but it reached an agreement with the defense that Petitioner would be sentenced to two fixed life sentences for the murders, a fixed ten-year sentence for first-degree burglary, and a fixed five-year sentence for the sentencing enhancement, all to be served concurrently. (State's Lodging A-3, pp. 654-56.) The trial court followed the agreement and imposed those sentences on Petitioner. (*Id.*) The Idaho Court of Appeals affirmed his convictions and sentences on direct appeal, and the Idaho Supreme Court declined to review the case.  (State's Lodgings B-3, B-6, B-7.)

**4.     Post-Conviction and Federal Habeas Proceedings**

While Petitioner's appeal was still pending, the trial prosecutor forwarded a supplemental discovery response to trial counsel. (State's Lodging C-1, pp. 12-18.) The supplemental response contained a recently completed written statement from a Jamie Lynn Hill in which she claimed to have witnessed an altercation between Jeff Smith and his ex-wife in 1994 or 1995, before Petitioner was tried on these charges. (State's Lodging C-1, p. 16.) Hill asserted that when she tried to intervene, Jeff told her, "you better back down little girl, or I'll take care of you just like I took care of that ol' Ammon couple." (State's Lodging C-1, p. 16.)

Based on this information, Petitioner's counsel pursued post-conviction relief, in part, on the ground that the prosecution had withheld exculpatory evidence from the defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (State's Lodging C-1, pp. 41-42.) After holding an evidentiary hearing, the trial court denied relief, concluding that

MEMORANDUM DECISION AND ORDER - 11

Petitioner had failed to show that the Hill had contacted investigators in the Downard case who would have had a duty to disclose the evidence to the defense. (State's Lodging C-4, p. 244.) On appeal, the Idaho Court of Appeals affirmed. (State's Lodging D-4, p. 8-11.) The Idaho Supreme Court denied Petitioner's request for review. (State's Lodging D-8.)

On May 23, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in this Court. The Court conducted its initial review and allowed Petitioner to proceed with his *Brady* claim and a claim of ineffective assistance of trial counsel. (Dkt. 5, pp. 2-5.) The Court noted that Petitioner's claims of actual innocence were not cognizable as freestanding habeas claims. (Dkt. 5, p. 2.) Respondents submitted an Answer to the Petition and a Motion for Summary Judgment. (Dkts. 12, 13.) The Court appointed counsel to assist Petitioner, and it denied Respondents' Motion for Summary Judgment subject to reconsideration after Petitioner's counsel had an opportunity to respond. (Dkt. 27, pp. 14-15.)

The Court later granted Petitioner's counsel's request to engage in limited discovery, and on August 10, 2010, Petitioner's counsel submitted an Amended Petition, proffering the following claims:

(1)     The State failed to disclose exculpatory, impeaching, and material evidence that Jeff Smith murdered the Downards (Claim A) (the *Brady* claim);

(2)     Petitioner's right to present a complete defense was violated when the trial court precluded evidence that would have implicated Jeff Smith in the crime (Claim B);

**MEMORANDUM DECISION AND ORDER - 12**

(3)  Petitioner was deprived of his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments (Claim C) because his counsel failed to (a) advise Petitioner adequately about his right to testify, (b) investigate and present forensic evidence or to challenge the State's forensic evidence, (c) investigate new evidence of Jeff Smith's guilt or move for a new trial, (d) present evidence showing the unreliability of State's witness Beverly Huffaker; (e) investigate and present evidence of Petitioner's good character, (f) show Jeff Smith's violent and threatening behavior, or (g) object to the trial prosecutor's shifting of the burden of proof in closing argument;

(4)  Petitioner's right to a fair trial was violated by the cumulative nature of the State's forensic experts and evidence, and by the late disclosure of expert witnesses (Claim D);

(5)  Inadmissible character evidence was admitted at trial that had no relevance without a nexus between the character trait and the crime (Claim E);

(6)  The admission of inmate James Swogger's testimony violated Petitioner's right to a fair trial because Swogger "lied" to investigators and the prosecuting attorney (Claim F);

(7)  The prosecuting attorney committed misconduct by vouching for the State's witnesses during his closing argument (Claim G);

(8)  Petitioner was deprived of his Fourteenth Amendment right to the effective

**MEMORANDUM DECISION AND ORDER - 13**

assistance of counsel on direct appeal because counsel failed to raise issues

that Petitioner was deprived of his right to present a defense and that the

prosecuting attorney improperly shifted the burden of proof in his closing

argument (Claim H);

(9)     Petitioner is actually innocent of the crime (Claim I).

(Dkt. 62, pp. 6-42.)

The Court ordered the Amended Petition to be filed, but then reviewed the

pleading under Rule 4 of the Rules Governing Section 2254 Cases and concluded that it

plainly appeared that Petitioner would not be entitled to relief on Claims A, C (limited to

subpart 3), D, E, F, G, and I. The Court dismissed those claims and ordered Respondents

to submit an answer to the remaining claims B (right to present a defense), C (ineffective

assistance of trial counsel) (in part), and H (ineffective assistance of appellate counsel).

Respondents have now filed their Response, arguing that the remaining claims are

untimely, procedurally defaulted, and fail on their merits. (Dkt. 94.) Petitioner has

submitted his Reply, and he has also filed motions for civil discovery. (Dkts. 92, 100,

104.)

After carefully reviewing the pleadings, the briefing, and record, the Court finds

that Respondents' procedural arguments implicate several complex and difficult questions

that need not be resolved to dispose of this matter in their favor.[2] The Court instead finds

---

[2] These include, but are not necessarily limited to, whether Petitioner received a full and fair
opportunity in the state courts to develop claims of ineffective assistance of counsel; whether the statute
of limitations should be equitably tolled by Petitioner's alleged "actual innocence," whether his innocence

**MEMORANDUM DECISION AND ORDER - 14**

that the most efficient route is to proceed directly to the merits of Petitioner's remaining claims. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *see also Van Buskirk v. Baldwin*, 265 F.3d 1080, 1083 (9th Cir. 2001).

Before turning to the merits, however, the Court will first address Petitioner's latest request for discovery.

## PETITIONER HAS NOT SHOWN GOOD CAUSE

## FOR DISCOVERY RELATED TO JAMES SWOGGER, JR.

After the parties had completed briefing, Petitioner submitted his third motion for discovery, requesting permission to depose James Swogger, Jr. (Dkt. 104.) In support, Petitioner's counsel asserts that Swogger has contacted her office and recanted his trial testimony. In addition to seeking leave to depose Swogger, Petitioner's counsel also requests disclosure of the files of the lead investigator, Detective Rodriguez, and asks the Court to review, in camera, all work product in the prosecutors' files. She makes this latter request as a means of searching for a letter that Swogger now claims he wrote to Rodriguez, establishing his first contact with law enforcement in the case. For the reasons that follow, these requests will be denied.

A habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). The petitioner must first seek leave of court, and leave will be granted only upon a showing of good cause. *See* Rule 6(a) of the Rules

---

also excuses all procedural defaults; and whether the limitations period should be equitably tolled based on Petitioner's mental limitations.

**MEMORANDUM DECISION AND ORDER - 15**

Governing Section 2254 Cases (Habeas Rules). Good cause exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy*, 520 U.S. at 908-09 (*citing Harris v. Nelson*, 394 U.S. 286, 295 (1969)).

Petitioner has not offered a reason to believe that he will be entitled to relief if these discovery requests are granted. Swogger's trial testimony is not part of any claim that remains standing in the Amended Petition, and because the Court will address all claims on their merits, discovery as a means of overcoming procedural bars – such as by developing evidence of "actual innocence" –  is no longer a relevant consideration. Moreover, the Court agrees with Respondents that Petitioner has not diligently pursued this evidence. He apparently did not attempt to locate, interview, or depose Swogger until after nearly three years had passed in this proceeding, and over 15 years after Petitioner was convicted in state court.

More to the point, the Court is not persuaded that Swogger's alleged recantation is persuasive evidence that should delay this case while the parties chase down that lead. To the contrary, Swogger's claims have evolved and shifted throughout the history of this case, and his alleged recantation falls in line with that tradition.

A review of the existing record supports that view. Swogger testified in state court that his initial contact with investigators in the Downard case came after he "talked to an officer in the Bonneville County Jail." (State's Lodging A-10 pp. 1559-60.) Detective

**MEMORANDUM DECISION AND ORDER - 16**

Rodriguez then called him and arranged a meeting. When Rodriguez and the prosecutor met Swogger in person, he attempted to make a deal in exchange of his testimony, but the prosecutor refused other than agree to recommend a different institutional placement for his safety.

Sometime later, Swogger wrote a letter to Rodriguez, noting that if he were called at trial, he would "have to tell the truth, which is that I do not know a thing." (State's Lodging A-4, p. 391.) At a pretrial hearing, he made another about face and claimed that he was lying in the letter when he said he did not "know a thing." (State's Lodging A-4, p. 395.) At that same hearing, he said, for the first time, that Petitioner had told him that he raped Mrs. Downard after she was dead.

At trial, Swogger testified that Petitioner had confessed to killing the Downards with a .22 caliber gun and that he raped Mrs. Downard after she was dead.  He claimed that he had not received a deal on any of his criminal cases, but that he did receive "a promise to request that I get moved to another institution" for safety. (State's Lodging A-10, pp. 154-55.) He acknowledged that he understood that the penalty for perjury in a capital case was potentially death. (*Id*. at 1563.)

Defense counsel then cross-examined him, exposing that he had testified incorrectly at the pretrial hearing about whether he had a pending charge for child molestation. (State's Lodging A-10, p. 1567.) He admitted that he was looking for a deal on his criminal charges when he first spoke with investigators. (*Id*. at 1568.) Defense

**MEMORANDUM DECISION AND ORDER - 17**

counsel also brought out that Swogger had written the letter to Rodriguez stating, "if forced to take the stand, I will have to tell the truth which is that I do not know a thing." (*Id.* at 1569-70.) He conceded that he held back, as a "trump card," the additional detail that Petitioner said he had raped Mrs. Downard. (*Id.* at 1570.) Defense counsel produced a letter to a trial judge in which Swogger asked for consideration on his sentence or "you should seriously reconsider calling me for my testimony [in this case]." (*Id.* at 1574.) The defense later presented another inmate who testified that Swogger's reputation for honesty was not good. (State's Lodging A-13, pp. 2546-60.)

In short, Swogger's questionable motives for testifying were fully explored, and he was revealed to be largely an untrustworthy opportunist seeking the best deal that he could get in exchange for his information. In his closing argument, the prosecutor implicitly acknowledged some of his credibility problems, noting that "whether he is a slimy scum bag or whatever you want to call him for ratting on a jail mate, he nevertheless told you what he heard . . . [a]nd you can give it whatever weight you want to." (State's Lodging A-14, p. 2794.)

It is within this context that the alleged recantation now arises, some 15 years after the main event. Recantations are viewed by the courts with suspicion, *see, e.g., Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993), and this one is no exception. It is far from clear when Swogger has lied in this case and when he has told the truth. Also, the current proffer is comprised entirely of allegations in affidavits from Petitioner's counsel

**MEMORANDUM DECISION AND ORDER - 18**

and her investigator; counsel has not explained why she could not obtain an affidavit or declaration under oath from this witness directly.

Therefore, because the alleged recantation is not linked to any remaining substantive claim and is of a piece with this witness's prior vacillation and manipulation, and because Petitioner has not exercised diligence in seeking the evidence sooner, the Court finds a lack of good cause supporting the request for a deposition.

Petitioner also seeks disclosure of the files of Detective Rodriguez and the prosecutors, including an in camera review of work product. Lurking within this request is the hint of a new *Brady* claim, as Petitioner seems to suggest that if a letter from Swogger to Detective Rodriguez exists showing that Swogger initiated the first contact, the evidence would be materially impeaching or exculpatory.

Setting aside the fact that Petitioner has already deposed Rodriguez in this proceeding and has been permitted to examine the State's files, the Court fails to see how the existence of this alleged letter would support a *Brady* claim. Swogger has already testified that he made the first move when he "talked to an officer in the Bonneville Count Jail," after which he received the phone call from Rodriguez. Regardless of how the initial contact occurred, Swogger admitted that he asked for a deal the first time that he met the investigators in person. He was questioned at trial about other letters in which he exhibited his tendency to seek benefits in exchange for his testimony. The State's recommendation to transfer Swogger for his safety and his understanding that the penalty

**MEMORANDUM DECISION AND ORDER - 19**

for perjury was the death penalty were not secrets, as the jury heard testimony about those things. Petitioner has failed to explain why, if the jury had only learned the minor additional point that it may have been Swogger rather than Rodriguez who initiated the contact by letter, there is a reasonable probability that the result of the proceeding would have been different. The Motion will be denied.

Having disposed of the discovery request, the Court now turns to the remaining claims in the Amended Petition.[3]

## LEGAL FRAMEWORK FOR HABEAS REVIEW

### 1.    Review of Claims Adjudicated by the State Court

When a state court has denied a state prisoner's federal claim on the merits, the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA) requires the federal district court to afford the state court's findings and conclusions substantial deference on habeas review.

Under AEDPA, the Court cannot grant habeas relief on any federal claim that the state court adjudicated on the merits unless the adjudication of the claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[3] The Court will address Petitioner's other pending discovery motion (his second) (Dkt. 92) as part of the discussion of the substantive claim to which it pertains (Claim C(subpart 4)).

**MEMORANDUM DECISION AND ORDER - 20**

28 U.S.C. § 2254(d).

To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A federal court cannot grant relief simply because it concludes in its independent judgment that the state court's adjudication of the claim is incorrect or wrong; the state court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court's decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id*.

## 2.    Review of Claims not Adjudicated by the State Court

When the state court did not adjudicate a federal claim on the merits that was fairly presented to it, and did not otherwise bar the claim on an independent and adequate state law ground, the federal court reviews the claim *de novo*. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). The petitioner must show by a preponderance of the evidence that he is being held in violation of federal law. 28 U.S.C. § 2254(a).

**PETITIONER WAS NOT DENIED HIS RIGHT**

**TO PRESENT A MEANINGFUL DEFENSE (CLAIM B)**

In his first non-dismissed claim, Petitioner contends that the trial court's exclusion

of evidence related to Jeff Smith's allegedly violent character violated his Sixth and Fourteenth Amendment right to present a meaningful defense to the charges against him. (Dkt. 62, p. 13.) He bases this claim on the trial court's exclusion of the defense's written offer of proof, labeled "Exhibit AA," which was apparently a compilation of police reports and witness statements showing specific instances of Jeff Smith's past misconduct. (*Id.* at 14.) The Idaho Court of Appeals described the proffered instances of Jeff's prior bad acts as the following:

> Jeff had (1) as a sixteen year-old brandished a firearm at a neighbor; (2) as an eighteen or twenty year-old raped his first wife and threatened to kill her with a shotgun if she were to leave him; (3) sold a watch to a bartender (apparently an attempt to raise an inference that Jeff is a thief); (4) in 1991 or 1992, drove a company vehicle in a reckless manner and became angry when confronted by his boss; and (5) threatened to use a gun to steal money from a hearing aid shop in 1994.

(State's Lodging B3, p. 6.)[4]

The Idaho Court of Appeals affirmed the trial court's ruling by relying primarily

---

[4] The original "Exhibit AA" that was offered in the state trial court apparently cannot now be located. (Dkts. 110, 111.) Petitioner has instead submitted a copy of a substituted Exhibit AA that his counsel attempted to augment to the record on appeal in the Idaho Court of Appeals. (Dkt. 69.) In support of his motion to augment, Petitioner's counsel argued in the state court that the original exhibit was not included in the appellate record. (Dkt. 76-1, Appendix A.) The State objected to the motion, claiming that the original exhibit was, in fact, already part of the record on appeal and that the newly proffered exhibit was not exactly the same as the one in the appellate record. (Dkt. 76-1, Appendix B.) The Court of Appeals denied the motion. (Dkt. 76-1, Appendix C.)

Respondents object here to Petitioner's reliance on the substituted Exhibit AA on the ground that the exhibit was never made a part of the state court record. But, regardless of fault, Respondents have not been able to produce the *original* exhibit that their representative claimed in the state courts *was* a part of the record on appeal. From a review of the record, moreover, the Court finds that the substituted version contains substantially the same evidence that Petitioner's counsel argued to the Court of Appeals was improperly excluded in the trial court. For these reasons, and because the present claim lacks merit in any event, the Court considers Petitioner's substituted Exhibit AA to be a close approximation of what was before the state courts.

**MEMORANDUM DECISION AND ORDER - 22**

on Rule 608(b) of the Idaho Rules of Evidence, which prohibits the admission of extrinsic

evidence of a witness's prior misconduct to impeach the witness's credibility. The Court

of Appeals did not address the issue within a federal constitutional framework, and this

Court will therefore review the claim *de novo*. Even under that more lenient standard,

Petitioner is not entitled to relief.

1.     **Standard of Law**

The Sixth and Fourteenth Amendments guarantee criminal defendants a

meaningful opportunity to present evidence in support of a complete defense. *Crane v.*

*Kentucky*, 476 U.S. 683, 689-690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479,

485 (1984). The right is subject to reasonable restrictions based upon other legitimate

interests in the criminal trial process. *United States v. Scheffer*, 523 U.S. 303, 308 (1998)

(citations omitted). A defendant does not have the right to present evidence that is

"incompetent, privileged, or otherwise inadmissible under standard rules of evidence."

*Taylor v. Illinois*, 484 U.S. 400, 424 (1988).

Federal habeas review of state court evidentiary rulings is limited. *See, e.g., Estelle*

*v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions"). Only state evidentiary

rulings that "serve no legitimate purpose or that are disproportionate to the ends that they

are asserted to promote" will implicate a defendant's right to due process of law. *Holmes*

*v. South Carolina*, 547 U.S. 319, 326 (2006). A state court's evidentiary ruling will not

provide a basis for habeas relief unless it "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-68).

**2.    Discussion**

Petitioner cannot show that the trial court's exclusion of his proffered evidence rendered the trial fundamentally unfair.

As an initial matter, the record shows that after Jeff testified that he had a "fair" reputation, the trial court allowed Petitioner's counsel to cross-examine him about several of his previous acts of violence and other unlawful behavior to impeach his credibility. (State's Lodging A-12, p. 2195.) During that examination, Jeff admitted that he had stolen Petitioner's .22 caliber rifle five years before the Downards were murdered and attempted to pawn it. (*Id*. at 2196-98.) He conceded that he had entered the Lynn and Sondra Smith's residence through a window and had stolen various items. (*Id*. at 2237-38.) He admitted that he had taken his ex-wife into the desert and threatened to kill her, though he denied that he did so at gunpoint. (*Id*. at 2233-34.) He agreed with defense counsel that he had "arguments" with his current wife but denied threatening "to blow her head off with a .22." (*Id*. at 2235.) He also agreed with defense counsel that inquired about a jar of money in a store, but denied saying "if I held a .22 to your head, you'd give me that?" (*Id*. at 2236.)

In other words, the trial court allowed a fairly thorough testing of Jeff's credibility

through cross-examination about his prior bad acts, and Petitioner's argument that certain questions were not permitted strikes only at the margins. It is true that the trial court precluded the defense from introducing *extrinsic* evidence in an effort to prove the specific instances of misconduct, but this ruling falls squarely within the contours of Rule 608(b) of the Idaho Rules of Evidence. That evidentiary rule prohibits extrinsic evidence to prove "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility, of the witness, other than conviction of crime as provided in Rule 609." Rule 608(b) is a standard and common rule of evidence, and Petitioner does not argue otherwise. *See*, *e.g.*, Fed. R. Civil P. 608(b).

Nevertheless, Petitioner characterizes the trial court's ruling as one that cut off relevant evidence of an "alternate perpetrator," which he seems to suggest was admissible independently of whether it impeached Jeff's credibility as a testifying witness. Contrary to his argument, this is not a case in which a state evidentiary rule was applied arbitrarily to prohibit a criminal defendant from introducing strongly probative evidence that ties a third person to the crimes charged. *See, e.g., Holmes*, 547 U.S. at 327 (finding a constitutional violation based on a state rule that excluded a person's partial admission to the crime and other testimony that he was in the area at the time of the murder); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that a state's hearsay rule could not be applied mechanistically to exclude a third party's confession).

Petitioner simply did not have that type of alternate perpetrator evidence. What he

**MEMORANDUM DECISION AND ORDER - 25**

had instead was extrinsic evidence of uncertain reliability that may have illustrated Jeff's poor character or propensity to be violent, but that lacked any true connection to the Downards or the events in this case. Petitioner has cited no authority for the proposition that a trial court's exclusion of third party character or propensity evidence that is not connected to the crimes charged or to the victims in the case at hand is unconstitutional. The case law that exists cuts decidedly in the opposite direction. *See Holmes*, 547 U.S. at 327 (accepting rules that exclude evidence of third party guilt where it is speculative, remote, or does not tend to connect the third party sufficiently to the crime).

Nor was Petitioner actually prevented from supporting his theory that Jeff was the more likely culprit. He did so through his cross-examination of Jeff and other witnesses, and through the presentation of numerous witnesses during the defense case-in-chief. The jury heard that Jeff was with the Downards on the day of homicides and was the initial focus of the investigation. The jury also learned that Jeff had once stolen the murder weapon long before the murders, had sneaked into the Smiths' home to steal various other items, owned a pair of shoes that had a similar pattern to the footprint in the Downards' home, gave inconsistent statements to the police and omitted a few important details, and may have asked to borrow the Downards' truck only to be rebuffed. Jeff essentially admitted during his cross-examination that he had previously engaged in conduct that could be characterized as violent and threatening, even though he may not have agreed with everything that Petitioner's counsel suggested.

**MEMORANDUM DECISION AND ORDER - 26**

Under these circumstances, the trial court's ruling was a "reasonable restriction[] based upon . . . legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted). Petitioner has not shown that he was deprived of a meaningful opportunity to present a defense, and Claim B will be denied.

## PETITIONER WAS NOT DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL (CLAIM C)

Petitioner next contends that his trial attorneys were ineffective under the Sixth Amendment. The Court has summarily dismissed one subclaim alleging ineffective assistance based on counsel's advice to Petitioner that he should not testify in his defense (Dkt. 84, pp. 14-16), but six subclaims remain.

In state court, Petitioner raised three vague allegations of ineffective assistance of counsel in his post-conviction action, which were dismissed by the state district court without further evidentiary development. Respondents argue that the current allegations are untimely and procedurally defaulted, but the Court again finds that it is much easier to dispose of these subclaims on the merits.

For the reasons that follow, the Court concludes that under a *de novo* standard of review, the remaining subclaims are without merit. Because the subclaims fail under *de novo* review, they would also necessarily fail under AEDPA.

### 1.    Standard of Law

To show a violation of the Sixth Amendment, a petitioner must establish (1) that

his counsel's performance was unreasonably deficient and (2) that the defense was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).

The standard for attorney performance in a criminal case is that of reasonably effective assistance, measured under prevailing professional norms. *Strickland*, 668 U.S. at 687-88. In assessing whether the representation fell below an objective standard of reasonableness, counsel's conduct must be viewed under the facts that existed at the time that the challenged act or omission occurred, rather than through the benefit of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

"There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. As a result, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S.Ct. at 788 (internal quotations and citation omitted).

If a petitioner can show unreasonably deficient representation, he must still establish actual prejudice under *Strickland*'s second prong. To do so, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694.

**MEMORANDUM DECISION AND ORDER - 28**

## 2.     Counsel's Investigation into the Forensic Evidence Was Reasonable (Claim C(4))

Petitioner alleges that his trial counsel were constitutionally ineffective in investigating and challenging the forensic evidence. (Dkt. 62, pp. 17-29.) In particular, he claims that counsel failed to investigate the shoe impression and ballistics evidence competently, or to retain qualified scientific experts to testify on these matters, and that counsel were remiss in not independently testing hair and fiber evidence, the two pairs of Foot Joy shoes that had been confiscated by the police, the Fieldmaster rifle, and the sex crimes kits that were taken during the victims' autopsies. (*Id.*)

Petitioner's claim founders on *Strickland*'s first prong. That is, he has failed to show that his counsel's performance in these areas fell below an objective standard of reasonably competent representation under the circumstances that existed at the time.

### A.     *Background*

The record before the Court shows a fairly robust defense team that was assisted by several experts. Petitioner was appointed Stevan Thompson as his lead counsel, and Thompson's law partner, Jerry Woolf, later appeared as co-counsel. Early in the case, counsel filed a motion for a private investigator and motions for the appointment of experts in shoe print identification and ballistics. (State's Lodging A-1, pp. 24-26, 30-32, 36-38.) Those motions were granted. (*Id.* at 52-53.) The private investigator that counsel retained also had the help of a second investigator, and the investigators contacted

**MEMORANDUM DECISION AND ORDER - 29**

numerous potential witnesses. (*Id*. at 132-33.)

The defense team had the assistance of at least two mental health experts: Dr. Marc Corgiat, who testified at trial about Petitioner's mental difficulties (State's Lodging A-13, pp. 2420-2516), and Dr. Timothy Durning, who evaluated Petitioner's competency to stand trial and examined him for possible mental retardation (*See* May 20, 2010 Deposition of Stevan Thompson ("Thompson Depo."), p. 50). Trial counsel also enlisted a speech pathologist to assist them in communicating with Petitioner in a manner that he could easily understand, and another psychologist may have been consulted on competency issues. (*Id*. at 27.)

Trial counsel selected a criminalist from California, Richard Fox, to review and examine the scientific evidence. (State's Lodging A-1, pp. 96-97.) By the time he was retained, Fox had nearly 30 years of experience as a criminalist. (*Id*. at 2689-91.) Fox had taught university courses in forensic science, authored textbooks, and was a member of various forensic science organizations. (*Id*. at 2690-91.) At trial, the defense chose to steer Fox's testimony to the shoe impression evidence rather than ballistics.

Petitioner now argues that counsel's overall investigation into the scientific evidence was deficient and that Fox was unqualified to testify. The Court disagrees.

### B.    *The Ballistics and Shoe Impression Evidence*

The ballistics evidence presented the strongest headwind for counsel, as they were confronted with at least two State experts who had already concluded that the shells found

at the crime scene were ejected from the .22 Remington Fieldmaster rifle that was taken from Lynn Smith's gun cabinet. Defense counsel followed up with Fox on this issue, who essentially agreed with those opinions. In the face of a consensus on the ballistics evidence, counsel chose to fashion a defense that would focus on Jeff's possible accessibility to the murder weapon, rather than continue on a quixotic journey of questioning whether the shells could be tied to the rifle. This was not an objectively unreasonable decision. *See Strickland*, 466 U.S. at 691 (counsel may "make a reasonable decision that makes particular investigations unnecessary").

The shoe impression evidence presented similar challenges. It is true that the initial photograph of the print was vulnerable to impeachment because the police took the photograph at an angle and failed to place a ruler next to the print, but defense counsel made the jury acutely aware of these blunders.

To shore up this part of its case, the State hired Dr. Eric Greenwade, a mathematician, to alter the photograph through a computer program to correct some of the initial deficiencies. At trial, Greenwade was permitted to testify that a nick or an "anomaly" could be seen in the photograph that matched Petitioner's shoe. Counsel objected to that testimony, but his objection was overruled, and he was left to cross-examine Greenwade about his lack of expertise to evaluate shoe impression evidence.

Fox reviewed the shoe impression evidence for the defense and testified at trial that he generally agreed with the State's shoe print expert, Donna Shepperdson, but

**MEMORANDUM DECISION AND ORDER - 31**

offered his opinion at trial as to why Eric Greenwade was mistaken about the anomaly. Fox's testimony was important to the defense because it suggested that there was not a "match" between Petitioner's shoes and the print at the crime scene, as Greenwade had claimed. To the extent that Fox was exposed to cross-examination about his unfavorable opinion on ballistics, counsel made a tactical decision that the defense needed to take some of the sting out of Greenwade's opinion, and that need outweighed the risk that the jury would learn that Fox agreed with the State's experts on ballistics. The Court finds nothing unreasonable about counsel's handling of the shoe print evidence and offering Fox as an expert to testify about that subject.

Petitioner's reliance on a few recent studies or reports that may call into question some aspects of shoe print or ballistics evidence as a general matter is not relevant to the choices that counsel made over 15 years ago under the state of the science at the time. Nor is the Court persuaded by Petitioner's attempt to undermine Fox's qualifications by citing parts of the record from another case in this District, *Rhoades v. Henry*, 598 F.3d 495 (9th Cir. 2010). At best, the *Rhoades* case shows that a different defense attorney made a tactical decision not to present some of Fox's theories to a jury under the facts of that case. Petitioner has offered no evidence that Fox was objectively unqualified as a criminalist to render the opinions that he did in the present case.

Petitioner also argues that trial counsel should have retained more specialized experts in the fields of ballistics and foot print evaluation rather than relying on a

**MEMORANDUM DECISION AND ORDER - 32**

generalist like Fox. The Ninth Circuit found a similar argument to be unpersuasive in *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002). There, the petitioner alleged that his trial counsel's use of a psychologist in the mitigation phase of a capital case, rather than an expert in the field of intoxication and brain science, amounted to ineffective assistance of counsel. *Id*. at 876. Turning aside that argument, the Ninth Circuit noted that "[t]he choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" *Id*. (citing *Strickland*, 466 U.S. at 691). The panel concluded that trial counsel "cannot be deemed ineffective because, with the benefit of hindsight, we now determine that other trial strategies or expert witnesses may have been a better choice." *Id*. That reasoning applies with equal force to defeat Petitioner's claim here.

### C.     The Other Physical Evidence

Petitioner also faults his counsel for not retaining any experts to test additional items of physical evidence, including hairs and fibers, the Foot Joy shoes, the Remington rifle, and the sex crimes kits. Petitioner contends that if these items had been tested for trace, serological, or DNA evidence, the results may have incriminated Jeff or exonerated Petitioner.

Most of these items were actually inspected by the State's investigators and experts before trial, and no incriminating evidence was developed. For instance, Petitioner notes correctly that sex crime kits were taken from the bodies of Leo and Mary Downard. (State's Lodging A-11, p. 1895.) But he overlooks that when one of the State's

**MEMORANDUM DECISION AND ORDER - 33**

forensic experts, Donald Wyckoff, was asked at trial by defense counsel whether "there

was a negative result as to those sex crimes kits," he responded that "there was no semen

found on either one of those people, if that's what you mean." (*Id*. at 1897.) Similarly,

Wyckoff testified that he had examined the rifle under a microscope and did not see any

stains that suggested the presence of blood. (*Id*. at 1886.) He also examined both pairs of

Foot Joy shoes and did not see blood. (*Id*. at 1888.) As to the hairs and fibers that had

been collected, Wyckoff agreed with the trial prosecutor that nothing "significant" came

of that evidence. (*Id*. at 1885.)

The State's examination of these items did not yield anything that incriminated

Petitioner directly, and Petitioner has failed to rebut the presumption that counsel made a

sound tactical decision to highlight that fact at trial. Based on counsel's cross-

examination of Wyckoff, it is reasonable to infer that the defense wanted to establish that

the sex crimes kits were negative –  to undermine the State's theory that Petitioner had a

sexual motive in killing the Downards – while simultaneously showing that the State had

failed to conduct a comprehensive examination for blood on central pieces of evidence in

the case. This latter point was part of a broader theme of a botched investigation. It is not

unreasonable for a defense attorney to poke holes in the adequacy of the police

investigation while forgoing another round of scientific examination on evidence that

might provide results that incriminate the defendant. *See Richter*, 131 S.Ct. at 789-90

("[a]n attorney need not pursue an investigation that would be fruitless, much less one

**MEMORANDUM DECISION AND ORDER - 34**

that might be harmful to the defense"). Even if the defense team could have shielded incriminating results from the prosecution, had the defense possessed that type of evidence counsel's ability to press forward with an alternate perpetrator theory may have been seriously compromised by ethical constraints. Under these circumstances, Petitioner has not shown that counsel's failure to test the items fell below an objective standard of reasonable assistance.

At its core, Petitioner's argument is that his trial counsel should have continued their investigation until they had uncovered more favorable evidence or found better opinions from top experts in their respective fields. The Court is not convinced. The Sixth Amendment requires only *reasonable* investigations or *reasonable* decisions that make further investigations unnecessary; there is no constitutional requirement that counsel scorch the earth for evidence or shop for the best expert opinion that can be found on any subject. *See*, *e.g.*, *Reynolds v. Bagley*, 498 F.3d 549, 557 (6th Cir. 2007) (noting that counsel does not have a duty to find the best experts); *Winfield v. Roper*, 460 F.3d 1026, 1041 (8th Cir. 2006) (same). To the contrary, "[c]ounsel [are] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S.Ct. at 789. That is what occurred in this case.[5]

---

[5] Petitioner points to Stevan Thompson's recent deposition testimony as supporting his argument that counsel made *no* decisions as to this evidence. The Court does not share present counsel's assessment of Thompson's testimony as proving the absence of a trial strategy so much as showing that Thompson's memory had faded as to what that strategy might have been in relation to these evidentiary items. Though Thompson could not remember seeing a report on the sex crimes kit, he did recall that "there was no

**MEMORANDUM DECISION AND ORDER - 35**

Because Petitioner has not satisfied *Strickland*'s first prong for establishing a Sixth Amendment violation, the Court need not reach the issue of prejudice on this subclaim.

### D.      Petitioner Has Not Shown Good Cause for Discovery on this Subclaim

Petitioner has filed a motion seeking access to much of this same physical evidence so that he can subject it to advanced scientific testing. He lists the evidence that he wants tested as the known hair samples of Jeff Smith, Petitioner, and the Downards; hair samples apparently collected at the crime scene; the sex crimes kits; the Downards' clothing; all bedding from the crime scene; Jeff's Levi pants seized from his apartment; the Foot Joy shoes; and the Remington .22 caliber rifle. (Dkt. 92-1, pp. 1-2.) He also seeks disclosure of all notes associated with previous testing of these items. (*Id*. at 2.) Petitioner apparently intends to test any biological material that may exist with "state of the art DNA typing procedures." (*Id*. at 5.) He asserts that the results would support his claim that his trial counsel were constitutionally ineffective in failing to test the evidence before trial. (*Id*.) The Court will deny the motion as lacking in good cause. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997); Rule 6(a) of the Rules Governing Section 2254 Cases.

Earlier in this matter, the Court found that good cause existed for limited discovery. (Dkt. 43.) In reaching its conclusion, the Court noted that "[i]t is of no small

_____

evidence of a sexual assault at the time when her body was found." (Thompson Depo., at 65-66.)
    Regardless, the Court finds that the trial record offers a more accurate picture of what counsel knew about this evidence at the relevant time and what their actions were based on that knowledge.

**MEMORANDUM DECISION AND ORDER - 36**

importance to the Court's decision that Petitioner's current request is specific, narrow, and tied to the issues in this case." (*Id.* at 9.)

Unlike that request, Petitioner's current request is tardy, exceptionally broad, and speculative. It appears that Petitioner is seeking to examine the bulk of the physical evidence in the case, but he apparently does not know where many of these items are, whether they contain testable material, or, even if they do, whether any testing would yield relevant results. The current record provides no encouragement on these issues. Wyckoff testified that semen was not found on the sex crimes kits and that he could not see blood on either the rifle or the shoes under magnification. While the red spot on Jeff's jeans was initially presumptive for blood, the documents that Petitioner has lodged with his discovery motion show that a follow-up by another laboratory gave a negative presumptive test result. (Dkt. 92-2, p. 24.) It also appears from this same batch of documents that the FBI conducted some hair comparison tests that did not result in significant findings to incriminate either Jeff or Petitioner, also corroborating Wyckoff's trial testimony. (*Id.*, at 12-19.) Petitioner has not offered any strong reason to believe that this information is incorrect or incomplete.

More importantly, the Court has now found that trial counsel's investigation into scientific matters was reasonable. If Petitioner were able to obtain DNA results, those results would, at best, assist him in developing the type of evidence that he claims his counsel should have uncovered before trial – that is, evidence to show *Strickland*

**MEMORANDUM DECISION AND ORDER - 37**

prejudice – but the prejudice issue has been rendered moot by his failure to establish that his counsel's failure to test these items was objectively unreasonable in the first place. Petitioner must prove both aspects of the *Strickland* test to show a Sixth Amendment violation.

It is for this reason that Petitioner has misplaced his reliance on *Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997). In *Jones*, trial counsel "repeatedly indicated his intention to test the [physical] evidence" but he failed to do so. The Ninth Circuit determined, in relevant part, that there were no facts to establish that trial counsel had made a sound strategic decision not to test the evidence, and it ordered discovery because the "test results may establish the prejudice required to make out such a claim." *Id*. at 1009. Here, in contrast, Petitioner has not carried his burden to prove that his trial counsel's investigation was unreasonably deficient such that the question of prejudice would arise.

### 3.    Failure to Move for a New Trial (Claim C(5))

Petitioner next contends that his trial counsel should have filed a motion for a new trial based on the newly discovered evidence of Jamie Lynn Hill's claim that Jeff Smith had made an incriminating statement to her in the mid-1990s. (Dkt. 62, p 32.)

The Hill evidence was the subject of a post-conviction claim brought under *Brady v. Maryland*, 373 U.S. 83 (1963). This Court previously denied Petitioner's *Brady* claim on the ground that the state court had made a reasonable factual finding, after an evidentiary hearing, that Petitioner had not established that Hill reported Jeff's alleged

**MEMORANDUM DECISION AND ORDER - 38**

statement to officials investigating the Downards' murders. (Dkt. 84, p. 11.)

Petitioner now asserts that his trial counsel's handling of this issue was deficient, but the precise nature of his claim remains elusive. He has not explained why his trial counsel's preservation of the issue in the post-conviction petition rather than in a motion for new trial was unreasonable. His contention that, had counsel acted immediately, he "would have been able to conduct interviews of key witnesses 6 years prior to the post-conviction hearing," is wholly speculative. (Dkt. 100, pp. 42-43.) He has also not established that he was disadvantaged or prejudiced when the evidence was fully tested at an evidentiary hearing in the post-conviction action. Relief will be denied.

## 4.    Counsel's Decision Not to Offer Witness Testimony to Impeach Beverly Huffaker (Claim C(6))

Petitioner's next subclaim centers on the impeachment of Beverly Huffaker. At trial, Huffaker testified that she and her son met with Petitioner early in the morning of March 22, 1992, after they had returned from a gambling trip to Nevada. She claimed that Petitioner told her that "something bad had happened." She recalled the date, in part, because her son, Scott, had won $400 gambling and he used that money to buy a gun. Scott also testified and confirmed that the encounter occurred on the weekend of March 21 and 22.

Trial counsel Stevan Thompson cross-examined Huffaker regarding her failure to tell the police about this important late-night meeting when they first interviewed her

after the murders. She admitted that she did not disclose the information for over a year and half. Counsel also impeached her recollection of the date by using her grand jury testimony, in which she had claimed that Scott purchased the gun at the "Shilo gun show." When counsel asked her if it would surprise her to learn that the gun show occurred in January instead of March, 1992, she insisted that she was not with Scott when he bought the gun and that she only later learned that he had bought it from a private individual. (State's Lodging A-9, pp. 1351-55.)

Later in the trial, the State produced a receipt from an Idaho State Police officer who had sold Scott a rifle in 1992, and the receipt was dated February 7, some six weeks before the Downards were killed. Petitioner's counsel stipulated with the State to introduce the receipt into evidence rather than present new testimony on the issue.

In Claim C (part 6) of the Amended Petition, Petitioner contends that his counsel's failure to offer the testimony of the Idaho State Police officer, or to re-call Beverly or Scott Huffaker and question them about the receipt, was constitutionally ineffective.

This claim presents a classic case of counsel making a tactical decision in the midst of a contentious trial to present evidence in one form (a stipulation) rather than another (though witness testimony). At his deposition, Thompson testified that he believed that the receipt "helped us a lot" because "the timeframe when [the officer] sold the gun to Mr. Huffaker did not match up with Beverly's testimony." (Thompson Depo., at 111.) That belief was reasonable at the time the decision was made, particularly

because Thompson had already demonstrated through his cross-examination that Huffaker had failed to come forward with this story at an appropriate time, that she mysteriously recalled details long after the fact, and that she was incorrect when she originally pinned the date to a gun show. While Petitioner notes that Thompson has also testified that he *now* believes it might have been a mistake not to call the Idaho State Police officer (*id.* at 111), Thompson's after-the-fact regret, formed with the benefit of hindsight, does not prove that the original decision was an objectively unreasonable one.

Alternatively, Petitioner has not established prejudice because he has not provided the nature of the additional testimony that he believes should have been presented, nor has he explained how the unspecified testimony would have affected the outcome of the case. Even without the receipt or any testimony about the receipt, defense counsel had already impeached Huffaker sufficiently to show that she may have been mistaken or confused about the date of the purchase of the *firearm*. On the other hand, Petitioner ignores that Huffaker also tied the date of this particular Nevada trip to the anniversary of her mother's death, a date that she surely would have known well. (State's Lodging A-9, p. 1349.) Whether additional witness testimony about the gun purchase would have added materially to the defense's argument that Huffaker was wrong about the date of her encounter with Petitioner, or would have had no effect whatsoever, is entirely speculative.

## 5.    Failure to Present Additional Evidence of Petitioner's Good Character (Claim C(7))

In this subclaim, Petitioner isolates a portion of Thompson's deposition testimony in which he admits that the defense should have presented additional evidence of Petitioner's gentle nature. (Dkt. 62, p. 35.) Petitioner contends that "had trial counsel done a thorough job in presenting evidence of Petitioner's good character, the jury would have seen a marked contrast between Petitioner and Jeff Smith, and would have strengthened the defense's theory of the case." (*Id*.)

Petitioner does not describe the excluded evidence in his Amended Petition or, beyond a conclusory statement, how it would have led to a reasonable probability of a different outcome. In any case, Thompson testified that he believed the defense's primary mistake was a failure to explain Petitioner's "[in]ability to plan and commit a crime like this; we could have put on that expert testimony, *not so much character testimony*." (Thompson Depo., pp. 140-41.) (Emphasis added.) In fact, trial counsel put on expert testimony that touched on that very subject. Dr. Marc Corgiat testified about Petitioner's low I.Q. and his limitations in cognitive functioning, which included Petitioner's decreased ability to formulate a complex plan or to conceal his involvement.

In addition, the jury heard testimony from a number of witnesses that Petitioner had a few simple pleasures in life, was childlike in some ways, and stuck closely to his daily routine. Evidence was also presented that Jeff had a troubled past, and there was no evidence before the jury that Petitioner had that same type of background. Counsel offered numerous witnesses in the defense case-in-chief, and the choice of which

witnesses to call lies at the heart of defense strategy.

Thompson's testimony 15 years after the trial expressing some doubt about whether the defense could have drawn a sharper contrast between Petitioner and Jeff does not establish either deficient performance or prejudice.

**6.      Failure to Present Additional Evidence of Jeff's "Violent and Threatening Behavior" (Claim C(8))**

In a variation on this same theme, Petitioner faults his trial counsel for not introducing the testimony of Petitioner and Jeff's sister to prove that Jeff "threatened to shoot their mother, that Jeff threatened to rape [his sister], that Jeff was sexually inappropriate with [his sister], and that Jeff had a temper." (Dkt., p. 36.) Petitioner's sister apparently would have also testified that, in contrast to Jeff, Petitioner was "easy going and did not have a temper." (*Id.*) Supposedly, his sister could impeach James Swogger, Jr. (*Id.*)

Petitioner overlooks that his counsel *did* attempt to introduce extrinsic evidence of Jeff's prior threats and violence, but was prevented from doing so by the trial court. In light of that ruling, Petitioner has failed to explain why it was unreasonable for his counsel not to engage in the futile act of offering additional evidence in the same general category. Even if it were unreasonable, he has not established that there is a reasonable probability that the trial court would have admitted this evidence, if offered, or that the result of the proceeding would have been different, if admitted.

**MEMORANDUM DECISION AND ORDER - 43**

**7.      Failure to Object to the Prosecutor's Closing Argument (Claim C(9))**

In this subclaim, Petitioner complains that the prosecutor shifted the burden of proof during his closing argument and that Petitioner's counsel were ineffective in not lodging an objection. Petitioner admits that the prosecutor gave a "correct recitation of the burden," but he nonetheless argues that "the State's argument that the defense had not proven 'lies, deceit and deception,' improperly placed the burden on the defendant." (Dkt. 62, p.37.) He also contends that the prosecutor shifted the burden when he argued that the defense had not challenged the State's evidence that Petitioner was "fixated" on Mrs. Downard. (*Id.*)

Prosecutors are permitted to argue reasonable inferences based on the record before the jury. *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir.2000). "[C]omments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." *United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995) (citations and internal quotations omitted).

The prosecutor clearly stated the correct burden, followed by what he asserted was an unfulfilled claim made by defense counsel in his opening statement. He also made an off-hand comment that Petitioner's "fixation" on Mrs. Downard was not "challenged." It is permissible for a prosecutor to call the jury's attention to weaknesses in the defense

case and to point out where the defense failed to undermine the State's allegations, *see Vaandering*, 50 F.3d at 702, and the prosecutor's comments in this case fell within that framework. Notably, the prosecutor did not argue that Petitioner's failure to testify should be taken as evidence of his guilt. *See United States v. Fleishman*, 684 F.2d 1329, 1343 (9th Cir. 1982) (noting that a "prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify").

Because an objection on burden-shifting grounds would have lacked merit, it was not unreasonable for counsel to stand silent. Moreover, there is no reasonable probability that had an objection been made, and had the objection been sustained, the result of the proceeding would have been different.

## 8.      Conclusion – Ineffective Assistance of Trial Counsel

Although Petitioner takes issue with almost every aspect of his trial counsel's investigation and representation in this case, the Court has reviewed the record and concludes that counsel acted reasonably under the circumstances. To be sure, counsel may have made an occasional mistake in this complicated murder case, but the Sixth Amendment only guarantees reasonable representation, not flawless representation. In most instances, Petitioner second guesses his trial counsel's reasonable choices regarding how to defend against the charges. Petitioner has also failed to establish a reasonable probability of a different outcome for any error that counsel may have made.

**MEMORANDUM DECISION AND ORDER - 45**

## APPELLATE COUNSEL WAS NOT INEFFECTIVE (CLAIM H)

In Claim H, Petitioner asserts that his counsel on direct appeal was ineffective in not arguing that (1) the trial court violated Petitioner's constitutional due process right to present a defense by excluding evidence of Jeff's threatening and violent history, and (2) the trial prosecutor shifted the burden of proof in closing argument. (Dkt. 62, pp. 41-42.)

Petitioner had a Fourteenth Amendment right to the effective assistance of counsel on his initial direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). The *Strickland* standard applies equally to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 286 (2000). Appellate counsel has not unreasonably represented a criminal appellant simply because he or she failed to raise every non-frivolous issue. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). To show prejudice, the petitioner must demonstrate that had counsel presented the issue on appeal, there is a reasonable probability that the appellate court would have reversed. *Robbins*, 528 U.S. at 288.

Applying those standards, the Court finds that Petitioner has not established ineffective assistance of appellate counsel. The Court has determined that the underlying constitutional claims lack merit, and there is no reasonable probability that had counsel raised them on appeal in the manner that Petitioner now claims he should have, the appellate court would have reversed.

## PETITIONER HAS NOT ESTABLISHED

## A COMPELLING CLAIM OF ACTUAL INNOCENCE (CLAIM I)

For his final "claim," Petitioner alleges that he is actually innocent of these crimes and that a fundamental miscarriage of justice has occurred. (Dkt. 62, p. 42.) He appears to acknowledge that this is not a substantive basis for habeas relief but is instead a procedural gateway to the review of otherwise procedurally barred claims. (*Id*.) His recent discovery requests are also tied, at least in part, to his claim of innocence.

The Court has addressed the merits of all the claims in the Amended Petition and found them to be lacking, and it need not reach this issue because the question of whether a showing of actual innocence can open a gateway to the merits of procedurally barred claims is now moot. Nonetheless, because of Petitioner's persistence on this issue, and because of its importance, the Court chooses to address it here.

To establish a claim of actual innocence, a habeas petitioner must come forward with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 315, 324 (1995). The petitioner bears the burden of demonstrating that "in light of all the evidence, including evidence not introduced at trial, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327; *see also House v. Bell*, 547 U.S. 518, 539 (2006). Put another way, the petitioner must establish that is "more likely than not any reasonable

juror would have reasonable doubt." *House*, 547 U.S. at 538. The standard is demanding and permits review only in the "'extraordinary'" case. *Schlup*, 513 U.S. at 327 (citation omitted).

Petitioner is far from carrying this heavy burden. Like many criminal cases, the evidence in the case before the Court had, and continues to have, aspects of uncertainty and ambiguity, but it was more than sufficient to sustain Petitioner's convictions. The most incriminating evidence against Petitioner included the following:

- The .22 caliber Fieldmaster rifle, linked to the murders by ballistics tests, belonged to Petitioner;

- Petitioner was seen by several witnesses with the rifle in his possession on the weekend that the Downards were murdered, and the rifle was locked in a gun cabinet at all other times;

- Specifically, Sondra Smith saw Petitioner *carrying the rifle* as he left the family home at around 5:30 p.m. on the night of the murders;

- Sondra also saw Jeff leaving the Smith home a bit later that same evening with nothing in his hands;

- Petitioner arrived at a friend's home at about 7:00 p.m. and told him he had been target shooting;

- Petitioner left at 10:15 p.m. and said that he needed to go shoot some rabbits;

**MEMORANDUM DECISION AND ORDER - 48**

- Conversely, there is no evidence that Petitioner was absent from the Smith home *without the rifle* at a time that Jeff could have stolen the rifle unnoticed, killed the Downards, and then returned it to the Smith home;

- Lynn Smith heard Petitioner taking a shower late on the night the Downards were murdered;

- Petitioner allegedly met the Huffakers on that night and told them "something bad had happened," and his hair was wet, as if he had just showered;

- Petitioner had told Beverly Huffaker at other times that he was attracted to older, grandmotherly types, and that he found Mrs. Downard attractive;

- Petitioner was seen driving down the Downards' street on more than one occasion in the days immediately following the murders;

- A shoe print was found and photographed in the Downards' bedroom, but Jeff Smith's Foot Joy shoes, with a similar tread, were excluded as too large;

- Petitioner's smaller Foot Joy shoes could not be excluded as having made the print;

- Petitioner admitted to a friend "that he was aware that it was his shoe print that was found at the Downards' home";

- Petitioner supposedly confessed to James Swogger, Jr., that he killed the

Downards;

These facts weave into a strong circumstantial case against Petitioner. Even if Swogger's testimony is discounted as unreliable, the other evidence stands undisturbed. While Petitioner has ready arguments for why each of piece of evidence against him can be impeached or given a different interpretation, those arguments were largely made at trial, and a habeas proceeding is not a proper forum in which to relitigate the entire case that has already been tried. Instead, "[w]hen confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict." *House v. Bell*, 547 U.S. at 539. A persuasive claim of actual innocence must be based on new evidence that was not presented to the jury that is so compelling that the reviewing court must conclude that it is now probable that no rational juror would vote to convict the defendant. *See id.* at 538-39.

Petitioner does not have that type of evidence.  What he has instead is character and propensity evidence regarding Jeff's background that runs the gamut from innuendo and rumor to past instances of misconduct that Jeff has admitted, the vast majority of which was well known to all parties during the criminal proceeding. Petitioner has no physical evidence that strongly links Jeff to the Downards' murders. He speculates that Jeff had the type of character to have committed the crimes, while Petitioner did not, but supposition of that sort does not act as a strong counterweight to the objective evidence tending to show that Petitioner *did* commit this particular crime.

**MEMORANDUM DECISION AND ORDER - 50**

Petitioner suggests that if his claim of innocence is missing a few component parts, that is precisely why the Court should authorize the evidentiary development that he has requested. The Court has already given Petitioner significant resources to further his investigation with the assistance of counsel and discovery, which apparently has not helped him to unearth more compelling evidence. On the other hand, the State has a strong interest in finality that has only grown as the years have accumulated. The Court has already expressed why Petitioner's most recent discovery requests are lacking in good cause, and it will not tread that ground again, except to reiterate that there is no firm reason to believe that new scientific testing would seriously undermine the existing expert opinions on ballistics and shoe print evidence or result in DNA evidence that either links Jeff to the crimes or excludes Petitioner from participation.

Accordingly, the Court concludes that Petitioner has not established a claim of actual innocence as reflected by the expanded record or his current proffer, nor has he convinced the Court that more discovery, a longer investigation, or an evidentiary hearing is likely to yield that type of evidence.

## CERTIFICATE OF APPEALABILITY

As required by Rule 11 of the Rules Governing Section 2254 Cases, the Court evaluates this case for suitability of a certificate of appealability ("COA").  *See also* 28 U.S.C. § 2253(c).

A habeas petitioner cannot appeal unless a COA has issued. 28 U.S.C. § 2253. A

COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court is satisfied that the following claim, while not meritorious, raises significant enough issues that Petitioner should be permitted an opportunity to convince the Court of Appeals of its merit: Claim C(4) (ineffective assistance of counsel in investigating the forensic evidence). The Court will issue a COA over that claim. The COA will also encompass the Court's ruling denying Petitioner's Motion for Additional Discovery and to Release Evidence (Dkt. 92). No other claims or rulings in this case are reasonably debatable or will be included within the certificate, though Petitioner may seek to broaden the COA in accordance with Ninth Circuit rules.

Petitioner is advised that he must still file a timely notice of appeal in this Court if he intends to pursue an appeal.

## ORDER

**IT IS ORDERED:**

1.     Petitioner's Motion for Additional Discovery and to Release Evidence (Dkt. 92) is DENIED.

**MEMORANDUM DECISION AND ORDER - 52**

2.      Petitioner's Third Motion for Discovery-Deposition of James Swogger, Jr.,
        In Camera Review, and Access to Detective Victor Rodriguez's Files (Dkt.
        104) is DENIED.

3.      All claims remaining in the Amended Petition for Writ of Habeas Corpus
        are DENIED.

4.      The Court issues a certificate of appealability over its decision to deny relief
        on Claim C (subpart 4) (ineffective assistance of counsel in investigating
        and challenging the forensic evidence). The certificate of appealabilty will
        also encompass the Court's ruling denying Petitioner's Motion for
        Additional Discovery and to Release Evidence (Dkt. 92), as it relates to
        Claim C (4). No other claims or rulings in this case will be included within
        the certificate.

5.      Upon the filing of a timely notice of appeal in this case, and not until such
        time, the Clerk of Court shall forward the necessary paperwork to the Court
        of Appeals for the Ninth Circuit for the docketing of an appeal in a civil
        case.

DATED:  **March 14, 2012**

~~Honora~~ble Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 53**