UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LANNY SMITH,<br><br>                    Petitioner,<br><br>vs.<br><br>LAWRENCE WASDEN and KEVIN KEMPF,[1]<br><br>                    Respondents. | Case No. 4:08-cv-00227-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

An Order denying Petitioner Lanny Smith's Petition for Writ of Habeas Corpus and a Judgment were entered on March 14, 2012. (Dkt. 112, 113.) The United States Court of Appeals for the Ninth Circuit remanded this case to permit Petitioner to obtain the previously undisclosed criminal case file Detective Victor Rodriguez kept in this case, and to file additional pleadings warranted by the discovery. (Dkt. 122.)

The production of the Victor Rodriguez file was part of an effort by Petitioner to expand the record for the purpose of overcoming the State's procedural default and statute of limitations defenses by showing cause and prejudice or actual innocence. (Dkts. 43, 84.) Since first undertaking discovery in this federal habeas corpus action, Petitioner

---

[1] The Court substitutes Idaho Department of Correction Director Kevin Kempf for former Director Brent Reinke.

**MEMORANDUM DECISION AND ORDER - 1**

has amended his petition twice, to include new substantive claims and factual allegations based on evidence that was not included in the state court record and has never been presented to the state courts. (Dkts. 62, 134.) Petitioner also asks for permission to conduct further discovery (Dkt. 138.) Respondents object to the presentation of new claims and to the request to conduct additional discovery. (Dkt. 138.)

The Court previously declined to address the tangled procedural issues that might foreclose some of the claims, and instead proceeded to the merits, concluding that Petitioner had not shown entitlement to relief even under a de novo review standard. (Dkt. 112.) Potential threshold procedural questions include whether Petitioner received a full and fair opportunity in the state courts to develop the factual basis of his claims; whether the statute of limitations on new claims should be equitably tolled by Petitioner's alleged actual innocence or his mental limitations; whether the procedural default of claims can be excused by a showing of actual innocence or cause and prejudice, including those eligible for consideration under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), and *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014); and to what extent defense counsel conflicts of interest on direct appeal and in the initial stages of the post-conviction matter excuse procedural default. Once again, the Court concludes that it is a more efficient use of public resources to go directly to the merits of Petitioner's claims, while permitting Respondents to reserve their procedural bar defenses.

## PROCEDURAL POSTURE OF CASE

With the help of another inmate, Petitioner presented six claims in his original pro se federal Petition for Writ of Habeas Corpus on May 23, 2008. (Dkt.1.) The Court asked

MEMORANDUM DECISION AND ORDER - 2

Petitioner to file a supplement to clarify his claims, and he did so on August 18, 2008. (Dkt. 7.)

The Court later appointed counsel for Petitioner and granted counsel's request to engage in limited discovery. On August 6, 2010, Petitioner's counsel submitted an Amended Petition, including eight new claims. (Dkt. 62.) On December 30, 2014, after additional discovery granted by the Ninth Circuit Court of Appeals, Petitioner filed a Second Amended Petition containing four new claims. (Dkt. 134.)

The Court ordered the Second Amended Petition to be filed, and then reviewed the pleading under Rule 4 of the Rules Governing Section 2254 Cases. The Court summarily dismissed Claims A, C(3), D, E, F, G, and I, concluding that Petitioner was not entitled to relief on those claims.

The Court previously concluded that further evidentiary development through additional discovery or an evidentiary hearing was not warranted. (Dkt. 112, p. 1.) After a thorough review of the entire record, including Petitioner's new submissions, the Court again concludes that neither further evidentiary development nor habeas corpus relief is warranted, for the reasons set forth below.

Some of the new evidence discovered by Petitioner is relevant to claims previously adjudicated. The Court has reviewed all of the claims, including those dismissed in previous Orders, to evaluate them in light of the new evidence Petitioner has presented. For the sake of clarity, the Court vacates the prior Order and Judgment, addresses anew all claims in this Order, and enters a new Judgment dismissing the Second Amended Petition for Writ of Habeas Corpus with prejudice.

**MEMORANDUM DECISION AND ORDER - 3**

## FACTUAL BACKGROUND AND STATE COURT PROCEEDINGS

In March of 1992, Leo and Mary Yvonne Downard were shot to death in their home in Ammon, Idaho. The Downards were most likely killed late night on March 21 or early in the morning on March 22, but their bodies were not discovered for another three days. Petitioner Lanny Smith's brother, Jeff Smith, was the last person to be seen at the Downard's home on March 21, and the State initially charged him with first-degree murder, but the case was dismissed after a preliminary hearing. The investigation then shifted to Petitioner. After the State developed new evidence, Petitioner was charged and convicted of murdering the Downards, as well as burglary, arising from entry into their home.

Petitioner was represented at trial by attorneys Stevan Thompson and Jerry Woolf. Special prosecuting attorneys appointed to represent the State in this matter were Thomas Moss and Jay Rosenthal. The trial judge was the Honorable James C. Herndon, Seventh Judicial District Court in Bonneville County, Idaho.

Petitioner is currently serving a controlling sentence of life in prison without the possibility of parole. Because he continues to claim that he is innocent of these crimes and that Jeff is the more likely perpetrator, the factual background will be recited in detail here.

**MEMORANDUM DECISION AND ORDER - 4**

## 1.  Petitioner's Possession of the Murder Weapon, and Jeff Smith's Whereabouts, on March 20, 21, and 22, 1992

In the 1980s, the Downwards lived with their children in a house on Sabin Drive in Ammon, which was one street over from Lynn and Julia Smith's home on Midway Drive. Lynn and Julia's sons—Petitioner and Jeff—knew the Downards and their children, and they visited the Downards' home often throughout their childhood years. (State's Lodging A-12, pp. 2125-27.)

Lynn and Julia divorced in 1988, and Lynn moved to nearby Idaho Falls, eventually marrying Sondra Genzinger, while Julia remained in the family home on Midway. (State's Lodging A-9, pp. 1390-91, 1479.) By then, Jeff had also moved out, but Petitioner still lived with his mother on Midway until late 1991, when he moved into a basement room in his father and step-mother's home in Idaho Falls. (State's Lodgings A-9, p. 1391; A-12, p. 2133.)

Lynn Smith kept several guns locked in a gun cabinet to which only he had access, and one of those guns was Petitioner's .22 caliber, pump-action Remington Fieldmaster rifle. (State's Lodging A-9, pp. 1480-81.) On the evening of March 20, 1992, a Friday, Petitioner told his father that he intended to go target shooting the next day. (*Id*.) At Petitioner's request, Lynn unlocked the gun cabinet and gave him the Fieldmaster rifle, together with a box of .22 caliber ammunition. (*Id*. at 1481.)

Saturday morning, Lynn left town and would not return until late that night. (State's Lodging A-14, p. 1491.) Sondra Smith, Petitioner's stepmother, was doing her weekly chores when she saw Petitioner, carrying his rifle, leave the house around 11:00

**MEMORANDUM DECISION AND ORDER - 5**

a.m. (*Id*. at 1402.) That afternoon, he drove to the golf course where he worked and spoke briefly with a coworker, Mike Johnson. (State's Lodging A-11, p.1906.) Johnson noticed the rifle in the backseat of Petitioner's car, and Petitioner told him that he was going target shooting. (*Id*. at 1907.) He returned home in the middle of the afternoon, which drew Sondra's attention because he struggled to open the front door with the rifle in his hands. (*Id.* at 1439.) When he left home for the second time around 5:30 p.m., Sondra saw that he was again carrying the rifle. (*Id.*)

Around noon on that Saturday, Jeff Smith arrived at his mother's home in Ammon to power rake her lawn. (State's Lodging A-12, pp. 2138-39.) He needed a truck to haul the heavy rental equipment, and Leo Downard gave him permission to borrow the Downards' pickup. (*Id*. at 2141.) Leo asked Jeff to rake his lawn after he had finished Julia's lawn. (*Id*.)

Altogether, Jeff completed three lawns that afternoon, and he was paid about $40. (State's Lodging A-12, pp. 2144-45.) Late in the afternoon, he returned the equipment to the rental store and drove to Lynn and Sondra's home in Idaho Falls to drop off some wooden planks. (*Id*.) Petitioner apparently helped Jeff unload the planks before Petitioner left with the rifle. (State's Lodging A-9, p.1407.) Sondra noticed that Jeff was dirty, and she kept a close eye on him because she had just finished cleaning the house. (State's Lodging A-9, p. 1407.) She watched him as he used the telephone briefly before leaving the residence, and she did not see him take anything with him as he left. (*Id*. at 1409-1416.)

**MEMORANDUM DECISION AND ORDER - 6**

Jeff returned the truck to the Downards and was seen departing their home at 6:30 p.m. (State's Lodging A-6, pp. 607, 628.) About thirty minutes later, neighbors saw Leo standing in his driveway, and he waved to them. (*Id*. at 553, 608.)

At about that same time, Petitioner arrived at a friend's house to watch NCAA basketball tournament games. (State's Lodging A-13, p. 2572.) Petitioner told his friend that he had been target shooting shortly before he came over. (*Id*. at 2576.) He stayed at the friend's house for about three hours, until about 10:15 p.m. (*Id*. at 2574.) Another guest claimed that Petitioner lingered in the doorway for a few minutes before announcing that he was headed home and adding that he "was going to kill some rabbits." (State's Lodging A-11, p. 1914.)

Sondra Smith was preparing for bed when she heard the front door open and close between 10:30 and 11:00 p.m. Saturday night. (State's Lodging A-9, p. 1437.) She assumed that Petitioner had returned. (*Id*.) Lynn Smith returned from his day trip around midnight, and he saw that Petitioner's car was parked in front of the house. (*Id*. at 1494.) Lynn noticed that Petitioner was still awake because he could hear the shower running in the bathroom downstairs. (*Id*. at 1513-14.)

Earlier, around 9:00 p.m., Jeff arrived at a nightclub, where he stayed for about three hours before moving on to another club. (State's Lodging A-12, pp. 2151-53.) He was generally in a good mood, interacted with others, and even bought an acquaintance a drink. (*Id*. at 232-33.) Jeff left the bar at 1:00 a.m. and, according to him, he then went to his apartment to go to sleep. (*Id*. at 2153.) His girlfriend arrived around 3:00 a.m. and stayed the rest of the night. (*Id*. at 2366.) Except for about 15 minutes the next morning

**MEMORANDUM DECISION AND ORDER - 7**

when Jeff went out to buy some groceries, he and his girlfriend were together all day on March 22 until late that night. (*Id*. at 2367, 2375.) Jeff was happy to see his girlfriend and was relaxed during the time that they spent together. (*Id*. at 2380-81.)

At an unknown time in the overnight hours of March 21 and 22, 1992, Leo and Mary Downard were shot to death in their home.

### 2.  The Days Following the Murders

On Sunday morning, Petitioner retrieved the rifle from his bedroom and gave it to Lynn, who put it away and locked the cabinet. (State's Lodging A-9, pp. 1515-17.)

That same morning, a member of the Downards' church became concerned when the normally dependable Mary failed to show up to teach a Sunday school class. (State's Lodging A-7, pp. 655-57.) She called the Downards' home, and then called again for the next several days, but received no answer. (*Id*.)

On separate occasions on Sunday afternoon, two witnesses in the Downards' neighborhood saw a person that they recognized as Petitioner drive slowly down Sabin Drive, once on a motorcycle and once in his compact car. (State's Lodging A-11, pp. 1979, 2006.) Others saw him driving in the area again two days later, looking in the direction of the Downards' home. (*Id*. at 2017-18, 2029-31.)

Jeff Smith also returned to the Downards' residence on Tuesday and Wednesday, ostensibly to ask Leo if he could borrow the truck again, and he went to the front door and knocked. (State's Lodging A-12, pp. 2155-60.) Jeff noticed that the front door was slightly ajar, but he did not go inside, and he left when there was no answer. (*Id*.)

The Downards' bodies were discovered on Wednesday, March 25. (State's Lodging A-6, p. 614.) Leo was found in the living room. (State's Lodging A-7, pp. 661.) He had been shot three times; once in the chest, another in his heart, and a third shot entered his head from extremely close range. (*Id*. at 773-74.) Mary's body was discovered upstairs in the master bedroom. (*Id*. at 662.) She had been shot three times in the head, with one shot behind her ear. (*Id*. at 764.)

### 3.  The Investigation, Charges, and Trial

Investigators retrieved five .22 caliber shell casings from the crime scene. (State's Lodging A-8, pp. 1142-44.) They also discovered two partial shoe prints in the dust in the bedroom where Mary's body was found and additional partial prints in a field behind the house. (State's Lodging A-7, pp. 710-11.) Of these, a photograph was taken of one of the prints from the upstairs bedroom. (*Id*.)

Because Jeff was the last person known to have been with the Downards before they were killed, the investigation started with him. (State's Lodging A-7, p. 673.) The police contacted Lynn Smith, who notified Jeff that investigators wanted to speak with him about "something serious that had happened in Ammon." (State's Lodging A-8, p. 997.) Jeff quickly located a police officer who was engaged in a traffic stop near his apartment and said, without prompting, that he had not been to Ammon recently. (State's Lodging A-13, p. 2534.) When he was interviewed formally that night, however, he admitted that he had been to the Downards' home raking their lawn the previous Saturday and that he had been back to knock on their door. (State's Lodging A-7, pp. 678, 691.)

When he was told that the Downards had been killed, he broke down and cried. (*Id*. at 678.)

Investigators searched Jeff's apartment and retrieved a pair of size 9½ FootJoy tennis shoes with a tread that was similar to the prints that they had seen in the Downards' home. (State's Lodging A-10, p. 1604.) These shoes were eventually deemed to be slightly too large to have made the print that had been photographed. (State's Lodging A-11, p. 1859.) They also collected a pair of jeans that had a small red spot on them, and a presumptive test for blood was positive, but a follow-up test by a lab could not confirm the presence of blood. (State's Lodging A-11, pp. 1889-90.)

Investigators later seized guns from Lynn Smith's gun cabinet, including the .22 caliber Fieldmaster rifle, and though Petitioner had the rifle on March 21 and 22, he told officers that only his father had access to the locked cabinet and that no one used the Fieldmaster in "quite some time." (State's Lodging A-10, p. 1597.) Lynn Smith also claimed that the cabinet had been locked when he went out of town on March 21. (*Id*. 1601.) Despite these assurances, ballistics tests would later confirm that the spent shell casings found in the Downards' home had been fired and ejected from Petitioner's Fieldmaster rifle. (State's Lodging A-8, pp. 1142-47.) And while the bullets taken from the Downards' bodies were severely damaged, at least one was also linked to the same rifle. (*Id*. at 1150.)

Because investigators still did not know that Petitioner possessed the murder weapon on the weekend that the Downards were killed, the State went forward with charges against Jeff for murder and burglary. The case proceeded to a preliminary

**MEMORANDUM DECISION AND ORDER - 10**

hearing, where Lynn admitted for the first time that Petitioner had the rifle from March 20 to 22. (State's Lodging A-10, p. 1609.) The charges against Jeff were dismissed, and the State's investigation then shifted to Petitioner.

Investigators had searched Petitioner's bedroom and seized a pair of size 8½ FootJoy tennis shoes that, unlike Jeff's FootJoys, were found to be closer to the size of the print that had been photographed in Downards' bedroom. (State's Lodging A-8, pp. 971-72.) The case against Petitioner still did not move forward, however, until about a year and a half after the murders, when a witness named Beverly Huffaker began to take on a more prominent role. She told investigators that Petitioner was a frequent visitor to her home before, during, and for some time after the Downards were murdered. (State's Lodging A-9, pp. 1239-40.) She said that Petitioner was close friends with her son, Scott, and that Petitioner had expressed his interest in older, heavy-set women and, in particular, that he found Mary Downard to be attractive. (*Id.* at 1281-91.)

Most notably, Mrs. Huffaker told the police about a meeting that she claimed happened with Petitioner very early in the morning on March 22, 1992, after she had returned from a trip to Nevada with her son. (State's Lodging A-9, pp. 1244-45.) According to her, Petitioner was waiting at her home when they arrived at 1:00 a.m., and he was teary and extremely upset, but he would only tell her that "something bad had happened." (*Id.* at 1249.) Scott Huffaker also recalled this incident and agreed that it happened on that date. (*Id.* at 1370.) Although the Huffakers went to Nevada frequently to

see shows and to gamble, they recalled this particular trip because Scott had won $400, which he allegedly used to buy a rifle the next day. (*Id*. at 1371.) [2]

On December 14, 1994, a grand jury indicted Petitioner on two counts of first degree murder, one count of burglary, and a sentencing enhancement for the use of a deadly weapon. (State's Lodging A-1, pp. 1-3.)

The case did not proceed to a jury trial for another 15 months, beginning in late March of 1996 and ending approximately four weeks later. Jeff Smith, who up to that point had indicated that he would invoke his Fifth Amendment privilege against self-incrimination, agreed to testify for the State under a grant of immunity. (State's Lodging A-12, pp. 2112-2283.) He provided a timeline of his actions on the weekend that the Downards were killed, and he denied he committed the crimes. (*Id*.)

In addition to the evidence recited above—including the forensic evidence showing a size 8½ shoe more closely matched the shoe prints and the ballistics evidence tying the spent shell casings to Petitioner's Fieldmaster rifle—the State also presented the testimony of a jailhouse informant, James Swogger, Jr., who claimed that Petitioner had confessed to him that he had killed the Downards. (State's Lodging A-10, pp. 1558-59.)

The defense called nearly two dozen witnesses in its case-in-chief. (State's Lodgings A-12 to A-14.) Notable among the evidence was the testimony of Brian Ravenscroft, who claimed that Petitioner had admitted to him "that he was aware that it was his shoe print that was found at the Downards' home," and that if they let Jeff go,

---

[2] The Huffakers' claims that this strange late-night interaction with Petitioner occurred on the weekend of the Downards' murders, rather than on some other date, was strongly contested by the defense at trial. A receipt of Scott's purchase of a rifle in 1992 was discovered during the trial, and it was dated in February rather than in March. The receipt was introduced into evidence. This issue is discussed in greater detail herein below.

they would arrest Petitioner. (State's Lodging A-13, p. 2592.) Petitioner did not testify, and the jury returned guilty verdicts on all counts. (State's Lodging A-14, pp. 528-30.)

The State originally sought the death penalty, but it reached an agreement with the defense that Petitioner would be sentenced to two fixed life sentences for the murders, a fixed ten-year sentence for first-degree burglary, and a fixed five-year sentence for the sentencing enhancement, all to be served concurrently. (State's Lodging A-3, pp. 654-56.) The trial court followed the agreement and imposed those sentences on Petitioner. (*Id.*) The Idaho Court of Appeals affirmed his convictions and sentences on direct appeal, and the Idaho Supreme Court declined to review the case. (State's Lodgings B-3, B-6, B-7.)

### 4. Post-Conviction Proceedings

While Petitioner's direct appeal was still pending, the trial prosecutor forwarded a supplemental discovery response to trial counsel (who was also serving as direct appeal counsel). (State's Lodging C-1, pp. 12-18.) The supplemental response contained a recently completed written statement from Jamie Lynn Hill, who claimed to have witnessed an altercation between Jeff Smith and his ex-wife in 1994 or 1995, before Petitioner was tried on these charges. (State's Lodging C-1, p. 16.) Hill asserted that when she tried to intervene, Jeff told her, "you better back down little girl, or I'll take care of you just like I took care of that ol' Ammon couple." (State's Lodging C-1, p. 16.)

Based on this information, Petitioner's counsel pursued post-conviction relief, in part, on the ground that the prosecution had withheld exculpatory evidence from the defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (State's Lodging C-1, pp.

**MEMORANDUM DECISION AND ORDER - 13**

41-42.) After holding an extensive evidentiary hearing, the trial court denied relief, concluding that Petitioner had failed to show that the Hill had contacted investigators in the Downard case who would have had a duty to disclose the evidence to the defense. (State's Lodging C-4, p. 244.) On appeal, the Idaho Court of Appeals affirmed. (State's Lodging D-4, p. 8-11.) The Idaho Supreme Court denied Petitioner's request for review. (State's Lodging D-8.)

## HABEAS CORPUS STANDARD OF REVIEW

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Different standards of review may apply, depending on whether the petitioner properly presented his claims to the highest state court.

### 1.   AEDPA Deferential Review

Where the petitioner challenges a state court judgment in which the petitioner's federal claims were adjudicated on the merits, Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C. § 2254(d) limits relief to instances where the state court's adjudication of the petitioner's claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). This standard is often referred to as the "AEDPA deference" standard. A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Stated more simply, "Section 2254(d) applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision was reached." *Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

**MEMORANDUM DECISION AND ORDER - 15**

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

When a party contests the reasonableness of the state court's factual determinations under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). If the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

**MEMORANDUM DECISION AND ORDER - 16**

### 2.  De Novo Review

Section 2254(d)(1), the strict deferential standard, does not apply, making de novo review of a claim possible only under the following circumstances: (1) where the state appellate court did not decide a properly-asserted federal claim; (2) where the state court's factual findings are unreasonable under § 2254(d)(2); or (3) where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such a case, as in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if there are factual findings of the state court, and they are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1). *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), and the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### CLAIM A(1): *BRADY* EVIDENCE—JAMIE HILL STATEMENT

Claim A(1)[3] is that the State failed to disclose Jamie Hill's s statements to police that Jeff admitted in 1994 or 1995 to murdering the Downards, in violation of Petitioner's Fourteenth Amendment rights, as set forth in *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

---

[3] To more easily identify the claims, the Court follows the numbering system set forth in the outline of the Second Amended Petition. As a result, the numbers are not always consecutive, for example, A(6) follows A(1).

Jamie Hill was a co-worker of Jeff Smith's then wife, now ex-wife, Robin Smith (now Jacobsen).[4] This claim was properly exhausted in the post-conviction action. After a review of the record, the Court concludes that Petitioner's new evidence does not make a difference in the outcome of this claim.

### 1.  Standard of Law

While defendants have no general constitutional right to discovery in criminal proceedings, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), due process requires that the prosecution disclose evidence favorable to an accused upon request, when such evidence is material to guilt or punishment, including impeachment evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. U.S.*, 405 U.S. 150 (1972). After the *Brady* rule was announced, the United States Supreme Court clarified: "We do not ... automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict ... A finding of materiality of the evidence is required." *United States v. Bagley*, 473 U.S. 667, 677 (1985).

"Material" evidence is any evidence for which there is a reasonable probability that its disclosure would have changed the outcome of the proceeding, and a "reasonable probability" means one sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682. To meet the "materiality" factor, the defendant need not show that he would more likely than not have been acquitted had the evidence been disclosed, but only that

---

[4] An Affidavit signed by Ms. Jacobson shows the spelling of her first name as "Robbin" (Dkt. 134-3), while everywhere else in the record it is spelled "Robin." The Court uses one "b" for consistency's sake.

**MEMORANDUM DECISION AND ORDER - 18**

he did not receive a fair trial that resulted in a verdict "worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1905).

In summary, there are three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

## 2.  Discussion

The Jamie Hill statement was the subject of an extensive evidentiary hearing during the state post-conviction proceeding, and the Idaho Court of Appeals denied the claim on the merits. (State's Lodging D-4.) To be entitled to relief, Petitioner must show that the Idaho Court of Appeals' decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Petitioner is unable to carry this burden.

The state district court found that Petitioner had failed to show the prosecution withheld favorable evidence because he had not proven that Hill reported Smith's statement with sufficient specificity to officials investigating the Downards' murders before or during Petitioner's trial.

On appeal, the Idaho Court of Appeals recognized *Brady* as governing precedent. The Idaho Court of Appeals upheld the district court's finding, reasoning:

**MEMORANDUM DECISION AND ORDER - 19**

The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. [Citation omitted.] Because there is sufficient evidence supporting the district court's factual finding that J.H [Jamie Hill] did not report Jeff's [Jeff Smith's] threat to the police until October 2000, we cannot conclude that the finding was clearly erroneous.

If J.H. did not relay Jeff's threat to the police involved in the investigation until October 2000 during the pendency of Smith's appeal, the prosecutor could not reasonably be imputed to have had knowledge or control of Jeff's threat to J.H. at the time of Smith's trial. We hold that the district court properly ruled that Smith failed to demonstrate that the state suppressed evidence of Jeff's threat. We therefore need not determine whether the evidence of Jeff's threat would have been favorable to Smith's case or whether suppression of it by the state would have prejudiced Smith. The district court properly dismissed Smith's *Brady* claim after an evidentiary hearing.

(State's Lodging D-4, pp.10-11.)

As to the state court findings, Petitioner now asserts: "While Ms. Hill's testimony was less than clear at times, the factual finding made by the district court is nonetheless clearly erroneous, and the Court of Appeals decision was based on an unreasonable determination of the facts in light of the evidence presented during the post-conviction proceedings." (Dkt. 1334, pp. 11-12.) In a habeas action, state court findings of fact are presumed to be correct, absent clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

At the evidentiary hearing, Hill initially testified that she had called the police and informed them on two different occasions about Smith's statement near the time that the incident occurred. She later backtracked and admitted that she could not remember the details and that she was not "100 percent" certain what she said to them. (State's Lodging C-4, pp. 93-94.) A sheriff's office incident report shows that an unknown person reported

an *incident of spousal abuse* involving Jeff and Robin at the care center where Jamie and Robin worked on March 18, 1994, but it contains no other information. (State's Lodging C-5, p. 2.)

On cross-examination it became apparent that Ms. Hill had told many different versions of this incident. Witnesses who worked at the center or who were mentioned by Ms. Hill were called testify at the hearing to dispute Ms. Hill's story. The State also introduced several witnesses who cast doubt on Hill's reputation for honesty. (State's Lodging C-4, p. 159.)

The Jamie Hill statement is also contrary to the transcript of the 2004 written interview Robin Jacobsen had with Sheriff's Investigator James Foster. In that interview, Robin said that Jeff never said anything to her about being involved in the Downards' murder. She said she didn't know Jamie Hill. Robin also said Jeff never said that he would kill Robin like he killed the Downards; rather, he threatened to kill her with a shotgun after she joked that it was too bad he hadn't been injured when he wrecked his pickup. (Dkt. 63-5, Exhibit 9 to Deposition of Stevan Thompson.)

Robin contradicted herself in an Affidavit (Dkt. 134-3), stating that Jeff told her, "I will put you down like I did the Downards." She stated that two underage girls were present at the time, and Jeff had come by the Life Care Center to ask Robin for money.[5]

---

[5] In contrast, the 2004 statement shows only that Robin said that she went outside her place of employment and saw two young ladies in Jeff's pickup. She said she gave him "an attitude hi" but they did not get into a physical fight and no one was with her. (*Id.*, pp. 9-10.) Also in that interview, in response to the question whether "Jeff, during the time you knew him, never admitted to you at any time, that he killed Leo and Mary Downard," she said, "Nope. Not one time." (*Id.*, p. 10.)

The circumstances of this alleged statement are very different from the circumstances that Jamie Hill described.

In an effort to show an unreasonable finding of fact, Petitioner misrepresents the post-evidentiary hearing record regarding the testimony of Jamie Hill's father, Idaho Falls Police Captain Hagen. Petitioner represents that Captain Gary Hagen "was clear in his response" that he recalled that Jamie made the statement to him "either around the time of Jeff Smith's preliminary hearing or Petitioner's trial." (Dkt. 134, p. 12.) To the contrary, Captain Hagen was simply trying to extrapolate what year the statement might have been made, using the trial date someone else provided to him as a reference point. Because the starting reference point is merely speculative, the resulting extrapolation was also speculation. What is clear is that he was very honest about not having any idea when the statement occurred:

> Q.   (By Mr. Stafford) Did you make a statement that this happened before Lanny's arrest and around the time of Jeff Smith's preliminary hearing?
>
> A.   I don't recall making a statement similar to that. There was a question as to the date that this had happened that Jamie had made this statement. And Mr. Dillon had asked me if I could remember the year, and I said, no, I really don't. If I had any idea, I would know what was going on in my life. And he said, well, how about the spring of '95? And I said, well, if that's the case, then, yeah, I did have a lot going on. And that's how we came up with the date between '95 and '96.
>
> Q.   But you could say that this was before Lanny Smith's trial; can you not?
>
> A.   I don't recall when the trial was.
>
> Q.   The year 1996.

**MEMORANDUM DECISION AND ORDER - 22**

> A.    Then if '95, it would be plain. If the statement was made in 1995, then the trial was in 1996.
>
> Q.    Well, it was while – Jamie made the statement – while she was working at the Life Care Center?
>
> * * *
> A.    I do not recall.
>
> Q.    You don't recall where she was working?
>
> A.    I do not recall. If I knew the year that the statement was made, I could probably tell you where she was working, but I don't recall when it was made.
>
> Q.    Do you recall if she was in high school or not?
>
> A.    I don't recall.

(State's Lodging C-4, pp. 103-04.)

Based on this testimony, Petitioner argues that the Idaho courts made an unreasonable determination of fact, because it is very clear from the foregoing colloquy that Captain Hagen knew the statement was made in 1995 or 1996. The record plainly reveals no such statement by Captain Hagen, and, in other parts of the record, he repeated his position that he did not recall the date of Ms. Hill's statement. (See State's Lodging C-4, pp. 98.)

Petitioner also argues that Captain Hagen's knowledge of the statement should be imputed to the investigating officers of the Bonneville County Sheriff's Office and to the prosecutor in the Downard case, because Hagen was a captain with the Idaho Falls Police Department. (Dkt. 134, pp. 12-13.) While it is true that "an individual prosecutor has a duty to learn of favorable evidence known to others acting on the government's behalf in

MEMORANDUM DECISION AND ORDER - 23

the case," *Kyles*, 514 U.S. at 437, there was no evidence that Gary Hagen was acting on the government's behalf in the Downard case. As an Idaho Falls police officer, he was not involved in the investigation of the Downards' homicides in Ammon, which were being investigated by the Bonneville County Sheriff's Department. More generally, he was acting as Hill's father rather than a law enforcement official when he advised her to contact the appropriate authorities and stay away from Jeff Smith. (State's Lodging C-4, p. 99.) In addition, the argument fails because Petitioner has not proven that the timing of the statements was prior to Petitioner's trial.

In summary, relying on all of the new and old evidence in the record, Petitioner simply has not established (1) the date that Jamie Hill made the statement to her father or to the police; (2) that her original report to the police even included the information about Jeff Smith's alleged comments about the Downards; or (3) that officials with authority in the Downard case knew about the incident between Smith and Hill such that they would have had a duty to disclose it to the defense. The reports of Jamie Hill and Robin Jacobsen contradicted themselves and each other, and Jamie Hill's credibility was seriously called into question by other witnesses at the post-conviction hearing. Accordingly, the Court concludes that this dispositive factual finding was not unreasonable on the evidence presented in state court, and the state court decision was not an unreasonable application of the law. Hence, Claim A(1) fails under 28 U.S.C. § 2254(d)(1) and (2).

### CLAIM A(6): *BRADY* CLAIM—ROBIN JACOBSON STATEMENT ABOUT JEFF'S CREAM-FILLED SURGICAL GLOVE

Petitioner asserts that the prosecution wrongly withheld from defense counsel evidence that Jeff's then-wife, Robin Jacobson had found potential exculpatory evidence four years after the murder. This claim was not presented to the state courts and is procedurally defaulted. The claim is derived from the following interview Robin Jacobson had with Police Investigator James Foster in 2004. The pertinent portion of that interview discussing the evidence is as follows:

Foster:     Do you recall Jeff ever telling you that he had killed the Downards?

Robin:     No.

Foster:     Do you recall Jeff ever telling you that he had planted evidence?

Robin:     No. Except there's one thing. I got home, and I wanted a cigarette. I didn't have a cigarette, so I looked in Jeff's bedroom, because him and I didn't sleep together [sic]. I could not tolerate his attitude and stuff. So I looking [sic] in between the bed and I found something so weird.

Foster:     What did you find so weird.

Robin:     It was a glove, kind of like a cut off glove, with liquid in it. With blood in it. Like a cream stuff. Tell me about it.

Foster:     Like cream?

Robin:     Yeah. With blood in it. And I almost had a heart attack. Went downstairs, used the phone to call an officer, an officer came over and said that's not going to help us. And I go; it's got to help somehow. It's from Jeff's room. It's part of his property.

**MEMORANDUM DECISION AND ORDER - 25**

Foster:        Do you remember when that was?

Robin:         '96.

Foster:        '96.

Robin:         Uh huh.

Foster:        And there was still wet blood in there?

Robin:         Uh huh.

Foster:        What kind of . . .

Robin:         Like a floaty.

Foster:        What kind of glove was it?

Robin:         Like a glove, a surgical glove. And I just lost it. I thought, oh, my God.

Foster?        That was in 1996.

Robin:         Yeah.

Foster:        Four years after the murder.

Robin:         Yes.

(Dkt. 63-5, pp. 15-16; Exhibit 9 to Deposition of Stevan Thompson.)

For shock value in his habeas pleadings, Petitioner describes this item as a "bloody glove," implying that Jeff had worn the glove when he killed the Downards. The evidence is nothing of the sort. From the description above, it is clear that, four years after the murder, Jacobson found an inflated surgical glove, like a "floaty," that contained cream and what she speculated to be blood. It defies logic to venture how or why a criminal would have stopped to capture blood from victims, placed in a surgical glove,

**MEMORANDUM DECISION AND ORDER - 26**

intermixed it with a "cream," tied it into a floaty, put it "in between the bed," and saved it in a liquid form for four years, without it having burst upon the impact of repeatedly sleeping in the bed. If Jacobsen did report this story to police investigators, it is no wonder that they deemed this type of "evidence" unusable.

This claim, based on Jacobson's off-hand recollection during an interview eight years later, is wholly speculative. There is no proof that the glove actually existed, nor is there any evidence tending to show that the glove, if it existed, was connected to the Downards' homicides, or why she believed that Jeff Smith might have been involved in the crime. There is nothing to verify the purported timing of the disclosure to police officers or even if the disclosure actually occurred, as with the Jamie Hill statement.

In the same interview, Jacobson stated that she just had a "feeling" that Jeff was involved because of his general "attitude" and because Jeff had said, "Yes!" when he heard on television that Petitioner had a trial date. (Dkt. 63-5, pp. 7; Exhibit 9 to Deposition of Stevan Thompson.) Jacobsen testified that she did not believe that Jeff ever hurt anyone, nor did he ever tell her that he had killed anyone. (*Id*., p. 4.) She confirmed at the post-conviction evidentiary hearing that Smith has never admitted to her that he had committed the crime. (State's Lodging C-4, p. 109.)

A meritorious *Brady* claim cannot be based on mere speculation. *See Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) (dismissing a petitioner's theory of a *Brady* violation as "mere speculation"). The Jacobson evidence is so untenable, vague, insubstantial, and unreliable that Petitioner has failed to show how its disclosure would have had any effect on guilt or punishment. *See United States v. Sarno*, 73 F.3d 1470,

1506 (9th Cir. 1995) (finding no *Brady* violation from the failure to disclose evidence

that was "marginal, ambiguous, cumulative, inadmissible, unreliable, inculpatory,

irrelevant, or of negligible probative worth").

There is "no constitutional requirement that the prosecution make a complete and

detailed accounting to the defense of all police investigatory work on a case." *Moore v.*

*Illinois*, 408 U.S. 786, 795. The State has no obligation to provide speculative

information to the defense. *U.S. v. Agurs*, 427 U.S. 97, 110 n.16 (1985) (citing *Giles v.*

*Maryland*, 386 U.S. 66, 98, Fortas concurring). The Court concludes that the cream-filled

floaty statement is not favorable to the defense, was not known by the prosecution, and is

not material. No federal habeas corpus relief is warranted on Claim A(6), and it borders

on being frivolous.

## CLAIM B
## RIGHT TO PRESENT A COMPLETE DEFENSE

Claim B is that the trial court's exclusion of evidence related to Jeff Smith's

violent character violated his Sixth and Fourteenth Amendment right to present a

meaningful alternate perpetrator defense to the charges against him. (Dkt. 134, p. 16.)

Petitioner bases this claim on the trial court's exclusion of the defense's written offer of

proof, labeled "Exhibit AA," which Petitioner asserts was a compilation of police reports

and witness statements showing specific instances of Jeff's past misconduct. (*Id*. at 17.)

The Idaho Court of Appeals described the proffered instances of Jeff's prior bad acts as

the following:

> Jeff had (1) as a sixteen year-old brandished a firearm at a neighbor; (2) as an
> eighteen or twenty year-old raped his first wife and threatened to kill her with a

**MEMORANDUM DECISION AND ORDER - 28**

shotgun if she were to leave him; (3) sold a watch to a bartender (apparently an attempt to raise an inference that Jeff is a thief); (4) in 1991 or 1992, drove a company vehicle in a reckless manner and became angry when confronted by his boss; and (5) threatened to use a gun to steal money from a hearing aid shop in 1994.

(State's Lodging B-3, p. 6.)[6]

Petitioner raised this issue as a state-law evidentiary claim on direct appeal in state court, rather than a federal claim. (State's Lodging B-1.) The Idaho Court of Appeals affirmed the trial court's ruling by relying primarily on Rule 608(b) of the Idaho Rules of Evidence, which prohibits the admission of extrinsic evidence of a witness's prior misconduct to impeach the witness's credibility. Assuming without deciding that Petitioner can show cause and prejudice for the procedural default of this claim, the Court reviews the merits of the claim de novo.

### 1.   Standards of Law

The Sixth and Fourteenth Amendments guarantee criminal defendants a meaningful opportunity to present evidence in support of a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 689-690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479,

---

[6] The original "Exhibit AA" that was offered in the state trial court apparently cannot now be located. (Dkts. 110, 111.) Petitioner has instead submitted a copy of a substituted Exhibit AA that his counsel attempted to augment to the record on appeal in the Idaho Court of Appeals. (Dkt. 69.) In support of his motion to augment, Petitioner's counsel argued in the state court that the original exhibit was not included in the appellate record. (Dkt. 76-1, Appendix A.) The State objected to the motion, claiming that the original exhibit was, in fact, already part of the record on appeal and that the newly proffered exhibit was not exactly the same as the one in the appellate record. (Dkt. 76-1, Appendix B.) The Court of Appeals denied the motion. (Dkt. 76-1, Appendix C.)

Respondents object here to Petitioner's reliance on the substituted Exhibit AA on the ground that the exhibit was never made a part of the state court record. But, regardless of fault, Respondents have not been able to produce the *original* exhibit that their representative claimed in the state courts *was* a part of the record on appeal. From a review of the record, moreover, the Court finds that the substituted version contains substantially the same evidence that Petitioner's counsel argued to the Court of Appeals was improperly excluded in the trial court. For these reasons, and because the present claim lacks merit in any event, the Court considers Petitioner's substituted Exhibit AA to be a close approximation of what was before the state courts.

**MEMORANDUM DECISION AND ORDER - 29**

485 (1984)). The right is subject to reasonable restrictions based upon other legitimate

interests in the criminal trial process. *United States v. Scheffer*, 523 U.S. 303, 308 (1998)

(citations omitted). A defendant does not have the right to present evidence that is

"incompetent, privileged, or otherwise inadmissible under standard rules of evidence."

*Taylor v. Illinois*, 484 U.S. 400, 424 (1988).

Idaho Rule of Evidence 404(a) provides that evidence of a person's character or

trait of character is not admissible to show propensity of a witness to act in conformity

with that character or trait. An exception to that rule is Idaho Rule of Evidence 608(b),

which permits a witness to be impeached by asking him specific instances of conduct for

the purpose of attacking or supporting his credibility, but may not be proved by

introducing extrinsic evidence. In addition, Idaho Rule of Evidence 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or needless presentation of

cumulative evidence."

Federal habeas review of state court evidentiary rulings is limited. *See, e.g.,*

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas

court to reexamine state-court determinations on state-law questions"). Only state

evidentiary rulings that "serve no legitimate purpose or that are disproportionate to the

ends that they are asserted to promote" will implicate a defendant's right to due process

of law. *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). A state court's evidentiary

ruling will not provide a basis for habeas relief unless it "rendered the trial fundamentally

**MEMORANDUM DECISION AND ORDER - 30**

unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-68).

### 2.    Discussion

To warrant habeas corpus relief, Petitioner must show that the trial court's exclusion of his proffered evidence rendered the trial fundamentally unfair. At trial, Jeff, the alternate suspect, testified that he had a "fair" reputation. The trial court allowed Petitioner's counsel to cross-examine him about several of his previous acts of violence and other unlawful behavior to impeach his credibility. (State's Lodging A-12, p. 2195.)

During that examination, Jeff admitted that he had stolen Petitioner's .22 caliber rifle five years before the Downards were murdered and attempted to pawn it. (*Id.* at 2196-98.) He conceded that he had entered Lynn and Sondra Smith's residence through a window and had stolen various items. (*Id.* at 2237-38.) He admitted that he had taken his ex-wife into the desert and threatened to kill her, though he denied that he did so at gunpoint. (*Id.* at 2233-34.) He agreed with defense counsel that he had "arguments" with his current wife but denied threatening "to blow her head off with a .22." (*Id.* at 2235.) He also agreed with defense counsel that he once inquired about a jar of money in a store, but denied saying "if I held a .22 to your head, you'd give me that?" (*Id.* at 2236.)

The purpose of Rule 608(b)'s prohibition of extrinsic evidence is to avoid "holding mini trials on irrelevant or peripheral matters." *U.S. v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999). However, the trial court has wide discretion on allowing "questioning during cross-examination on specific bad acts if those acts concern the witness's credibility." *Id.*

Here, the trial court allowed a thorough testing of Jeff's credibility through cross-examination about his prior bad acts. The trial court permitted limited questioning about several bad acts and domestic violence. The Court prohibited Petitioner from introducing evidence that slightly bore on credibility—that he sold a watch to a bartender (apparently an attempt to raise an inference that Jeff is a thief), and that he threatened to use a gun to steal money from a hearing aid shop in 1994. Given the wide latitude the trial court gave Petitioner, disallowing the extrinsic evidence or questioning about these marginally relevant topics did not make Petitioner's trial fundamentally unfair.

This is not the end of Petitioner's argument about Jeff. Petitioner characterizes the trial court's ruling not simply as one touching on Jeff's credibility, but one that cut off *relevant* evidence of an "alternate perpetrator" that was admissible independently of whether it impeached Jeff's credibility as a testifying witness. That is a different question. Contrary to Petitioner's argument, this is not a case in which a state evidentiary rule was applied arbitrarily to prohibit a criminal defendant from introducing strongly probative evidence that ties a third person to the crimes charged. *See, e.g., Holmes*, 547 U.S. at 327 (finding a constitutional violation based on a state rule that excluded a person's partial admission to the crime and other testimony that he was in the area at the time of the murder); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that a state's hearsay rule could not be applied mechanistically to exclude a third party's confession).

Petitioner simply did not have strong, reliable, relevant alternate perpetrator evidence. What he had instead was collateral evidence that may have illustrated Jeff's

**MEMORANDUM DECISION AND ORDER - 32**

poor character or propensity to be violent, but it lacked any true connection to the Downards or the crime. Petitioner has cited no authority for the proposition that a trial court's exclusion of third party character or propensity evidence *that is not connected to the crimes charged or to the victims in the case* is unconstitutional. The case law that exists cuts decidedly in the opposite direction. *See Holmes*, 547 U.S. at 327 (accepting rules that exclude evidence of third party guilt where it is speculative, remote, or does not tend to connect the third party sufficiently to the crime).

Nor was Petitioner actually prevented from supporting his theory that Jeff was the more likely culprit. He did so through his cross-examination of Jeff and other witnesses, and through the presentation of numerous witnesses during the defense case-in-chief. The jury heard that Jeff was with the Downards on the day of homicides and was the initial focus of the investigation. The jury also learned that Jeff had once stolen the murder weapon long before the murders, had sneaked into the Smiths' home to steal various other items, owned a pair of shoes that had a similar pattern to the footprint in the Downards' home, gave inconsistent statements to the police and omitted a few important details, and may have asked to borrow the Downards' truck only to be rebuffed. Jeff essentially admitted during his cross-examination that he had previously engaged in conduct that could be characterized as violent and threatening, even though he may not have agreed with everything that Petitioner's counsel suggested.

Under these circumstances, the trial court's ruling was a "reasonable restriction[] based upon . . . legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted). Petitioner has not shown that he

**MEMORANDUM DECISION AND ORDER - 33**

was deprived of a meaningful opportunity to present a defense. No relief is warranted on Claim B, with or without the new evidence.

## CLAIM C: INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts seven different ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments. Some of these claims were properly exhausted and some are procedurally defaulted. Some are timely, and some appear untimely. Regardless, assuming without deciding that Petitioner can meet the procedural hurdles to present his claims, the Court reviews the merits of each.

### 1.  Standard of Law

*Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims. The first prong of the *Strickland* test, "deficient performance," requires a showing that counsel's performance "fell below an objective standard of reasonableness," *id*. at 688, or was "outside the wide range of professionally competent assistance," *id*. at 690.The test is "highly deferential," evaluating the challenged conduct from counsel's perspective at the time at the time counsel acted. *Id*. at 689.

The second prong of the *Strickland* test, "actual prejudice," requires the petitioner to demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

### 2.     Claim C(3): Trial Testimony

Petitioner alleges that his counsel failed to advise Petitioner adequately about his right to testify and failed to assist Petitioner to exercise that right. This claim was not

**MEMORANDUM DECISION AND ORDER - 34**

presented to the Idaho Supreme Court, and hence, it is procedurally defaulted. Assuming

without deciding that Petitioner can show excuse for the procedural default of this claim,

the Court concludes that it has no merit.

### A. *Underlying Standard of Law regarding Trial Testimony*

There is sparse United States Supreme Court precedent governing the right to

testify. Although several cases mention the right to testify, the actual claims at issue were

not about whether the defendant had the ultimate right to testify or "overrule" a defense

attorney's advice that the defendant should not testify. The following cases are

illustrative of those cited by courts that have faced a right-to-testify issue; because each

case is different from the facts in this case, the central factual issue and legal context of

each case is noted in parentheses below.

In a criminal case, the defendant "has the ultimate authority to make certain

fundamental decisions regarding the case, as to whether to plead guilty, waive a jury,

testify in his or her own behalf, or take an appeal." *See Jones v. Barnes*, 463 U.S. 745,

751 (1983) (no right to force counsel to raise nonfrivolous claims on appeal). An

accused's right to testify is protected by the Fifth, Sixth, and Fourteenth Amendments,

but the right can be limited. *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987) (no right to

introduce defendant's own hypnosis-induced statements).

"A criminal defendant may knowingly and voluntarily waive many of the most

fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513

U.S. 196, 201 (1995) (waiver of exclusionary provisions of plea-statement rules). A

waiver is valid as long as it is knowing, voluntary, and intelligent. *United States. v. Ruiz*, 536 U.S. 622, 629 (2002) (waiver of *Brady* right in guilty plea context).

The right to testify is tied to the right to effective assistance of counsel, because the decision whether to testify must be made in the context of the overall strategy of the case. The "purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." *Jones*, 304 U.S. at 465. Therefore, whether a defendant testifies usually is attributed to the tactical strategy of counsel, who has weighed the benefits and risks of testifying, including exposing the defendant to cross-examination. "[A]bsent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed v. Ross*, 468 U.S. 1, 13 (1984).

The United States Supreme Court has instructed that the "determination of whether there has been an intelligent waiver of the right to *counsel* must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (emphasis added). The Supreme Court has not particularly applied this contextual analysis to a waiver of the right to testify, but lower federal courts have done so, rejecting arguments that defense counsel or a state court must follow a specific formula to render a waiver of the right to testify valid.

In *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990), the United States Court of Appeals for the Ninth Circuit explained that it had joined other circuits and the majority of states in concluding that the trial court has no duty to advise the defendant of

**MEMORANDUM DECISION AND ORDER - 36**

the right to testify, nor is the court required to place a waiver of the right to testify on the record. *Id*. at 446. The court reasoned that the "broad rule that the court has no duty sua sponte to advise a defendant of his right to testify would be meaningless if it were possible for defendants to obtain new trials simply by claiming ignorance of the right." *Id*. at 447. In *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993), the Ninth Circuit Court held that, "[i]f the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *Id*. at 177 (citing *Martinez,* 883 F.2d at 761). In other words, "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Id*. (citing *Edwards,* 897 F.2d at 446, and *Martinez,* 883 F.2d at 760).[7]

### B.  *Discussion*

In light of the foregoing standards, Petitioner cannot establish that his counsel's performance was deficient. In a 2010 deposition, Petitioner's lead trial attorney, Stevan Thompson, testified about the circumstances surrounding Petitioner's decision not to testify. He testified that he and co-counsel explained to Petitioner "what he had a right to do and what he could get up and try to say." (Dkt. 63-2, p.3.) Thompson did not remember Petitioner ever saying that he definitely wanted to testify or did not want to testify. Rather, Thompson recalled that "[t]his was not a situation where you—where Lanny said: I want to testify, but you would not let him," and "[t]his was simply a

---

[7] Other circuits use different legal standards. *See Boyd v. U.S.*, 586 A.2d 670 (D.C. Ct. App. 1991) (collecting cases under three different approaches).

situation where, based on your best advice, he was following your advice and agreed not to testify." (Dkt. 63-2, p. 11.)

Petitioner's psychological tests indicated that he had a less-than-average intelligence quotient, but he was not "retarded" and could understand the nature of the proceedings against him. Many witnesses testified in court that they regularly carried on conversations with Petitioner, and that he engaged in planning out his days, worked two different jobs, and otherwise was able to function as any person of average intelligence.

Petitioner was not a proactive client. (Dkt. 63-2, p. 2.) As to the decision to testify, Thompson explained:

> [A]t some point, we made the decision not to put Lanny on. I think more of it was a concern that we did not know what he would say on cross-examination; how he would respond to the questions and—because I had a lot of respect for Tom Moss [the prosecutor] at the time.
>
> I just felt he would probably do a pretty good job of cross-examining Lanny to the point of doing everything he could to get him upset and get him frustrated, get him confused. I did—I felt that was going to hurt us more than help us, I guess.

(Dkt. 63-2, p. 3.)

Under case law set forth above, because Petitioner was informed as to the decision to testify and did not assert his right by testifying firing his counsel, or asking the Court to permit him to do so, he has not shown that he was denied the right to testify. Because the decision was bound up in the strategy of counsel, Petitioner has not shown that his counsel made an unreasonable decision based upon psychologist opinions that Petitioner could get easily frustrated, angry, and confused, and based upon Petitioner's propensity for making odd, incriminating statements. The fact that counsel had reasonable concerns

**MEMORANDUM DECISION AND ORDER - 38**

about Petitioner testifying in an extremely serious case cannot be second-guessed in this habeas corpus proceeding. *See Gerlaugh v. Stewart*, 129 F.3d 1029, 1033 (9th Cir. 1997).

As to prejudice, Petitioner has not provided the Court with the specific content of his proposed testimony. His briefing merely generalizes: "Petitioner would have refuted the State's theory on motive by explaining his sexual preferences, would have discussed his relationship with the victims, and would have testified that he had not seen the victims around the time of the murders. Petitioner also would have explained that his statement to Bob Donovan[8] was not an admission that it was his shoe print." (Petition, Dkt. 134, p. 20.) Notably absent from Petitioner's proposed testimony are any facts showing that he was not in possession of the gun, not in the neighborhood before and after the shootings, and not visibly upset after the shootings, and did not say and do the things that Mrs. Huffaker reported.

The Court concludes that Petitioner has shown neither deficient performance nor prejudice resulting from the strategic decision to not call Petitioner to testify at trial, and, thus, this claim is subject to denial.

### 3.  Claim C(4): Forensic Evidence

Petitioner asserts that his attorneys were ineffective for failing to do more to challenge the ballistics and shoe print evidence tying Petitioner to the Downards' murders. He asserts (a) trial counsel failed to effectively investigate and present forensic evidence and failed to effectively challenge the State's forensic evidence; and (b) trial

---

[8] This appears to be a mistaken reference to Brian Ravenscroft.

**MEMORANDUM DECISION AND ORDER - 39**

counsel failed to retain qualified, independent forensics experts; (c) trial counsel failed to adequately investigate shoe impression evidence, failed to effectively cross-examine the State's experts, and failed to present competent expert testimony to rebut the State's experts; (d) trial counsel failed to adequately investigate ballistics evidence; and (e) trial counsel failed to properly examine, obtain, test, and preserve key forensic evidence.[9] Rather than address these assertions separately, the Court will organize its discussion of Petitioner's two defense attorneys' performance around each type of forensic evidence. This is a procedurally defaulted claim that is reviewed de novo.

Preliminarily, it is important to note that Petitioner's challenge to the forensics evidence is related to his request for additional discovery in this matter. He asserts that he cannot show prejudice arising from this claim if he cannot do discovery to support his claims. Essentially, Petitioner would like to go back 20 years in time and re-test all of the evidence, depose all of the experts, and create a new defense for himself. For three reasons, the Court concludes that this is not a prudent or required course of action. The first is that Petitioner's counsel did an adequate job of investigating the forensics and then formed a strategy around the findings and investigation—and a defense attorney's strategy is virtually unchallengeable. The second is that the conviction is supported by a wide range of witness testimony as to motive, opportunity, possession of the weapon, and admissions related to the shooting. The third is that the expert witnesses on both sides

---

[9] Petitioner also argues in a footnote that the trial court's decision in permitting Greenwade to testify violated Petitioner's due process right under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) (Dkt. 134, p. 25, n.11.) Petitioner argues that Greenwade was not qualified to render the opinion about whether a photograph anomaly matched a nick in Petitioner's shoe, but the trial court overruled the objection of Petitioner's counsel. The Court does not treat this as a separate claim, as it is not properly presented in a footnote.

**MEMORANDUM DECISION AND ORDER - 40**

more or less agreed with each other, and there is no inkling in the record showing the

testing done by the forensics laboratories and the expert witnesses was done incorrectly

or that different test outcomes would result upon retesting. Federal habeas corpus review

is not a forum amenable to fishing expedition.

### C.  *Shoe Impressions*

Two shoe prints were found at the scene. A partial shoe print was found in the dirt

outside the Downards' home, and a cast was made from the print. Another partial

impression was left in the dust near Mrs. Downard's bed, and photographs were taken of

this print. Both prints were made by a pair of FootJoy shoes. Petitioner owned a pair of

8½ FootJoys, and Jeff owned a pair of 9½ FootJoys. Both pairs were seized as evidence.

The State's shoe print expert, Donna Shepherdson, had about 120 hours of training

in footwear evidence, having attended classes taught by leading experts in the field, Bill

Bodziak and Roger Davis; Shepherdson had been qualified as an expert in footprint

identification in the past. (State's Lodging A-11, pp. 1851-52.) Shepherdson testified that,

using the photographs of the partial dust print, photographs of the floorboards on which a

ruler was displayed to show the length of the floorboards, and the two pairs of shoes, she

made a simple calculation based on the width of the floorboard and found she "could

eliminate the larger shoe of being outside the range," but she "could not eliminate at this

[early] point, the smaller shoe, the size eight and a half shoe." (*Id.*, p. 1856.) She then

used a second method, making a one-to-one enlargement of the photograph, whereupon

she made transparent overlays of the bottom of the shoes using black fingerprint powder

for comparison purposes. This second test showed the same results as the first: the larger

**MEMORANDUM DECISION AND ORDER - 41**

shoe could be "absolutely" eliminated, while the smaller shoe could not be eliminated. (*Id*., pp. 1856-59.)

As to the cast made from the other shoe impression found in the dirt outside the home, Shepherdson testified that, preliminarily, she thought the print could have been made by either set of shoes, but the State did not give her enough time to proceed with an in-depth analysis. (*Id*., p. 1855.) Later, she revisited the casts when she had the one-to-one photographs for comparison purposes, and she determined that the larger shoe could be eliminated, but the smaller could not. (*Id*., pp. 1862-63.)

On cross-examination, Petitioner's counsel had Shepherdson clarify that she "absolutely" would not and could not testify that the dust print came from a size 8½ FootJoy. (*Id*., p. 1869.) In addition, defense counsel had Shepherdson repeat several times that she didn't believe that the angle of the camera on the dust print photo made a significant difference in her analysis. (*Id.*, pp. 1873-76.) Counsel also asked Shepherdson if she had found some "identifying characteristics" of the shoe to use for matching purposes, and she said she had not. (*Id*., p. 1878.) Counsel also had Shepherdson admit that the preferred method in the science of the day was to take the original photos in black and white, but that the photos in this case had been taken in color. (*Id*., p. 1879.)

Having anticipated that matching the size 8½ shoe to the photograph might be questioned based on the quality of the photograph, the State also hired Dr. Eric Greenwade, a mathematician, to create a digitally-enhanced image, in an attempt to match the dust print to either the size 8½ or 9½ shoe. Greenwade explained the reason he was retained:

**MEMORANDUM DECISION AND ORDER - 42**

> Q.   Describe the problem that was presented to you.
>
> A.   The basic problem as was explained to me was there was a photograph taken that was taken under non-optimal circumstances. And I was asked if there was anything that I could do to remediate some of the effects that may have occurred from taking the photograph in a less than optimal condition.
>
> Q.   And what was your response to that?
>
> A.   My response was that I believe that this was do-able because it followed the same procedures that we use in our day-to-day work using the same hardware and the same software that we use to do our normal activities.

(State's Lodging A-10, pp. 1747-48.)

Greenwade testified that the process was called "digital image warping," a "technique that had been used for over twenty years," and that was commonly used in areas such as medical imaging and satellite photography. After first testing a set of unrelated shoes that he matched to a set of photographs taken of a dust print of the shoes, he thought that that the technology could be applied to the actual shoes and photographs from the crime scene and proceeded to test the evidence from the crime scene. (*Id*., pp. 1748-51.)

At trial, Greenwade testified about his methods and his conclusion that the 8½ shoe matched the dust print photograph very well, and the 9½ did not. Greenwade used the measurements of the hardwood floor slats to create an accurate measurement for the photograph to make up for the lack of a ruler in the photograph. He testified at length about his complex system of analysis, and how he matched up several points to arrive at the correction calculations and conclusions.

**MEMORANDUM DECISION AND ORDER - 43**

Greenwade was also permitted to testify that he found an "anomaly" in the photograph that could be matched to a nick in Petitioner's shoe. Greenwade concluded: "Based on the measures that I made on the corrected photograph, the three features identified in the residue footprint were consistent with the size eight and a half FootJoy and were very much out of range with respect to the nine and a half." (*Id.*, p. 1783.)

Defense counsel objected to the testimony about matching the anomaly in the photograph to the nick in the shoe. Counsel was permitted to voir dire Greenwade thoroughly in front of the jury about Greenwade's utter lack of expertise to evaluate shoe impression evidence, with Greenwade admitting several times that he had zero experience in forensic shoe print identification. (*Id.*, pp. 1789-98.) As a result of counsel's objection, the trial court ruled that Dr. Greenwade was not considered "an expert as a criminologist" or an "expert in footwear identification as in the classical sense of criminologists," but only as an expert in the field of "scientific visualization." (*Id.*, p. 1798.) The court ruled that Petitioner's counsel's objection went to weight and not admissibility and said, "[T]he jury has heard your concerns and their concerns that go to the weight of his testimony." (*Id.*, p. 1798.)[10]

Prior to trial, Petitioner's attorneys were faced with the issue that Greenwade, Shepherdson, and Fox all had eliminated the larger FootJoy shoe as having made the prints at the Downards' residence. In addition, at trial, Petitioner's acquaintance, Brian

---

[10] Petitioner also takes issue with Thompson's failure to repeat all of his in camera voir dire questions in front of the jury, because, in hindsight, counsel wished he would have done so. (Dkt. 63-1, p. 48.) The Court finds no deficient performance in this circumstance. Petitioner's counsel asked sufficient voir dire questions of Greenwade in front of the jury for the court to emphasize to the jury that the court did not consider Greenwade a shoe impression expert, and, together with presenting Fox's testimony challenging the Greenwade work as unnecessary and unorthodox, counsel's performance was adequate.

**MEMORANDUM DECISION AND ORDER - 44**

Ravenscroft, testified that Petitioner told Ravenscroft that his shoeprint was found in Mrs. Downard's bedroom. (State's Lodging A-13, p. 2585 et seq.) Defense counsel argued that Jeff had stolen Petitioner's shoes and worn them to kill the Downards. Defense counsel called Fox to testify that he disagreed with Greenwade about going so far as to positively identify Petitioner's exact shoe and to offer his opinion about why Greenwade was mistaken about the anomaly.

Petitioner asserts without support that Fox "was unqualified to assist with the shoe impression evidence." (Dkt. 134, p. 23.) However, the trial transcript showing that Fox had been qualified as a footwear identification expert *50 or 60 times* prior to testifying in Petitioner's case. (State's Lodging A-14, p. 2696.)

Petitioner also argues that trial counsel should have retained more specialized experts in the fields of ballistics and foot print evaluation rather than relying on a generalist like Fox.[11] The Ninth Circuit found a similar argument to be unpersuasive in *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002). There, the petitioner alleged that his trial counsel's use of a psychologist in the mitigation phase of a capital case, rather than an expert in the field of intoxication and brain science, amounted to ineffective assistance of counsel. *Id*. at 876. Rejecting that argument, the Ninth Circuit noted that "[t]he choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" *Id*. (citing *Strickland*, 466 U.S. at 691).

---

[11] Petitioner also argues that his counsel did not do very much investigation before retaining Fox, but Thompson's deposition shows he consulted at least three other counsel about potential expert witnesses. (Dkt. 63-1, p. 11.)

**MEMORANDUM DECISION AND ORDER - 45**

Fox testified that he reviewed Shepherdson's work and testified that he, too, eliminated the 9½ FootJoy from having made the dust print or the print outside the house, but he could not eliminate the 8½. (*Id.*, pp. 2716 & 2760-61.)

Because Greenwade's positive identification was not in line with the shoe experts' opinions, defense counsel focused on the distinction between the shoe experts' opinions that the smaller shoe "could not be eliminated" based on its "configuration, its class, and its size" (*id.*, p. 2716), and the non-shoe-expert's opinion that only Petitioner's shoe could have made the dust print. Only Greenwade testified at trial that he could make a positive identification. Fox showed how the Shepherdson photograph did not match the nick in the shoe. Fox testified that, if Greenwade's theory was true about the spots on the shoe showing on the photograph, then there were many spots shown on the photograph, and that proved that Petitioner's shoe did not make the shoe print in the dust. (*Id.*, p. 2732-33.) Fox testified at length about shoe analysis and then testified that he placed "no significance" on the anomalies by which Greenwade said he could positively identify the shoe. (*Id.*, p. 2742.)

Fox further testified that Greenwade's work was unnecessary and unorthodox:

Q.    Mr. Fox, this computer technology [of Greenwade] . . . had nothing to do with Mr. Greenwade's finding as to these anomalies, did it?

A.    Other than – no. Other than the fact that he sees things in his production on the screen. That program is not for identifying footwear. Not for identifying individual characteristics. As I understand it, it is for taking a photograph and in some way digitizing it through his system and correcting for distortion. And that's what's in his report. That's what he's used the system for. That's what we discussed. And he was very open in telling me about his system.

> Q.    And you've already testified as to whether or not there was much distortion in this picture, correct?
>
> A.    There is very little distortion in the photograph, in my opinion.
>
> Q.    That's Donna Shepherdson's black and white that you're referring to?
>
> A.    Yes.

(State's Lodging A-14, p. 2763.)

Relying on unsupported hyperbole rather than fact, Petitioner argues: "The result of putting Fox on the stand was disastrous—the State eviscerated Fox within the first minute of cross-examination." This argument is overstated to the point of being untrue. On cross-examination, the State asked Fox whether he wrote reports on the shoes, the firearms, or the pants. He responded that he examined the evidence but did not write reports. Petitioner's counsel bolstered Fox's responses with an objection that there is no requirement of written reports. The objection was overruled, because the court ruled the State was entitled to know what Fox did and did not do—but the jury was made aware by the objection that an expert was not required to produce a written report.

Petitioner fails to acknowledge that Fox's job was different from the State's experts' job. Fox was hired not only to perform an independent evaluation of the evidence, but to review the reports, findings, and conclusions that the State's experts had made. Whether an expert prepares a report is often a matter of strategy. Without a report, the expert's testimony at trial can be more flexible, not having committed his opinion to

**MEMORANDUM DECISION AND ORDER - 47**

writing; the absence of a report also makes the task of cross-examination of a witness more difficult for the adverse attorney.

Fox's credibility was strengthened by his concessions that Shepherd was qualified to evaluate shoe impression evidence and that he and she were in agreement on several points: that the 9½ could be eliminated, that the 8½ could not be eliminated, that neither could testify with certainty that Petitioner's shoe made the impressions, and that the photograph did not have substantial distortion. This testimony set the stage for Fox's extended testimony that Greenwade was not a shoe impression expert, how shoe impression experts match a particular shoe to an impression, how Greenwade's work was unnecessary because the photograph did not have substantial distortion, how Greenwade's work substantially deviated from the manner in which shoe impression experts performed identifications, and how specifics from the photographs and Petitioner's actual shoe did not support Greenwade's theory that light and dark spots on the corrected photograph corresponded to nicks in the shoe.

Petitioner's attorneys did an adequate job with what they had to work with. Two shoe print experts with extensive experience agreed that only a size 8½ FootJoy could have made both the dust and the dirt shoe impressions. Because the shoe size could not be challenged, it made more sense to challenge the identity of the shoe and suggest Jeff had taken Petitioner's shoes and gun to kill the Downards. Petitioner's counsel's cross-examination of Greenwade to show his lack of credentials as a shoe expert and Fox's explanation of why Greenwade was wrong worked together to support the theory of the case that Jeff, not Petitioner, had killed the Downards. Pointing to Jeff as the one who

wore the shoes on the night of the murder logically accounted for the testimony of all of the experts and Ravenscroft.

Petitioner's argument that trial counsel was ineffective for failing to consult with or retain an expert to review Greenwade's work, despite counsel's "awareness" that Fox "was not qualified to review the techniques utilized by Greenwade to produce the enhanced photo" misses the point of the strategy selected by counsel that was, in part, necessitated by the fact that the qualified shoe impression experts agreed that an 8½ FootJoy made the shoe impressions and the fact that Petitioner admitted it was his shoe print found in Mrs. Downard's bedroom. Rather than fighting the battle at the level of dueling mathematicians—the intricacies of whose work probably would not have been understood by the jury anyway—counsel chose to focus on the court-qualified shoe impression experts and a simpler argument that no correction was needed and that the non-shoe expert had made elementary mistakes shoe experts would not make. "That ['Greenwade was not a footprint expert and really went beyond his expertise'] was an important distinction I think that we felt we needed to make," said Thompson of the decision. (Dkt. 63-1, p. 40.) Counsel's overall strategy regarding the evidence he had to work with—that it was almost certainly Petitioner's shoe print—was not unreasonable simply because he did not hire more or different experts.

Petitioner seems to be arguing that Thompson should have shopped until he found an expert who would have disagreed with the State's experts on the shoe impression (and ballistics) findings. Not so. Here, too many experts agreed that the forensics pointed to Petitioner, and Petitioner has not been able to show a hint of evidence in 20 years that

**MEMORANDUM DECISION AND ORDER - 49**

they were all wrong together. Good lawyering is not about creating favorable evidence, it is about making the best defense that can be made, despite unfavorable evidence, which is exactly what Petitioner's counsel did.

Part of Petitioner's argument that Fox "was eviscerated" by the prosecutor on cross-examination also relies on the prosecutor's questions about Fox's ballistics testing that *the prosecutor knew fell clearly outside the scope of direct examination*—this questionable behavior by the prosecutor shows neither that Fox was incompetent nor that his attorneys were ineffective. Petitioner's counsel strategically did *not* ask Fox about the ballistics on direct examination because Fox agreed with the three state experts that the bullets came from Petitioner's Fieldmaster .22. However, on cross-examination of Fox, the prosecutor began asking him questions about the ballistics. It is unfathomable that the prosecutor did not know exactly what he was doing when he asked Fox whether he had reviewed the ballistics evidence in the case and then asked the question, "You don't dispute the firearms ballistics testimony . . . ," whereupon he was interrupted by defense counsel's objection that the question was beyond the scope of direct. The objection was sustained, but, as Petitioner argues, the asking of the question left the inference that Fox *had* reviewed the ballistics reports of the State experts, *had* agreed with the findings, but had not testified to avoid harming Petitioner's case. (*Id.*, pp. 2749-50.) Again, this unfortunate colloquy was the fault of the prosecutor, who was too skilled *not* to know what he was doing, but it does not follow, as Petitioner argues, that this was a reason that defense counsel should have retained two different experts. Neither defense counsel nor his expert need anticipate bad behavior from the prosecution. (Dkt. 63-1, p. 13.)

**MEMORANDUM DECISION AND ORDER - 50**

Petitioner further argues that his counsel should have retained separate experts to refute the Shepherdson and Greenwade testimony, rather than having Fox analyze the shoe print evidence *and* the ballistics evidence. Petitioner provides no evidence whatsoever that any other expert of the same era would have disagreed with Shepherdson and Fox, and does not explain a factual basis that would have supported a different opinion. Petitioner does not provide any concrete evidence that either of these experts were incompetent to do the task they were hired to do. In fact, the prosecutor recognized that both Fox and Shepherdson were experts in their field when he argued, "The defense, ladies and gentlemen, I suggest wants you to believe that footprint identification is some esoteric science"—"[o]nly able to be done by people such as Mr. Fox and Ms. Shepherdson." (Dkt. 62-3, p. 37.)

As to prejudice, Petitioner simply ignores the bottom line, which is that, regardless of whether one or ten mathematicians testified at Petitioner's hearing, two recognized shoe impression experts agreed that the 8½ could not be eliminated and the 9½ could be eliminated, and a witness testified that Petitioner admitted that his shoe made the Downard bedroom shoe print. There was not a host of suspects who owned size 8½ shoes. Therefore, Petitioner's counsel's efforts with expert witnesses regarding the forensics evidence was adequate.

### D. *Ballistics Evidence*

The State presented testimony from two ballistics experts, either because the reputation of the first, Martin Ols, had been tarnished as a result of testimony in other cases, or, as was represented at trial, he took a job with the Bureau of Alcohol, Tobacco,

and Firearms at the National Laboratory in Maryland. The second expert was Rocky

Mink, the Oregon State Police Directing Criminalist in the Ontario Forensic Laboratory.

Both concluded that the casings found at the crime scene were ejected from the .22

Remington Fieldmaster rifle that investigators had seized from Lynn Smith's gun cabinet.

Ols and Mink also referenced a third review performed by the State of Wyoming

Forensic Laboratory.[12]

Mink, like Fox, was a general criminologist who was qualified to testify on

firearms and toolmark identifications and comparisons, as well as drug analysis, trace

evidence, blood alcohol, and footwear impressions. (State's Lodgings A-8, p. 1161.)

Mink testified at trial about his findings and conclusions:

> "I found microscopic detail present in the firing pin impression, the
> extractor mark, and the ejector marks that were of significant enough
> character to allow me to conclude positively that the cartridge case, or the
> cartridge cases demonstrating that detail were as I've stated in my report,
> fire, in, extracted from, and ejected from the mechanism of State's Exhibit
> 64-A, the suspect Remington rife."

(State's Lodging A-8, p. 1147.)

Thompson cross-examined Mink on why the firing pin impression detail from

casing to casing appeared different in the photographs. Counsel also questioned Mink on

the fact that matching weapons to casings was not an exact science, and that, earlier,

Mink had described the final stages of his identification process as a "feeling based on

whatever microscopic detail" he observed. (State's Lodging A-8, p. 1162.) Thompson did

not make much headway on cross-examination of Mink, as Mink was able to explain

---

[12] A third state firearms expert, Richard Cravello of Wyoming, apparently also reviewed the ballistics evidence.
(Dkt. 63-2, p. 2.)

**MEMORANDUM DECISION AND ORDER - 52**

himself well on virtually every point counsel questioned. This does not necessarily point to a deficiency in counsel's performance, but seemed to be attributable to Mink's skill at testifying and his experience in ballistics analysis. Thompson understood the state of ballistics evidence during that era: "[W]hat concerned me a little bit with the whole ballistics science of ballistics was that it does really come down to somebody that has a lot of experience looking through a comparison microscope kind of knowing it when you see it, that the striations match on the bullets. It's not like a fingerprint, particularly." (Dkt. 63-1, p. 12.) That said, Thompson realized the fact that the experts agreed with each other was problematic: "[W]hen [Fox] reviewed it he could not disagree with them particularly as to the shell casings. That is usually the most damaging because the firing pin imprint usually is kind of like a fingerprint." (*Id.*, p. 13.)

To challenge his counsel's circa 1996 decisions on the ballistics investigation, Petitioner unabashedly relies on a 2009 treatise, *Strengthening Forensic Science in the United States: A Path Forward*, published by the National Research Council of the National Academies (NRC Report). Petitioner seems to be arguing that the State's three ballistics experts in 1996 should have been criticized for following 1996 state-of-the-industry standards,[13] and that Petitioner's counsel should have sought out an expert who

---

[13] Mink testified that "there's no particular number [of points] that's established as meeting a criteria for identification." (State's Lodging A-8, p. 1162.) He clarified: "The field of firearms examination comparison has over the years conducted a number of series of tests comparing both random stria, random microscopic detail. And it is the basic feeling or consensus of one schooled in firearms examination and comparison that if you have significant microscopic detail, that again you can consistently account for, consistently produce, consistently associate with a particular area, surface, item, object, et cetera, it is a positive identification." (*Id.*, pp. 1164-65.)

**MEMORANDUM DECISION AND ORDER - 53**

had the clairvoyance to not follow industry standards, but to use standards that were not to be identified until many years later.[14] This is an untenable and unsupported argument.

Petitioner also exaggerates the import of the treatise to his particular case. The treatises does *not* state that bullet identification is impossible or unreliable; it simply says there are no uniform standards, as Mink testified, and that it is possible to make these types of identifications if the experts have experience at what they do. Despite the high standards for habeas corpus relief, Petitioner posits a superficial proposition to support his assertion that he is entitled to relief: "Given the NCR Report, Mr. Mink's level of certainty seems unwarranted and overstated." (Dkt. 134, p. 32.)

Because Petitioner's attorneys made a reasonable decision to work with the consistent expert opinions in front of them—all of them in agreement that the bullets came from Petitioner's Fieldmaster .22—they chose to fashion a defense that would focus on Jeff's possible access to the murder weapon, rather than trying to find a champion willing to try to slay three or four experts with a single contrary opinion. Thompson explained: "[T]he problem we kept coming back to is: Everybody was telling us that it looked like that gun fired the shells. We were sort of dulling our axe on it being some other gun at that point in time." (Dkt. 63-1, p. 16.) This was not an objectively

---

[14] Again proffering broad generalities rather than facts, Petitioner argues that Fox shouldn't have been used because he "had some unusual theories about ballistics testing" and that some of Fox's views were "a little bit out in left field." These statements were from a deposition of David Parmenter, counsel for Paul Rhoades, in a death penalty case arising from a 1987 murder that was before this Court on habeas corpus review many years ago. These statements are unaccompanied by any explanation of the foundation for the statements. For example, it is unknown whether Fox was ahead of his time in 1996 and had views more like those expressed in the 2009 treatise, or whether they were simply contrary to any ballistics standards, whether in 1996 or 2009. The Court finds these statements unpersuasive without a context, which Petitioner has chosen not to provide.

**MEMORANDUM DECISION AND ORDER - 54**

unreasonable strategic decision. *See Strickland*, 466 U.S. at 691 (counsel may "make a reasonable decision that makes particular investigations unnecessary").

Putting aside the very real question of whether Petitioner actually could have found an expert in 1996 to disagree with the other four experts, he emphasizes the need to have brought forward a ballistics expert to rebut the Martin Ols testimony based on Ols' incompetence. For example, at Jeff 's preliminary hearing, Ols testified that he thought there was one extractor on Petitioner's rifle, and on cross-examination at trial, he admitted that he had made a mistake and there were actually two extractors. At the preliminary hearing Ols testified that the firing pin impressions on the evidence he examined were limited, but at trial he testified that he concluded that the casings were fired from "only" Petitioner's gun. (*Id.*, p. 1204.) He based his opinion on firing pin impressions, particularly, breach-face marks; extractor marks, and ejector marks. (*Id.*, pp. 1205-06.)

Petitioner ignores the portion of the trial transcript that shows his counsel covered these points skillfully during his examinations of the experts. Counsel showed that Ols was only classified as a firearms *technician*, and that he did not have the requisite training to be a certified FBI firearms examiner. (State's Lodging A-8, pp. 1197- 1202.) The Court ruled that Ols had "the minimum qualifications" to give an opinion on the firearms evidence, and that his opinion "has some probative value," but that the weight would be left up to the jury. (*Id.*, p. 1204.) Counsel pointed out the difference in Ols' preliminary hearing testimony about the "limited" nature of the firing pin impressions, but Ols

rebounded by that he had seen better and worse impressions, and had been able to make identifications from worse than those in this case. (*Id.*, p. 1214.)

Defense counsel also asked Ols if, in the Rauland Grube case, an FBI firearms examiner said that Ols' tests for shotgun patterns were invalid.[15] Ols responded that he had been told about the FBI expert's testimony, but had never been given an opportunity to read the expert's report or do any further on that particular case. (*Id.*, p. 1215.) Other cross-examination of Ols tended to show that he was not been especially careful in his testing, such as the fact that he was injured in a test-fire of a weapon because he did not check the locking mechanism before firing it (not in this case). (*Id.*, pp. 1209-11.) Despite Ols' shortcomings, Thompson realized his cross-examination would not be "great," given the fact that both Mink and Fox agreed with Ols. (Dkt. 63-1, p. 18.) This was a function of the evidence and the chosen strategy based on the unfavorable nature of the evidence, not deficient performance.

Like the shoeprint evidence, neither counsel nor the expert he selected can be faulted where all three experts have agreed that the bullet casings from the crime scene matched Petitioner's rifle. After retaining one expert, counsel was not required to shop for an expert willing to proffer an opinion that supported Petitioner's case. *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). Petitioner's counsel also did an adequate job cross-examining both States' experts to show the weaknesses of their analyses. No deficient performance is evident in the record regarding the ballistics.

---

[15] A shotgun was not used in Downard crimes; Petitioner has not shown how the question of whether Ols was adept at analyzing a shotgun blast, as opposed to a .22 bullet casing, is especially relevant. As with much of his other argument, Petitioner relies on broad generalizations that do little to bolster his case.

**MEMORANDUM DECISION AND ORDER - 56**

Not only has Petitioner failed to show deficient performance, he has not shown actual prejudice, as required by *Strickland*. Petitioner has not come forward in any proceeding with even an inkling to show that a different expert would have been able to refute the findings of the State's experts, and that he should be given additional public funds to re-test the unanimous opinions that were sought in the 1990s.

### E.  *Sex Crimes Kits*

Petitioner also asserts that counsel could have done more to independently test the sex crimes evidence. A police report prepared by Morgan J. Hendricks noted that there was no evidence of "sexual contact or assault or defense wounds on or inside" either Mr. or Mrs. Downard's body at the time of autopsy. (Dkt. 64-2, pp. 21-22.) Officer Greg Black testified that a sex crimes kit was done and delivered to Don Wyckoff, a forensics scientist for the Idaho Department of Law Enforcement. (State's Lodging A-8, p. 983.) Donald Wyckoff, supervising chemist for the Idaho Bureau of Investigation, testified that there was no semen found on either one of the victims, and that the sex crimes kits were negative. (State's Lodging A-11, p. 1897.) Mrs. Downard was found clothed in her underwear top and bottom, pajama top and bottom, and robe. (State's Lodging B-1, p. 70; Dkt. 63-4, p. 31.)

Petitioner has not provided anything to show that Wyckoff performed the tests completely wrong and missed any semen.[16] The evidence of Mrs. Downard's fully-clothed body and state lab finding of no presence of semen made it unnecessary for

---

[16] While Petitioner asserts in a footnote that a photograph shows that there was semen on the bedsheets, he does so without citation to the record or providing a copy of the photograph to this Court. (Dkt. 139, p. 9, n. 3.) There is nothing in the record before this Court supporting the proposition that the killer left his semen on the bedsheets, especially given that there was none found on Mrs. Downard's fully-clothed body.

**MEMORANDUM DECISION AND ORDER - 57**

Thompson to pursue this avenue any further. Hence, there is no deficient performance, and Petitioner has shown no prejudice.

### F. *Hair Samples*

Hair samples were collected from Jeff and Petitioner to try to match them up to hair samples at the scene. Donald Wyckoff, supervising criminalist for the Crime Lab in Pocatello, testified that nothing significant came of the hair and fiber samples testing in this case. (State's Lodging A-11, p. 1885.) Petitioner has provided nothing that would show that Wyckoff's testing methods or conclusions should be questioned at this late date. This claim fails for lack of prejudice.

### G. *Jeff's Pants*

Wyckoff determined that the spot on Jeff's pants could be blood, but the preliminary test that was done could have been a false positive. The next step was to have a second test performed to verify whether it was, in fact, blood. The fabric containing the spot was sent to the Serological Research Institute in Richmond, California, which did additional testing and determined that the spot had a negative presumptive test for blood and "could not be confirmed as being blood." (Dkt. 139-1, pp. 24-25.) The State provided the fabric to defense for testing, but no further testing was done. (State's Lodging A-11, pp. 1890-94.)

Here, perhaps counsel could have done more, but, again there is nothing to suggest that another test would yield a different result. Even if counsel was deficient on this point, given the strength of the other evidence pointing to Petitioner as the perpetrator, Petitioner has failed to show prejudice.

**MEMORANDUM DECISION AND ORDER - 58**

H. *Conclusion*

These observations from *Harrington v. Richter*, 562 U.S. 86 (2011), applicable to either a deferential or a de novo habeas corpus review, appropriately describe Petitioner's counsel's performance regarding the forensic evidence:

> *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. And while in some instances "even an isolated error" can support an ineffective-assistance claim if it is "sufficiently egregious and prejudicial," *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.

562 U.S. at 86.

Representation is constitutionally ineffective only if it "so undermined the proper functioning of the adversarial process," depriving the defendant of a fair trial. *Strickland*, 466 U.S. at 686. Here, the adversarial system functioned adequately. Petitioner was afforded expert witness testing and analysis, the State's witnesses were cross-examined adequately, and nothing in the record shows that the testing and analysis done by the entire cadre of experts was so inadequate that opposite results could have been achieved with a different defense expert.

**4. Claim C(5): Failure to Investigate New Evidence of Jeff Smith's Guilt or Move for a New Trial**

Petitioner asserts that Thompson did nothing when he received the new information about the Jamie Hill statement and the Robin Jacobson story during the two-

year time period when he could have filed a motion for a new trial, or at least investigated the information further.

Under Idaho law, a motion for new trial must be brought within two years after judgment, which means after completion of a direct appeal. Idaho Code § 19-2407; I.C.R. 34; *State v. Parrott*, 57 P2d 509 (Idaho Ct. App. 2002). Thompson received the information on November 2, 2000, and Petitioner's appeal was rejected by the Idaho Supreme Court on May 21, 2001. (State's Lodging B-6.)

The claim that Thompson should have discovered this information on his own prior to trial, or should have filed a motion for a new trial if it was undiscoverable prior to trial, was presented on post-conviction appellate review (State's Lodging D-1, pp. 10-11.) The Idaho Court of Appeals addressed the claim narrowly, characterizing it as follows:

> [T]rial counsel should have discovered J.J.'s allegations on his own at some point prior to November 2000 in order to file a motion for a new trial based on newly discovered evidence of Jeff's guilt. This claim fails the deficient performance prong of the *Strickland* test because, as discussed above, the application and supporting evidence do not establish how counsel would have discovered Jeff's threat to J.H. had he investigated Jeff.

(State's Lodging D-4, p. 8.)

Petitioner's quarrel with how Thompson chose to bring this claim is a quarrel based on strategy. Counsel did not bring this claim in a motion for a new trial, but in a post-conviction petition. Counsel testified that he could have filed a motion for a new trial, but, "at that time my thinking was to finalize the appeal and then pursue this issue on a post-conviction relief." (Dkt. 63-3, p. 9.) Petitioner offers no separate argument or analysis on his claim—either as to the deficient performance or the prejudice prong of

*Strickland*. Because a hearing on the motion for new trial would have resulted in the same conclusions as were reached in the post-conviction matter, Petitioner has not shown that he would have been granted a new trial. Therefore, counsel was not deficient for selecting a post-conviction presentation rather than a new-trial presentation, and no prejudice resulted from counsel's decision not to pursue these claims in a motion for new trial and instead include them in a post-conviction action, where a full evidentiary hearing was held.

### 5.   Claim C(6): Beverly Huffaker Testimony

Petitioner's next claim centers on the impeachment of Mrs. Beverly Huffaker. Petitioner argues that counsel should have done more to show that Mrs. Huffaker's testimony was unreliable. This claim is procedurally defaulted. At trial, Mrs. Huffaker testified that she and her son, Scott Huffaker, met with Petitioner early in the morning of March 22, 1992, after they had returned from a gambling trip to Nevada. She claimed that Petitioner told her that "something bad had happened." She recalled the date, in part, because Scott had won $400 gambling and he used that money to buy a gun. Scott also testified and confirmed that the encounter occurred on the weekend of March 21 and 22.

Thompson cross-examined Mrs. Huffaker regarding her failure to tell the police about this important late-night meeting when they first interviewed her after the murders. She admitted that she did not disclose the information for over a year and half. Counsel also impeached her recollection of the date by using her grand jury testimony, in which she had claimed that Scott purchased the gun at the "Shilo gun show." When counsel asked her if it would surprise her to learn that the gun show occurred in January instead

of March, 1992, she insisted that she was not with Scott when he bought the gun and that she only later learned that he had bought it from a private individual. (State's Lodging A-9, pp. 1351-55.)

However, Huffaker was further impeached when, later in the trial, the State produced a receipt from the seller—an Idaho State Police officer who had sold Scott a rifle in 1992—and the receipt was dated February 7, some six weeks *before* the Downards were killed. Petitioner's counsel stipulated with the State to introduce the receipt into evidence rather than present new testimony on the issue.

Petitioner contends that his counsel's failure to offer the testimony of the Idaho State Police officer, or to re-call the Huffakers and question them about the receipt, was constitutionally ineffective. This claim presents a classic case of counsel making a tactical decision in the midst of a contentious trial to present evidence in one form (a stipulation) rather than another (though witness testimony). At his deposition, Thompson testified that he believed that the receipt "helped us a lot" because "the timeframe when [the officer] sold the gun to Mr. Huffaker did not match up with Beverly's testimony." (Dkt. 63-3, p. 2.) Petitioner points to post-trial interviews with jurors indicating that they had questioned the validity of the gun purchase receipt, and, therefore, had placed little impeachment value on it. (*Id*.)

Ineffective assistance claims cannot be based on hindsight. Thompson's belief was reasonable at the time the decision was made, particularly because Thompson had already demonstrated through his cross-examination that Huffaker had failed to come forward with this story at an appropriate time, that she mysteriously recalled details long after the

**MEMORANDUM DECISION AND ORDER - 62**

fact, and that she was incorrect when she originally pinned the date to a gun show.

Petitioner's argument that Thompson believed *at the time of his deposition* that it might

have been a mistake not to call the Idaho State Police officer (*id*. at 111), Thompson's

after-the-fact regret, formed with the benefit of hindsight, does not prove that the original

decision was an objectively unreasonable one. In *Harrington v. Richter*, the Supreme

Court observed:

> After an adverse verdict at trial even the most experienced counsel may
> find it difficult to resist asking whether a different strategy might have been
> better, and, in the course of that reflection, to magnify their own
> responsibility for an unfavorable outcome. *Strickland*, however, calls for an
> inquiry into the objective reasonableness of counsel's performance, not
> counsel's subjective state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

562 U.S. at 109-10.

In addition, Petitioner has not established prejudice. Even without the receipt or

any testimony about the receipt, defense counsel had already impeached Mrs. Huffaker

sufficiently to show that she may have been mistaken or confused about the date of the

purchase of the firearm. Further, Mrs. Huffaker also tied the date of this particular

Nevada trip to the anniversary of her mother's death, a date she surely would have known

well. (State's Lodging A-9, p. 1349.) Whether additional witness testimony about the gun

purchase would have added materially to the defense's argument that Mrs. Huffaker was

wrong about the date of her encounter with Petitioner, or would have had no effect

whatsoever, is entirely speculative. While jurors stated in after-trial interviews that they

questioned the validity of the receipt and therefore disregarded that evidence, it is

unknown what they would have decided about the pinpointed date if they had to weigh

**MEMORANDUM DECISION AND ORDER - 63**

Mrs. Huffaker's testimony about her mother's death against the police officer's testimony about the gun purchase. Other considerations weighing in the balance were (1) the testimonies of other witnesses who noted that Petitioner was upset after the murders (bolstering Mrs. Downard's story of the late-night meeting, regardless of whether she was mistaken about the meeting having occurring near the gun purchase or her mother's death) and (2) Mrs. Huffaker's other testimony about Petitioner's statements regarding Mrs. Downard (which lent credibility to her entire testimony, because she had treated Petitioner like a son and had little to gain from testifying against him). *Strickland* prejudice is "actual prejudice" and requires Petitioner to demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." 466 U.S. at 694. Stacked against the remainder of the evidence, live testimony on the date of the gun purchase would not have been enough to amount to a reasonable probability that the result of the trial would have been different.

### 6.   Claim C(7): Petitioner's Good Character

Petitioner also alleges that trial counsel failed to investigate and present evidence of Petitioner's good character, a claim that is procedurally defaulted. To support this claim, Petitioner isolates a portion of Thompson's deposition testimony in which he admits that the defense should have presented additional evidence of Petitioner's gentle nature. (Dkt. 134, p. 38.) Petitioner contends that "had trial counsel done a thorough job in presenting evidence of Petitioner's good character, the jury would have seen a marked contrast between Petitioner and Jeff Smith, and would have strengthened the defense's theory of the case." (*Id.*)

**MEMORANDUM DECISION AND ORDER - 64**

Petitioner does not describe the excluded evidence in his Second Amended Petition or explain how it would have led to a reasonable probability of a different outcome. In his deposition, Thompson testified that he could have put on more evidence to show Petitioner's "[in]ability really from an emotional standpoint to be able to plan and commit a crime like this; we could have put on that expert testimony, *not so much character testimony*." (Dkt. 63-3, p. 10 (emphasis added).)

But, in fact, trial counsel did put on expert testimony that touched on that very subject. The jury heard testimony from a number of witnesses that Petitioner had a few simple pleasures in life, was childlike in some ways, and stuck closely to his daily routine. Evidence was also presented that Jeff had a troubled past, and there was no evidence before the jury that Petitioner had that same type of background. Though not expressly "character" evidence, Dr. Marc Corgiat testified about Petitioner's low I.Q. and his limitations in cognitive functioning, which included Petitioner's decreased ability to formulate a complex plan or to conceal his involvement. In addition, counsel offered numerous witnesses in the defense case-in-chief, and the choice of which witnesses to call lies at the heart of defense strategy.

Viewing all of the evidence, the Court disagrees with Petitioner's unsupported assertion that prejudice resulted from not providing more character evidence about Petitioner. The Court concludes that the case was much less about who had the *propensity* to kill the Downards, and much more about who had a *motive* to do so. Petitioner's suggested vague testimony from his sister that he liked girls his own age would not have countered Mrs. Huffaker's detailed and damaging testimony about

**MEMORANDUM DECISION AND ORDER - 65**

Petitioner's familiarity with Mrs. Huffaker's bedroom, robe, and hands, and his favorable comparisons between Mrs. Downard and Mrs. Huffaker.[17] That testimony was essential to showing motive; it came from a person whom Petitioner liked and trusted; and it had nothing to do with "good character" or gentleness.

In addition, had Petitioner put on character witnesses, the State would have been entitled to ask them about "events affecting the character trait or traits [Petitioner] has placed in issue." *See U.S. v. Lewis*, 482 F.2d 632 (1973) (giving an extensive overview of what type of evidence can be used to challenge character evidence put on by a defendant).

Based on all of the foregoing, the Court concludes that Thompson's testimony 15 years post-trial expressing some doubt about whether the defense could have drawn a sharper contrast between Petitioner and Jeff does not establish either deficient performance or prejudice.

### 7. Claim C(8): Failure to Call the Smith Brothers' Sister to Testify

Claim C(8) is that defense counsel failed to bring forward sufficient evidence of Jeff's past violent and threatening behavior. Particularly, Petitioner faults Thompson for not introducing the testimony of Vicky Smith Sarver (now Rodriguez), the sister of Petitioner and Jeff, to prove that Jeff "threatened to shoot their mother, that Jeff threatened to rape [his sister], that Jeff was sexually inappropriate with [his sister], and that Jeff had a temper." (Dkt., p. 36.) Petitioner's sister would have also testified that, in

---

[17] Petitioner's counsel described Mrs. Huffaker's testimony as essential to the State's case: "She was a big key to the case in putting together—in putting the sexual motive and the time frames incriminating—the state was presenting some stuff they felt [amounted to] pretty incriminating statements that Lanny made during the timeframe when the Downards were killed. All that came through her." (Dkt. 63-3, p. 1.)

contrast to Jeff, Petitioner was "easy going and did not have a temper." (*Id.*)

Petitioner overlooks that his counsel *did* attempt to introduce extrinsic evidence of Jeff's prior threats and violence, but was prevented from doing so by the trial court. In light of that ruling, Petitioner has failed to explain why it was unreasonable for his counsel not to engage in the futile act of offering additional evidence in the same general category. In addition, Petitioner's counsel elicited testimony about several incidents of Jeff's unlawful behavior on cross-examination of Investigator Victor Rodriguez.

Finally, even if Petitioner's counsel's performance was deficient, Petitioner has not established a reasonable probability that the trial court would have admitted this evidence if offered, or that the result of the proceeding would have been different if admitted, because the evidence had nothing to do with the Downards or the crime.

### 8. Claim C(9): Failure to Object to Prosecutor's Shifting of the Burden of Proof in Closing Argument

Yet another procedurally defaulted claim is Petitioner's complaint that his counsel failed to object when the prosecutor shifted the burden of proof during his closing argument. Petitioner admits that the prosecutor gave a "correct recitation of the burden," but he nonetheless argues that "the State's argument that the defense had not proven 'lies, deceit and deception,' improperly placed the burden on the defendant." (Dkt. 134, p. 40.) He also contends that the prosecutor shifted the burden when he argued that the defense had not challenged the State's evidence that Petitioner was "fixated" on Mrs. Downard. (*Id.*)

**MEMORANDUM DECISION AND ORDER - 67**

Prosecutors are permitted to argue reasonable inferences based on the record before the jury. *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000). "[C]omments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." *United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995) (citations and internal quotations omitted).

The prosecutor clearly stated the correct burden, followed by what he asserted was an unfulfilled claim made by defense counsel in his opening statement. He also commented that Petitioner's "fixation" on Mrs. Downard was not "challenged." This did not necessary mean that Petitioner had to do so with testimony *of his own*; he could have provided other evidence on this point, but did not. It is permissible for a prosecutor to call the jury's attention to weaknesses in the defense case and to point out where the defense failed to undermine the State's allegations, *see Vaandering*, 50 F.3d at 702, and the prosecutor's comments in this case fell within that framework. Notably, the prosecutor did not argue that Petitioner's failure to testify should be taken as evidence of his guilt. *See United States v. Wasserteil*, 641 F.2d 704, 709 (9th Cir. 1981) (holding that the test to judge impermissible comment upon a defendant's assertion of his Fifth Amendment right not to testify is whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify).

MEMORANDUM DECISION AND ORDER - 68

Because an objection on burden-shifting grounds would have lacked merit, it was not deficient performance for counsel to stand silent. Moreover, there is no reasonable probability that had an objection been made, and had the objection been sustained, the result of the proceeding would have been different.

### CLAIM D: CUMULATIVE EXPERT TESTIMONY
### AND LATE DISCLOSURE OF OPINIONS

Petitioner alleges that his due process right to a fair trial was violated by the cumulative nature of the state's forensic experts and the late disclosure of expert witnesses. Petitioner presented this claim to the Idaho appellate courts, citing federal due process principles (State's Lodging B-1, pp. 37-38), but the Idaho Court of Appeals addressed it only as a state-law abuse-of-discretion claim. (State's Lodging B-3, pp. 8-10.) Therefore, the Court concludes that the claim was properly presented but not addressed by the Idaho appellate courts, entitling it to de novo review here.

Petitioner cites no case law in support of his claim. On direct appeal, he cited only to broad due process principles, such as the "right to fair opportunity to defend against the State's accusations," from *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and the fact that "due process is flexible and calls for procedural protection as a particular situation demands, from *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Court concludes that there is no governing precedent supporting a "cumulative experts" claim. There is no allegation that Petitioner sought funding for additional experts and was denied necessary experts by the trial court, such that he did not have a "fair opportunity" to defend himself.

**MEMORANDUM DECISION AND ORDER - 69**

In addition, while the expert disclosures were made late in the disclosure time period, they were still *within* the time period, and, thus Petitioner's branding of them as "late" is misleading. The expert report of Dr. Greenwade was disclosed to defendant on January 10, 1996. The trial was originally scheduled for January 22, 1996. The trial was moved to March 26, 1996, as a result of a change of judge. (See State's Lodging B-1, pp. 30-31.) Between January and March, Petitioner's attorneys and expert Richard Fox reviewed "a copy of Greenwade's reports, repeatedly talked to and even met with Mr. Greenwade, and went over his reports and findings prior to trial." (State's Lodging B-2, p. 13.) Therefore, Petitioner had adequate time before the actual trial date to determine a strategy to rebut the expert's testimony and seek additional funding, if needed. There is no allegation that Petitioner sought and was denied an extension of time to procure additional experts.

Because this entire claim is unsupported in fact and in law, it is subject to denial.

## CLAIM E: INADMISSIBLE CHARACTER EVIDENCE

Petitioner asserts that the prosecution's "theory that Petitioner was attracted to older women with large breasts was inadmissible character evidence designed to introduce a motive for the murder of the Downards." (Dkt. 134, p. 42.) Petitioner alleges that the prosecution never provided any nexus between Petitioner and Mrs. Downard.

In his state court action, Petitioner brought this claim under Idaho Rule of Evidence 404(b), asserting that the evidence should not have been admitted because it was another crime, wrong, or act that was more prejudicial than probative as to his character. The Idaho Court of Appeals rejected that argument, recognizing that Idaho

Rule of Evidence 404(b) generally prevents the admission of previous acts to establish a person's character for the purpose of showing that the person acted in conformity with that character in a given situation.

The evidence at issue is as follows:

> Huffaker testified that Smith had repeatedly told her that he like older, heavier, grandmotherly-looking women. After the Downards were killed, Smith commented to Huffaker that she resembled Mrs. Downard, comparing their hands, bodies, perfume and bedroom décor. Smith gave Huffaker a bathrobe he said was like the one Mrs. Downard had. Smith also admitted to Huffaker that he had been at the Downard's home on the day they were killed.

(State's Lodging B-3, p. 12.) In addition, Mrs. Huffaker also testified that Petitioner frequently bought her flowers and was very generous. (State's Lodging A-9, p. 1356.)

On the date the Huffakers believed the Downards were killed, Scott Huffaker testified that Petitioner had left a white rose under the left windshield wiper for his mother, because Petitioner "always liked giving my mom things." (State's Lodging A-9, p. 1374.) Scott also testified that Petitioner was teary-eyed and upset on that night. (*Id*., p. 1375.)

In considering the claim, the Court of Appeals concluded:

> Huffaker's testimony about Smith's preference for older, heavy-set women and his infatuation with Mrs. Downward was not in itself evidence of a crime, wrong, or act of Smith to prove he acted in conformity therewith. Rather, Huffaker's testimony was relevant to establishing a possible motive and intent on Smith's part. We further hold that the district court did not abuse its discretion in concluding that the probative value of the questioned evidence was not substantially outweighed by the danger of unfair prejudice.

(*Id*., pp. 13-14.)

**MEMORANDUM DECISION AND ORDER - 71**

Assuming for the sake of argument that Petitioner exhausted a federal due process claim arising from Mrs. Huffaker's testimony, this Court must determine whether the Idaho Court of Appeals' opinion is contrary to federal precedent. The federal courts have recognized that "the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation." *Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989) (collecting cases); *see Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (considering whether  admission of evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Common evidentiary standards across state and federal jurisdictions permit the admission of evidence to show motive or intent. The Court agrees that Mrs. Huffaker's testimony was relevant to Petitioner's motive and intent, and was not focused on other bad acts or wrongs. The Court also agrees that the evidence was not of the type that "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Lesko*, 881 F.2d at 55. An age gap or other differences regarding attraction of one adult to another is not "excessively inflammatory." In addition, the very relevant testimony that Mrs. Huffaker—an older woman who was someone Petitioner liked and trusted—began to notice Petitioner drawing comparisons between her and Mrs. Downard is probative as to why Petitioner would have killed the Downards.[18] Petitioner has not shown that his right to due process and a fair trial were

---

[18] With all due respect to Mrs. Huffaker, the Court finds the only description in the record of her physical appearance is from the prosecutor during a pretrial hearing, who described Mrs. Huffaker, who was 64 years old, as a " fat old woman with large breasts." (State's Lodging A-5, p. 90.)

**MEMORANDUM DECISION AND ORDER - 72**

violated by admission of Mrs. Huffaker's testimony. Therefore, habeas corpus relief is

not warranted.

## CLAIM F: DUE PROCESS VIOLATION BY ADMISSION OF JAILHOUSE INFORMANT JAMES SWOGGER'S TESTIMONY

Petitioner' entire argument as to Claim F is as follows:

The testimony of jailhouse informant James Swogger was extremely
unreliable and its admission violated Petitioner's due process right to a fair
trial. Swogger lied to Detective Rodriguez and lied to Prosecuting Attorney,
Tom Moss. (See Attachment KK, State's Lodging B-1 (Appellant's Brief,
State v. Lanny Smith, Idaho Supreme Court Docket No. 23515, pp.68-70)).
Admission of his testimony was highly prejudicial and Petitioner asserts
that, at a minimum, Swogger expected to obtain some benefit in exchange
for his testimony.

(Dkt. 134, p. 43.)

Petitioner presented this argument to the Idaho appellate courts, citing *Lilly v.

Virginia*, 119 S.Ct. 1887 (1999) (plurality decision addressing admissibility of

accomplices' confessions that inculpate a criminal defendant), for the proposition that

evidence should not be admitted unless it is reliable. (State's Lodging B-1, p. 69.)

Petitioner further argued that the Idaho Court of Appeals "should establish a new rule in

assessing the admissibility of this type of testimony." Petitioner suggested a seven-factor

analysis for assessing reliability. (*Id.*) Nevertheless, the Idaho Court of Appeals stated

that this issue was presented "without citation to any authority," and, thus, would not be

addressed.

Because Petitioner presented some authority, seeking a broad extension of the rule

in *Lilly*, and the Idaho appellate courts did not acknowledge Petitioner's authority, the

Court reviews the claim de novo. On habeas review, Petitioner has cited no authority.

**MEMORANDUM DECISION AND ORDER - 73**

This Court concludes that *Lilly*, cited in the state appellate record below, does not support Petitioner's claim. Swogger recanted and then returned to his testimony, and cited as the reason for his earlier recantation real and threatened retaliation from other inmates. The trial court ruled that it could not find Swogger "inherently incredible based upon the evidence supplied"—which was testimony from Swogger, another inmate, and a jail deputy. (State's Lodging A-4, p. 558.) "[W]hether Mr. Swogger is telling the truth or not" would be left to the jury to decide, the Court ruled. (*Id.*)

Because there is no precedent showing that such a circumstance amounts to a constitutional violation rather than a credibility question for the jury, Petitioner's claim must be denied. "New rules" of procedure cannot be created on federal habeas corpus review. *Teague v. Lane*, 489 U.S. 288 1989).

## CLAIM G: PROSECUTORIAL MISCONDUCT BY VOUCHING FOR THE STATE'S WITNESSES DURING CLOSING ARGUMENT

Petitioner alleges that the prosecutor improperly vouched for witnesses, misstated facts as to why Greenwade was hired, stated evidence not in the record, and misrepresented the evidence by telling the jury that Petitioner had a "fixation" on Mrs. Downard. (See Attachment KK, State's Lodging B-1 (Appellant's Brief, State v. Lanny Smith, Idaho Supreme Court Docket No. 23515, pp.70-72)) This claim was presented to the Idaho Supreme Court on direct appeal. Petitioner argues that, to the extent that this claim was not "federalized" during the state court review process, direct appeal counsel is to blame. The court concludes that either under AEDPA deference or de novo review, the claim fails.

### 1.  Standard of Law

A prosecutor in a criminal case has an obligation to avoid peppering his opening and closing argument with "assertions of personal knowledge" or "improper insinuations and assertions calculated to mislead the jury." *Berger v. United States*, 295 U.S. 78, 88 (1935)). "Improper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness's testimony." *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002).

### 2.  Discussion

Petitioner argues that the prosecutor improperly vouched for Jeff Smith, Beverly Huffaker, Victor Rodriguez, Donna Shepherdson, and Eric Greenwade. Petitioner has presented this argument in wholesale fashion, without pointing to specific places in the closing argument where the "vouching" occurred. Upon its review of the trial transcript, this Court notes the prosecutor used phrases such as: (1) "Believe me, …"; (2) "I'm not going to say it was a lie. It was a mistake. But it certainly wasn't perjury"; (3) "If we were out here trying to deceive you and trying to hide evidence and trying to manufacture evidence, why would we have brought that receipt in and given it to you... That was brought to you by us;" and that Mr. Greenwade had "impeccable credentials." (State's Lodgings B-1, A-14.) However, both the prosecutor and the judge admonished the jury that the lawyers' argument was not testimony or evidence. (State's Lodging A-14, pp. 2883, 2885.) In addition, the prosecutor also stated:

**MEMORANDUM DECISION AND ORDER - 75**

> [Defense] [c]ounsel has made a challenge at the end of his argument, Mr. Thompson. And that is make the State stick to the facts. And I want you to hold me to that. And if I don't stick to the facts, you disregard anything I say if you don't' think it's been a proven fact in this case.

(State's Lodging A-14, p. 2873.)

The Court has read the entire closing argument and does not find anything so inappropriate that it should have been stricken. The prosecutor's comments are part of an argument and a manner of speaking, rather than an attempt to persuade the jury to take the prosecutor's word for facts or credibility.

Petitioner also argues that the prosecutor misrepresented the evidence by telling the jury that Petitioner had a "fixation" on Mrs. Downard. A "fixation" is at the least a preoccupation, and at the most, an obsession. Mrs. Huffaker provided sufficient testimonial evidence that Petitioner was preoccupied by Mrs. Downard.

Petitioner has not shown that the prosecutor violated Petitioner's due process rights by the manner in which he presented his argument. No relief is warranted on any aspect of this claim.

## CLAIM H: INEFFECTIVE ASSISTANCE OF DIRECT APPEAL

Petitioner alleges that direct appeal counsel was ineffective for failing to raise issues that (1) petitioner was deprived of his right to present a defense in excluding evidence of Jeff's threatening and violent history; and (2) the prosecuting attorney improperly shifted the burden of proof in his closing argument.

**MEMORANDUM DECISION AND ORDER - 76**

Because the underlying claims that Petitioner believes should have been asserted on appeal are without merit, as discussed above, the ineffective assistance of appellate counsel claims are also without merit.

## CLAIM J: *BRADY* CHAIN OF CUSTODY OF EVIDENCE

With disclosure of the Rodriguez file, Petitioner's habeas counsel saw, for the first time, chain of custody reports for the gun, bullets, shoes, and other items that referred to breaks in the chain of custody. The items had been passed between various experts in different states, including Petitioner's own expert, as the trial transcript reflects. Petitioner alleges that the prosecutor failed to disclose this information to defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In typical overbroad and undersupported fashion, Petitioner asserts: "Had trial counsel been aware of the issues, Smith would not have been convicted, especially given the scarce physical evidence purportedly connecting him to the homicides." (Dkt. 134.)

None of the new *Brady* claims have ever been presented to the state courts. While it is unclear whether Petitioner has exhausted these claims in state court, it is clear that Petitioner's claims are without merit, and, thus, the Court will address them without regard to exhaustion. *See* 28 U.S.C. § 2254(b)(2).

### 3.  Standard of Law

While defendants have no general constitutional right to discovery in criminal proceedings, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), due process requires that the prosecution disclose evidence favorable to an accused upon request, when such evidence is material to guilt or punishment, including impeachment material. *Brady v.*

*Maryland*, 373 U.S. at 87; *Giglio v. U.S.*, 405 U.S. 150 (1972). "Material" evidence is any evidence for which there is a reasonable probability that its disclosure would have changed the outcome of the proceeding, and a "reasonable probability" means one sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). There are three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

As to chain of custody issues at trial, the prosecution must introduce sufficient proof so that a reasonable juror could find that the evidence is in substantially the same condition as when it was taken into custody. *United States v. Harrington*, 923 F.2d 1371 (9th Cir.), *cert. denied*, 502 U.S. 854 (1991). A defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced. *United States v. Robinson*, 967 F.2d 287, 292 (9th Cir.1992), *abrogated in part on other grounds as recognized in Ortega–Mendez v. Gonzales*, 450 F.3d 1010, 1020 (9th Cir. 2006). "Physical evidence is admissible when the possibility of misidentification or alteration is eliminated not absolutely, but as a matter of reasonable probability." *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004) citation and punctuation omitted).

### 4.  Discussion

Chain of custody evidence is important when it is unclear whether someone has tampered with the evidence since it was taken into custody, or whether the evidence a party is attempting to present at trial is not the same evidence that was retrieved from the

**MEMORANDUM DECISION AND ORDER - 78**

crime scene. In this case, expert witness testimony was necessary to give meaning to the evidence. Petitioner has not alleged that the evidence was altered before or after experts reviewed it. The fact that the experts all agreed on the inculpatory nature of the ballistics and shoe print evidence make it even more difficult for Petitioner to show that challenges to the chain of custody would have been given substantial weight at trial.

Respondent persuasively argues that the record does not definitively show that Petitioner's counsel did not receive the chain of custody evidence. Petitioner's counsel was an experienced criminal attorney who surely knew (1) that police were required to keep a chain-of-custody report, (2) that he did not have a copy of it (if he did not), (3) that the evidence had been passed between several experts in several states; and (4) that he could get a copy of the chain-of-custody report from the prosecutor. Petitioner's habeas corpus counsel has not obtained an affidavit from trial counsel stating that the chain-of-custody record had not been disclosed. However, for the sake of argument, the Court assumes that habeas counsel believes trial counsel did not receive the reports because she did not see them herself in the case file, and that trial counsel did not receive them.

The Court further agrees with Respondent that no prejudice resulted from any nondisclosure of the reports. Thompson knew how many people had handled and tested the evidence, and he very well could have formulated a strategy around breaks in the chain of custody by investigating whether every exchange of the evidence between each expert had been documented. He could have demanded that the State bring all of their custodians to trial for foundation purposes. However, he did not, because such a strategy

MEMORANDUM DECISION AND ORDER - 79

would not have led to anything except an even lengthier trial and an annoyed jury. Had Thompson challenged the chain of custody, he would have had to assert that someone altered or replaced the real evidence before it reached the experts, and he would have had to make that argument in the face of the State's experts identifying the evidence (which they did at trial in preface to their testimonies). There is nothing in the record showing that a chain-of-custody defense would have been successful.

Turning to the trial transcript, the Court concludes that the prosecution laid adequate foundation for the evidence that was admitted, further diminishing the value of the allegedly withheld chain-of-custody reports. Officer Greg Black testified about the manner in which the bullet casings were retrieved from the Downards' house. First, investigators photographed the casings next to small yellow identifying placards. Next, Black marked an evidence envelope, using with the same yellow placards from the photos. He used the lip of the envelope to scoot the casings into the envelope. At trial, Black noted the writing on the exterior of the envelopes showed that the exhibits had been sent back and forth to different labs and experts. Thompson had no objections. (State's Lodging A-8, pp. 945-950.)

Officer Black further testified about attending the autopsy, and how he had seen the bullet fragments retrieved from the victims' bodies, and how he placed those in a plastic container and then in an evidence envelope, and had marked them accordingly. (*Id.*, pp. 955-56.)

Officer Black identified the property record for the tennis shoes. He noted that he had marked the date and initials on both of the shoes he retrieved from Petitioner's room.

He identified the shoes marked as Exhibits 30-A and 30-B as the same shoes he had retrieved. The shoes were admitted without objection. (*Id.*, pp. 972-73.) Officer Albert Thompson similarly identified the shoes he retrieved from Jeff's home by showing his initials, "AT," on the inside tag of each shoe. He recognized the shoes taken from Jeff because one of the shoes "still has some of the—well, it looks like mortar and mud to me. Still embedded in the bottom of the shoe." Thompson identified the shoes as being size 9½. (State's Lodging A-8, p. 1012.)

Officer Paul Wilde testified that, when they received a report on the casings, it showed a number of possible weapons that may have fired the casings. Several guns listed were Remington 500 series rifles, and so he thought it was necessary to exclude the rifle Lynn Smith had showed them. (State's Lodging A-8, p. 1094.) Officer Wilde identified the Smith rifle at trial by its name, model, model number, and serial number, which were recorded in the reports and receipt to Lynn Smith when the rifle was taken. (*Id.*, p. 1095-97.)

At trial, there was no controversy over which shoes were taken from Jeff and which shoes were taken from Lanny. There was no question that the Smiths owned size 8½ and 9½ shoes, and that Lanny wore smaller shoes than Jeff. A size 9½ shoe box was taken from Jeff, and Jeff's size 9½ shoes had about one inch of mud caked on them from all of the yard work he had just completed, while Lanny's shoes had been cleaned before they were taken into custody.

Petitioner makes much of the fact that a police report mistakenly showed that the 8½ sized shoes were retrieved from Jeff, but that fact was known at trial, and the defense

team did nothing about it at trial. (Dkt. 134, p. 53.) That is because the rest of the evidence showed that Jeff's shoes were 9½ and Petitioner's were 8½, and the officer who retrieved each pair of shoes had his own initials in the shoes, and so there was really nothing to contest.

Petitioner also boldly asserts that the newly-disclosed files revealed for the first time that a latent fingerprint of Jeff Smith was found on the Bushnell scope of the Remington Fieldmaster. Petitioner asserts that trial counsel did not have this information. (See Dkt. 134-9, Attachment MMM.) Robert Kerchusky, supervisor of the Idaho Department of Law Enforcement "latent fingerprint section," is the author of the report, as noted on the first page. If counsel did not receive the second page, then they should have requested it, because page one says, "positive – see back." Surely, anyone reading the report—and especially a criminal defense attorney—would want to know what the positive identification on the back of the report showed and would have requested it from Kerchusky. In fact, page two of the report states: "On – Martin Ols – 4 identifications made from rifle. One latent print of value remaining on Bushnell scope." (Dkt. 134-9, p. 9.)

At trial, Kerchusky testified that the four regular and one latent prints (five total) matched Expert Martin Ols' prints. (State's Lodging A-10, pp. 1738-39.) Detective Victor Rodriguez testified to the same. (Dkt. 134-9, pp. 8-9.) Petitioner's out-of-context interpretation of the report is that Kerchusky found a latent print on the scope and did not bother to try to match it to Ols or Jeff (why that would be the case when his job was to identify all of the prints is illogical). To the extent that it is necessary for the report to be

**MEMORANDUM DECISION AND ORDER - 82**

interpreted by the person who prepared it—Kerchusky—he did so at trial, and dispelled Petitioner's theory. Petitioner has no real argument that he could have brought the report into court and cross-examined Kerchusky into saying that the report meant something other than what he intended it to say. This argument is close to frivolous.

In conclusion, Petitioner has not shown that his defense counsel did not have the chain-of-custody reports kept in this case. Neither has Petitioner shown materiality, defined as evidence sufficient to undermine confidence in the outcome of the trial. Neither has Petitioner shown that prejudice resulted from not having or using the chain-of-custody reports. Accordingly, Petitioner's *Brady* claim fails.

### CLAIM K: *BRADY* DISCLOSURE OF PRIOR BAD ACTS OF JEFF SMITH

Detective Victor Rodriguez previously did not disclose that he kept in his possession a separate file on Jeff Smith. Petitioner now argues: (1) the reports would have impeached Rodriguez when he testified that Jeff's background did not include a significant amount of violence; and (2) the reports would have impeached Jeff Smith regarding proof of his violent nature and past threats to kill people, especially with a .22. (Dkt. 134, p. 61.)

Petitioner overvalues the file as an impeachment tool for Victor Rodriguez's testimony. Petitioner argues that the prosecution did not reveal that, in October of 1993, during a time period when Jeff Smith had a statutory rape charge pending, Detective Rodriguez wrote to the prosecuting attorney to notify him that Jeff Smith had "displaced acts of violence on his two ex-wives, even to the point of holding a gun to their heads." (Second Amended Petition, p. 60.) In the letter, Rodriguez recommended that Jeff be

placed on a sex offender caseload if he received probation. (*Id*.) Petitioner argues that this

information contradicts Rodriguez's trial testimony:

> Q.     Officer, Rodriguez, you've indicated that Jeff Smith was not
> considered by you to be a suspect in July and August of
> 1993. You were aware, were you not, of Jeff Smith's
> background?
>
> A.     Yes.
>
> Q.     And that background included a significant amount of
> violence?
>
> A.     I'm not aware of a significant amount of violence, no.
> * * *
> Q.     You were not aware of Jeff Smith threatening his ex-wife,
> Julie Woodall, with a .22?
>
> A.     I'm aware of that situation. But not with a .22, I don't believe.
>
> * * *
> Q.     You did tell the grand jury, did you not, that Jeff has a
> background of wife abuse and physical abuse?
>
> A.     I recall I did.
>
> * * *
> Q.     Did you consider Jeff Smith to be dangerous in June of '94?
>
> A.     I don't believe so.

(State's Lodging A-10, p. 1675.)

Rodriguez certainly may have been attempting to minimize Jeff's history of

violent and threatening behavior. However, the problematic feature of Petitioner's new

argument is that his counsel would have been haggling over subtleties in word choice

with Rodriguez. For example, what constitutes a "significant amount of violence" and

**MEMORANDUM DECISION AND ORDER - 84**

whether a person is "dangerous" is a matter of context and opinion. When asked about Jeff's specific instances of violence on cross-examination, Rodriguez acknowledged the instances, and he may have been correct that Woodall was not threatened with a .22—but instead with a shotgun. (*See* Woodall Declaration, Dkt. 134-3, p. 17 (describing the gun twice as a "shotgun"). Whether Petitioner would have gotten any mileage out of this line of questioning is entirely speculative. Therefore, even though the file was suppressed, no prejudice resulted.

Petitioner's second argument is that the Victor Rodriguez file could have been used to impeach Jeff. However, the trial court had ruled that counsel could ask about incidents of violence, but not introduce extrinsic evidence to impeach Jeff. Therefore, Petitioner has not shown that the incidents of violence in the file would have been admitted, had they been known.

However, backing up to the issue of suppression regarding impeachment of Jeff, it is important to note that the Rodriguez file contained references to public police reports on Jeff Smith, and Petitioner had equal access to Jeff, Jeff's ex-wives, and other victims listed in the police reports—information Petitioner obviously possessed. Petitioner's counsel knew about Jeff Smith's domestic violence against his wives, because he questioned Victor Rodriguez and Officer Stimpson in detail about the incidents. (State's Lodging A-8, pp. 1082-87.)

In summary, Victor Rodriguez was remiss in not providing his personal file on Jeff Smith to the defense team. However, Petitioner's *Brady* claim fails because the information in the file was not material—which is defined as evidence sufficient to

undermine confidence in the outcome of the trial—and no prejudice ensued. Petitioner argues that no reasonable juror would have convicted Petitioner of murdering the Downards if the Victor Rodriguez file detailing the additional violent behavior of Jeff Smith, or Rodriguez's knowledge of it, had been disclosed. The Court disagrees. The trial court limited the admissibility of the type and content of Jeff's prior bad acts. In addition, more discussion of Jeff's bad acts still would do nothing to disturb the evidence showing that Petitioner had motive, opportunity, and a weapon, and that he left his shoe print at the crime scene.

### CLAIM L: *BRADY* ALTERNATE SUSPECT INFORMATION

Petitioner alleges that the newly-disclosed investigatory file shows that the police had alternate suspects in mind that were never disclosed to Petitioner's counsel. While this meets the first prong of *Brady*, there is no prejudice in light of the substantial evidence that Petitioner was the perpetrator.

Petitioner argues that the file shows police knew there was an "open, bitter hatred" between Mr. Downard and his boss, and that his boss eventually forced him into early retirement. However, there is no evidence suggesting that Mr. Downard's boss killed Mr. and Mrs. Downard. In fact, this type of evidence would seem to cut the other way—Mr. Downard was the one forced to leave the company, and thus would have more motive to harm his boss, than vice versa. Petitioner has no evidence whatsoever that this was a viable option upon which to build a defense.

In addition, police did not disclose that there was a general report of a semi-automatic .22 pistol that was stolen from an Idaho Falls residence between February and

**MEMORANDUM DECISION AND ORDER - 86**

March 1992. There is absolutely no other evidence showing that another person with a gun stolen from an Idaho Falls residence shot the Downards, based on evidence surrounding the scene of the crime. In addition, the evidence at trial showed that the murder weapon was a rifle, not a semi-automatic pistol.

At trial, the police investigators explained how they began the murder investigation by identifying all of the people who had had recent contact with the Downards. They realized the shoe prints were from FootJoys and that Jeff had been at the Downards' home, which quickly led them to suspect Jeff, who owned a pair of FootJoys. Early on, Lynn Smith thwarted the investigation by responding to investigators' questions about whether the .22 had been used recently by saying that it had not been used in some time, and that he had the key to the gun cabinet and had been away in Nevada during the time period in question. As soon as it became known at Jeff's preliminary hearing that Lynn had given Petitioner the gun, the investigation shifted to Petitioner. Mrs. Huffaker provided the critical testimony that Petitioner had confessed to her that he had been to the Downards on the day of the murder.

The Court finds that the record contains a large amount of evidence that the murderer was one of the Smith brothers, rather than Mr. Downard's boss or an unknown person wielding the stolen pistol. While the Court does not condone the withholding of other potential perpetrator evidence by the prosecution, there is nothing in the record that shows that either of these two leads would have been fruitful, and, in fact, they are quite far-fetched. *Cf. Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (holding that undisclosed evidence of several leads in the sheriff's files was not material because

**MEMORANDUM DECISION AND ORDER - 87**

defendant's theory that they might have helped his case was speculative and he did not show how the evidence might have altered the outcome). Therefore, no relief is warranted on this claim for lack of materiality and prejudice.

**CLAIM M: *BRADY* FAILURES RE:**
**JAILHOUSE INFORMANT JAMES SWOGGER.**

James Swogger, Jr., a jailhouse informant, testified at trial that Petitioner confessed to killing the Downards with a .22 and raping Mrs. Downard after killing her. He claimed that he had not received a deal on any of his criminal cases, but did receive a promise to be moved to another institution for safety. (State's Lodging A-10, pp. 1550-81.) He acknowledged at trial that he understood the penalty for perjury in a capital case was potentially death. (*Id.* at 1563.)

However, in a 2011 unsworn telephone interview initiated by Petitioner's habeas counsel Elisa Massoth, Swogger recanted his trial testimony, some 15 years after the main event. (Exhibit 134-11.) Petitioner now alleges that the prosecution violated *Brady* by failing to disclose that Swogger (1) initiated contact with the police, (2) was threatened with prison if he failed to testify, and (3) obtained benefits in exchange for his testimony. In that interview, Swogger and Massoth discussed whether Swogger was willing to sign a declaration immediately. Swogger said he would sign it, but, in the five years since that interview, he has not done so. Because this claim is based on unsworn, speculative information provided by a witness who is on his second recantation many years after the trial, the Court concludes that no relief is warranted. As the Court will explain, Petitioner has not met any of the *Brady* factors in his proffer of Swogger's

second recantation.

Recantations are viewed by the courts with suspicion, *see, e.g., Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993), and this one is no exception. It is far from clear when Swogger has lied in this case and when he has told the truth. The record reflects that Swogger's claims have evolved and shifted throughout the history of this case. His newer recantation falls in line with that tradition. Swogger now asserts that Lanny never told Swogger that he killed the Downards or raped Mrs. Downard.

Swogger's initial recantation occurred before trial. On May 14, 1995, Swogger wrote a letter to Victor Rodriguez stating: "Please do not continue to harass me. If I am forced to take the stand, you will regret the words out of my mouth because I will have to tell the truth which is I do not know a thing. So you and everyone else should leave me the hell alone." (State's Lodging A-10, p. 1569-70.)

At a pretrial hearing on a motion in limine to block his testimony, Swogger made another about-face and claimed that he was lying in the letter when he said he did not "know a thing." (State's Lodging A-4, p. 395.) At that same hearing, he said, for the first time, that Petitioner had told him that he raped Mrs. Downard after she was dead. At trial, Swogger testified that Petitioner had confessed to killing the Downards with a .22 caliber gun and that he raped Mrs. Downard after she was dead. Defense counsel then cross-examined him, exposing that he had testified incorrectly at the pretrial hearing about whether he had a pending charge for child molestation. (State's Lodging A-10, p. 1567.)

At trial, Swogger admitted that he was looking for a deal on his criminal charges when he first spoke with investigators. (*Id.* at 1568.) Defense counsel also brought up the

MEMORANDUM DECISION AND ORDER - 89

Swogger letter to Rodriguez that threatened, "if forced to take the stand, I will have to tell the truth which is that I do not know a thing." (*Id*. at 1569-70.) His position at trial was that he held back, as a "trump card," the additional detail that Petitioner said he had raped Mrs. Downard. (*Id*. at 1570.)

Defense counsel also produced a second letter Swogger had written to a trial judge in his criminal case, asking for a reduction in sentencing, with the following threat:

> If you are not willing to agree to these terms, then you should seriously reconsider calling me for my testimony. And don't bother sending a transport for me to come before the trial. Because unless I have one of the terms in writing by the proper authorities, I will not come no matter what you do to me or how much time you give me."

(*Id*. at 1574.)

The defense also presented another inmate who testified that Swogger's reputation for honesty was not good. (State's Lodging A-13, pp. 2546-60.)

Petitioner points to a series of discrepancies between Swogger's prior and current versions of events to support his claim that, 20 years ago, the prosecutor should have disclosed the current, rather than the past, allegations of Swogger. First, during his in camera testimony for the motion in limine and trial testimony, Swogger testified that he did not even know who Victor Rodriguez was until Rodriguez called him in Burley and asked to meet with him. (State's Lodging A-4, p. 387; State's Lodging A-10 pp. 1559-60.) In the 2011 interview with Petitioner's counsel, Swogger said he wrote directly to Detective Rodriguez to offer to testify.

Petitioner faults Rodriguez for not disclosing that Swogger contacted him first, rather than Rodriguez contacting him. However, there is no corroborating evidence that a

**MEMORANDUM DECISION AND ORDER - 90**

"first contact" letter ever existed. In the interview, Swogger said he didn't recall the gist of the first letter to Rodriguez, and Swogger was not even sure "how it all came about." (Dkt. 134-11, pp. 30-31.) This 'new' information is vague and speculative, was prompted by a leading question in the interview, is unsworn, and seems to contradict Swogger's prior testimony.

Second, in the 2011 interview, Swogger said the prosecutor and Rodriguez threatened Swogger that he would be prosecuted for the same crime as Petitioner and would face a death sentence if he did not testify. Swogger testified slightly differently at trial—that he had been advised on a number of occasions that the penalty for perjury in a capital case could be up to life imprisonment and even execution. (State's Lodging A-10, p. 1563.) Thus, beyond the fact that the new statement is unsworn, uncorroborated, and contrary to his sworn testimony, in either instance Swogger believed there was a potential death sentence available for him if he either refused to testify or testified untruthfully. The practical effect on Swogger (a death sentence) is the same under either scenario.

Finally, Petitioner asserts that the prosecutor should have disclosed that Swogger obtained benefits in exchange for his testimony. At trial, Swogger testified that, when Rodriguez and the prosecutor met Swogger in person, he attempted to make a deal in exchange of his testimony, but the prosecutor refused, other than to agree to recommend a different institutional placement for his safety. (State's Lodging A-10, pp. 437-440.) In his 2011 interview, Swogger now says that he received a benefit of being transferred to a Nevada prison where he was held in general population and not in isolation. This is not substantially different from his testimony at trial. He *was* transferred to a different

**MEMORANDUM DECISION AND ORDER - 91**

institution. There is nothing in the record showing that his placement in general population, rather than isolation, was bestowed upon him as a benefit for testifying. It is equally possible that, in Nevada, Swogger was not subject to being threatened or harmed by other inmates, as in Idaho, where, he testified, he feared retaliation from inmates who knew he had testified against another inmate. In any event, benefits received *after* one testifies at trial that were *not promised* before trial do not support a *Brady* claim, because the witness had no sure expectation of receiving a benefit for testifying.

Reviewing the record in its entirety, the Court concludes that Swogger's questionable motives for testifying were fully explored, and he was revealed to be largely an untrustworthy opportunist seeking the best deal that he could get in exchange for his information. His late-disclosed information about the rape of Mrs. Downard was strongly contradicted by the fact that Mrs. Downard was found fully clothed and the rape kits were negative for semen. In his closing argument, the prosecutor explicitly acknowledged some of Swogger's credibility problems, noting that "whether he is a slimy scum bag or whatever you want to call him for ratting on a jail mate, he nevertheless told you what he heard . . . [a]nd you can give it whatever weight you want to." (State's Lodging A-14, p. 2794.)

Regardless of how the initial contact occurred, Swogger admitted that he asked for a deal the first time that he met the investigators in person. He was questioned at trial about other letters in which he exhibited his tendency to seek benefits in exchange for his testimony. The State's recommendation to transfer Swogger for his safety and his understanding that the penalty for perjury was the death penalty were not secrets, as the

**MEMORANDUM DECISION AND ORDER - 92**

jury heard testimony about those things. Petitioner has failed to explain how, assuming the "new" information is true, there is a reasonable probability sufficient to undermine confidence in the outcome of the trial.

The Court concludes that Petitioner has not shown that the prosecution violated *Brady* by not "disclosing" the information Swogger now claims is the truth. The new recantation is unsworn, uncorroborated, and contrary to his sworn testimony. Therefore, there is no admissible evidence showing that the recantation was suppressed or that it is material. Further, no prejudice occurred, because the jury heard substantially the same information at trial and Swogger was a witness wholly without credibility, as the prosecutor acknowledged in closing.

## CLAIM I: ACTUAL INNOCENCE

"Actual innocence"  has been recognized as a "gateway through which a habeas petitioner [can] pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Neither the United States Supreme Court nor the Ninth Circuit has conclusively determined whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Herrera*, 506 U.S. at 417 ("We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."); *Jones v. Taylor*, 763

F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable.").

Even assuming that a freestanding claim of actual innocence *is* cognizable in a noncapital habeas case such as this one, the Court concludes—on de novo review—that Petitioner has not shown that he is actually innocent. As a result, his freestanding claim is without merit, and this particular avenue for excusing procedural default or the untimeliness of Petitioner's late claims is foreclosed.

### 1.  Standard of Law

To show actual innocence, a petitioner must support his allegations of constitutional error with new reliable evidence that was not presented at trial, *Schlup v. Delo*, 513 U.S. 298 (1995). For example, types of evidence "which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. at 331, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996). Actual innocence must be premised on "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. at 615.

This exception is to be applied only in the "extraordinary" or "extremely rare" case. *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup*, 513 U.S. at 320-21.  In *Larsen v. Soto*, the United States Court of Appeals for the Ninth Circuit summarized the difference between those cases that meet the high actual innocence standard, and those that do not:

The *Schlup* standard "is demanding," *Perkins*, 133 S.Ct. at 1936, and precedents holding that a habeas petitioner satisfied its strictures have typically involved dramatic new evidence of innocence. In *House*, for instance, DNA evidence established that semen found on a murder victim came from the victim's husband and not from House, *see* 547 U.S. at 540–41, 126 S.Ct. 2064, and there was evidence that the husband had a history of violence toward his wife, raising an inference that he "could have been the murderer," *id.* at 548, 126 S.Ct. 2064. In *Carriger*, the prosecution's chief trial witness had confessed in open court that he himself (and not Carriger) had committed the murder for which Carriger had been convicted. *See* 132 F.3d at 471–72. In contrast, we have denied access to the *Schlup* gateway where a petitioner's evidence of innocence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt. *See, e.g., Lee v. Lampert*, 653 F.3d 929, 943–46 (9th Cir. 2011); *Sistrunk v. Armenakis*, 292 F.3d 669, 675–77 (9th Cir. 2002). Thus, to satisfy *Schlup*, the petitioner's new evidence must convincingly undermine the State's case. However, definitive, affirmative proof of innocence is not strictly required. As we explained in *Carriger*, a *Schlup* claim "is procedural, not substantive": a petitioner's new evidence must be sufficient to undermine a court's confidence in his conviction, but not to erase any possibility of guilt. 132 F.3d at 478.

742 F.3d 1083, 1095-96 (9th Cir. 2013).

The evidence supporting an actual innocence claim must be "newly presented" evidence of actual innocence, meaning that "it was not introduced to the jury at trial." However, the evidence need not be "newly discovered," meaning that it could have been available to the defendant during his trial. *Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir. 2003).

Because of the importance of the evaluation of actual innocence, a district court "is not bound by the rules of admissibility that would govern at trial" and can consider evidence that is "claimed to have been wrongly excluded" or which "became available only after the trial." *Schlup*, 513 U.S. at 328. Although inadmissible evidence may be considered, its reliability still must be evaluated by the court. Similarly, the district court

may evaluate the credibility of witnesses who testified at trial in light of the newly
discovered evidence. 513 U.S. at 330–32. A petitioner meets the threshold requirement if
he persuades the district court that, in light of the new evidence, no juror, acting
reasonably, would have voted to find him guilty beyond a reasonable doubt. 513 U.S. at
327.

### 2.  Discussion

Nothing in the Victor Rodriguez file shows that Petitioner is factually innocent.
The record was already replete with evidence that Jeff has threatened violence and acted
out in violence against his ex-wives. Nothing in the Rodriguez file links him to the
Downard crimes. Random propensity evidence of an alternate perpetrator does not show
that Petitioner is innocent.

Reviewing the other evidence in the record, the Court concludes that little, if
anything, points to the actual innocence of Petitioner. While Petitioner broadly attacks the
unanimous adverse opinions from the experts on both sides, he has not come forward
with any well-reasoned legal argument sufficiently undermining those opinions in the 20
years since trial. Nor has Petitioner provided any facts showing that new experts would
not reach the same opinions.

Beyond the unanimous forensics evidence, there is substantial testimonial
evidence from people close to Petitioner that points to him as the perpetrator. It was clear
from the record that Mrs. Huffaker knew Petitioner extremely well and treated him like a
son. Petitioner has not shown that Mrs. Huffaker had any kind of improper motive for
testifying about Petitioner the way that she did; in fact, it was clear that, early in the

investigation, she wanted to protect Petitioner. Later on, as Petitioner said and did more disturbing things tied to the Downard case, Mrs. Huffaker disclosed them to authorities, because she, personally, began to fear Petitioner.

Though as a 64-year-old, she had some difficulty after four years had passed in pinning down the date that the crying and upset Lanny Smith met them after a gambling trip, Mrs. Huffaker never wavered in her reports of Petitioner's odd statements and behavior after the crime, including her assertion that Petitioner told her he had been at the Downards on the date of the murders. Petitioner's counsel wrote a letter to Mrs. Huffaker after trial "asking her if her testimony would still remain the same, if anything has changed since the trial; and, you know, to let me know if there is anything that you would like to talk about." (Dkt. 63-3, p. 1.) Mrs. Huffaker never responded to Petitioner's counsel. Nor has Petitioner come up with anything from either of the Huffakers showing that Mrs. Huffaker's testimony and view of Petitioner's involvement in the Downard murders had changed. While there was some evidence in the record that Victor Rodriguez had instructed Mrs. Huffaker not to cooperate with interviews by the defense team, nothing shows that Rodriguez influenced the content of her testimony.

Other evidence of Petitioner's fondness for older women existed but was not admitted at trial. Petitioner's grandmother had died in June of 1991, less than a year before the Downards' murders in March 1992. (State's Lodging A-9, p. 1463.) Petitioner's father told the presentence investigator that Petitioner "was extremely upset over his grandmother's death." (*Id.*, p. 3.)

The presentence investigation report included these statements by Petitioner:

> [Lanny] Smith ... describ[ed] how his grandmother would come
> regularly to his home and care for his mother [who had severe epilepsy]
> and the children. [Lanny] Smith declared a very close relationship with his
> grandmother, and even though she had died approximately five years ago,
> [Lanny] Smith became visibly emotional at discussing her. He stated he
> still misses her very much and she *is the only member of his family that he*
> *associated with as "I loved."*

(State's Lodging A-15, p. 2 (emphasis added).)

Another instance involving an older woman was that Petitioner's golf course

supervisor reported that Petitioner once approached an older female golfer, asked her for

a hug, and then fondled her breasts. (State's Lodging A-15, p. 3.) The prosecutor was

prepared to call the 50-year-old woman to testify at trial, but the evidence was not

permitted because it was too prejudicial. (State's Lodging A-11, p. 2076.) In yet another

instance, a male acquaintance of Petitioner was prepared to testify that Petitioner reported

that he paid $100 for a 50-year-old prostitute in Las Vegas, and said that he "liked them

older," when the witness said that Petitioner should have hired a younger prostitute for

that amount of money. (*Id.*, pp. 2071-72.) That evidence also was not admitted due to its

prejudicial nature.

Though the defense has consistently maintained that Petitioner did not have the

character traits or ability to carry out a crime like the Downards' murder, the prosecution

had evidence to contradict those assertions. The prosecution had ready an instance of

Petitioner harassing and stalking a female coworker (not an elderly woman), culminating

in a possible break-and-entry into her home. Teresa Lane, who worked with Petitioner at

J.J. North's, would have testified that Petitioner talked to her about women's nipples,

stared at her breasts, brushed up against her body at work in an inappropriate and

**MEMORANDUM DECISION AND ORDER - 98**

offensive manner, and asked her a series of questions about her husband's habits and her home, as if he was contemplating breaking into her house. Later, someone did break into her house, but tripped over a dog bowl and left suddenly. (State's Lodging A-11, pp. 1929-30.)

Other testimony not admitted at trial showed that Petitioner had maintained a relationship with the Downards, despite his consistent story that he had not been to the Downards for many years, (State's Lodging B-1, p. 43 (emphasis in original).)[19] In a 1991 interview with police investigators, Petitioner's mother, Julia Smith, said that Petitioner went to the Downards often and brought her produce from their garden (the Downards owned an empty lot next to their home on which they maintained a large garden). (State's Lodging A-4, p. 881.)

Petitioner's mother was not permitted to testify, nor were her 1991-92 statements to police investigators admitted, because at the time of trial, she suffered from bouts of confusion and sometimes lacked lucidity due to her epilepsy. Prosecutors made an offer of proof as to Julia's proposed testimony, and pointed to factual consistencies between Julia's interview responses and other evidence in the case to demonstrate that the interview responses were reliable when made. In that interview, Julia Smith said that it was Petitioner, not Jeff, who was violent, explosive, and smart enough to plan such a murder: "Jeff is too stupid" to make such a plan, Julia commented, but "Lanny is a

---

[19]     James Olson testified that he was Petitioner's shift supervisor at J.J. North's Grand Buffet between September 1993 and December 1994. In a casual conversation after the murders but before Petitioner was a suspect in the crime, Petitioner told Olson that Petitioner had never lived in Ammon and had not been there for years. Petitioner also told Olson that Petitioner didn't own any guns and was not interested in guns and would never have one. (State's Lodging A-11, pp. 1945-52.)

**MEMORANDUM DECISION AND ORDER - 99**

thinker, calculating, would plan it, out and not leave fingerprints." (State's Lodging A-4, p. 882.)

Like Mrs. Huffaker, Julia reported that Petitioner had been very upset the night of the murders, calling her in tears and telling her that he had done something terrible. (State's Lodging A-4, pp. 501-02; 866-71.) Petitioner admitted to investigators that he had called his mother, but he heavily emphasized that he wasn't crying. (Dkt. 134-7.) Julia also knew that the murder weapon was a .22 before investigators spoke to her.

Other evidence at trial showed that Petitioner had a negative change of personality and habits shortly before and continuing after the date of the murder. This evidence was provided by friends and coworkers, who had little or no motive to pin the murder on Petitioner. Contrarily, evidence from other witnesses showed that Jeff was in a much more positive mood during the time period in question.

Petitioner often visited and sometimes performed work for Scott and Christie Wessell. He even babysat and transported their children from time to time. At trial, Christie Wessell testified that a few days before the shootings, Petitioner was acting "kind of down," and asked them, "If you shot someone in the head with a .22, would it kill them?" (State's Lodging A-9, p. 1472.) She also testified that, when she mentioned to Petitioner the fact that the Downards' bodies had been discovered, he did not respond at all, which she thought was strange. (*Id*., p. 1473.) Scott Wessell testified similarly about the gun comment, and also testified that Petitioner told him he had bought a bathrobe for an older lady, not his mother. (*Id*., p. 1458-61.)

Petitioner's coworker, Mike Johnson, saw the gun wrapped in carpet in Petitioner's car on the day of the shooting. (State's Lodging A-11, p. 1906.)  Don J. Fronger, greens superintendent of the Pinecrest Golf Course, had a conversation with Petitioner after the murder charges against Jeff were dismissed. Petitioner told Fronger he had the rifle that day, and he had gone out target practicing. Fronger asked him why he had gone, and Petitioner said that he had missed a deer two years before that. Fronger then asked him why he hadn't taken his deer rifle, and Petitioner responded that he just took the .22. (State's Lodging A-11, p. 1957-58.)

Fronger also asked Petitioner if he had killed the Downards. Petitioner replied, "Do you think I could do something like that?" Fronger testified that Petitioner did not ever say that he did not shoot the Downards. (*Id.*, p. 1958.)

Tim Losche, who worked at the Pinecrest Golf Course, heard the conversation between Fronger and Petitioner and said Petitioner told Fronger he took the .22 because the bullets were less expensive than for the deer rifle. (State's Lodging A-11, pp. 1966-67.) Losche testified that, after the death of the Downards, Petitioner was not as clean as he used to be—he would wear a dirty shirt to the golf course, not wash his hands after using the bathroom, and not change his stained clothing between his J.J. North's job and his golf course job. (*Id.*, p. 1968.)

The two brothers' reactions to the news of the Downards' death were quite different. When Petitioner was told about the Downards' death by investigators, Petitioner showed little reaction, other than saying, "They were nice people." In contrast, Officer Albert Thompson testified that, when he first informed Jeff that the Downards

**MEMORANDUM DECISION AND ORDER - 101**

had been killed, Jeff "outright started bawling. He apologized for bawling. And told me that he normally doesn't cry." When asked if Jeff's reaction to the information of the death of the Downards appeared to be spontaneous, the officer replied, "Yes, it did." (State's Lodging A-8, p. 1001.)

Jeff's shoes were found in an extremely muddy condition from his work during the day, such that his shoe could not have left the impression in the dust of the Downard bedroom, but Petitioner's shoes that matched the dust shoe print were found clean. (Dkt. 134-10, p. 20.)

Petitioner has been afforded an opportunity to have a fair amount of discovery in this case, and he has found nothing that bears on the testimony of the witnesses who have tied him to having the shoes, the gun, and the motive to kill the Downards. His new finds are not enough to warrant a hearing because they all relate to collateral issues. The "new evidence" does not lead the court to conclude that it is more likely than not that no reasonable juror would have convicted Petitioner if the jury had evaluated the newly-presented evidence. Petitioner has not presented a credible claim of "factual innocence." Those witnesses who provided testimony about motive and presence at the Downards' home stand unchallenged. For all of the foregoing reasons, and those others cited throughout this Order, the Court rejects Petitioner's claim of actual innocence, both as a stand-alone claim and as a gateway to overcome procedural default or untimeliness.

**MEMORANDUM DECISION AND ORDER - 102**

## MOTION FOR DISCOVERY
## AND CERTIFICATE OF APPEALABILITY

Petitioner requests additional public funds to conduct testing on the physical evidence. The Court concludes that Petitioner has not shown that his constitutional rights were violated or that he has a viable actual innocence claim. Many of the claims in his Petition are far-fetched, and some border on frivolous. Considering the limited nature of federal habeas corpus review and balancing the rights of Petitioner to a constitutionally adequate defense, the lack of merit of Petitioner's claims, the need of the victims' families for closure, the interest of the state of Idaho in the finality of its judgments, and the cost to the taxpayers, the Court concludes that justice would not be served by allocating further resources to Petitioner for additional discovery.

The Court's second, more extensive review of this case shows that, as to many issues, Petitioner has skimmed what appear to be shocking facts from their context; when the Court carefully reviews the assertions against the record, Petitioner's purported "facts" lack record support. While the record clearly reflects several instances of unprofessional and wrongful action on the part of the government, no prejudice resulted therefrom. As a result, the Court will not grant a certificate of appealability on any aspect of Petitioner's claims except the narrow question of whether counsel was ineffective regarding a rebuttal to the Greenwade testimony. This Court is now of the opinion that Petitioner has not presented any other issues that are adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**MEMORANDUM DECISION AND ORDER - 103**

## ORDER

**IT IS ORDERED:**

1. The Order and Judgment previously entered in this action (Dkts. 112, 113) are VACATED.

2. Petitioner's Motion for Additional Discovery and to Release Evidence (Dkt. 138) is DENIED.

3. Respondent's Motions for Extension of Time to file Answer (Dkts. 140 & 142) are GRANTED.

4. Petitioner's Second Petition for Writ of Habeas Corpus is DISMISSED with prejudice.

5. The Court will not issue a certificate of appealability on any aspect of Petitioner's claims except the narrow question of whether counsel was ineffective regarding a rebuttal to the Greenwade testimony.

6. Upon the filing of a timely notice of appeal, the Clerk of Court shall forward the necessary paperwork to the Court of Appeals for the Ninth Circuit.

DATED: March 31, 2016

Edward J. Lodge
United States District Judge